Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

DAVID FLOYD, *et al.*,                    08 Civ. 01034 (SAS)

        **Plaintiffs,**

   -against-

                         **DECLARATION**

THE CITY OF NEW YORK, *et al.*,

        **Defendants.**
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ /


## DECLARATION OF JOO-HYUN KANG IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR STAY

    I, Joo-Hyun Kang, pursuant to 28 U.S.C. § 1746 and subject to the penalties of perjury, state the following is true and correct:

    1.    I submit this affidavit in support of Plaintiffs' opposition to Defendants' Motion to Stay the Court's Order Regarding Injunctive Relief. I am not a party to the above-captioned case.

    2.    I have been the Director for Communities United for Police Reform (CPR) since 2012. Among other responsibilities, in this position I coordinate planning and implementation of the coalition's multiple strategies (including policy, legal, community education, organizing, research, communications) to end discriminatory policing; represent the campaign/coalition in meetings with elected officials; serve as a media spokesperson for CPR; provide strategic direction to the member organizations; meet with, organize, and speak to hundreds of community members impacted by discriminatory police practices, including illegal stops and frisks.

    3.    I have been involved with police accountability issues in New York City since the mid-1990s. From 1996 to 2003, I served as the Executive Director of the Audre Lorde Project, a

community center for Lesbian, Gay, Bisexual, Transgender communities of color. In this capacity I was a founding member of the NYC Coalition Against Police Brutality (CAPB) which included and worked with a wide range of grassroots community organizations committed to police reform. As a founding member of CAPB, I organized, educated, and advocated to end discriminatory policing within lesbian, gay, bisexual and transgender communities of color, and helped to organize community rallies, events and forums aimed at achieving accountability for various cases of police brutality, including the torture of Abner Louima and death of Amadou Diallo in the late 1990s.

4.     I am the co-author of "Organizing at the Intersections: A Roundtable Discussion of Police Brutality Through the Lens of Race, Class, and Sexual Identities", found in Zero Tolerance: Quality of Life and the New Police Brutality in New York City, editors Andrea McArdle and Tanya Erzen, New York University Press, 2001.

5.     Around the year 2007, I worked with other grassroots organizations to co-found the People's Justice coalition following the killing of Sean Bell and other high profile police shootings. People's Justice is a coalition of grassroots organizations committed to educating communities of color about their rights when interacting with police.

**Communities United for Police Reform ("CPR")**

6.     CPR, launched in 2012, is a non-partisan, multi-strategy campaign and coalition to end discriminatory policing practices in New York City. CPR works for lasting change that promotes public safety and policing practices based on cooperation and respect rather than discriminatory targeting and harassment of particular communities.

7.     CPR includes over 60 organizations from across New York City whose members include community members residing in neighborhoods with high crime rates, lawyers,

2

researchers, and activists. The organizations in our coalition represent community members from all five boroughs, different walks of life and include individuals with family members who are police officers. The majority of our member organizations are grassroots organizations whose constituencies, memberships or clients are based primarily in low-income communities of color. Members of these communities bear the brunt of the New York City Police Department's ("NYPD") unjust stop and frisk policies. This includes organizations that have been leading work on police reform in African American, Latina/o and immigrant communities; organizations representing lesbian, gay, bisexual, and transgender communities; and youth organizations. Notably, young people of color have been documented as those most often impacted by the NYPD's stop and frisk practices.

8.      In addition, CPR partners with a broad range of additional organizations to advance our effort to create a safer New York City for everyone. Many of our partners work on behalf of the communities most unfairly targeted by the NYPD's stop and frisk practices.

9.      CPR's work is largely focused on police reform, particularly centering on the experiences of those directly affected by discriminatory NYPD policies and practices. Relevant examples include but are not limited to:

   a.  CPR organized a citywide coalition of over 100 community organizations, labor unions, advocacy organizations and others to pass two important pieces of legislation in the City Council directly relevant to increasing NYPD accountability: Intro 1079, a local law to create a clear mechanism for NYPD oversight and increased transparency through establishment of an Inspector General, and Intro 1080, a ban on bias-based profiling. The City Council overrode the Mayor's vetoes on both bills.

    b. Our members hold educational and organizing sessions in local communities, including conducting "Know Your Rights trainings" to increase the safety of community members during police encounters and to educate ourselves around issues related to discriminatory policing.

    c. In collaboration with the Center on Race, Crime and Justice at John Jay College of Criminal Justice, we launched a website, www.stopandfriskinfo.org, compiling academic and public policy research on policing.

10.     Members of CPR organizations regularly express the concerns of community members impacted by abusive policing practices in many public arenas and media outlets. For example, members have testified about their discriminatory stop and frisk experiences in front of numerous venues, including the New York City Council, at press conferences, at town hall meetings across the city, and in front of the Congressional Black Caucus (CBC), Congressional Progressive Caucus (CPC), Congressional Hispanic Caucus (CHC), and Congressional Asian Pacific American Caucus (CAPAC) in Washington DC. In addition, CPR members have been quoted on policing, police oversight and police reform in the City of New York in media outlets as diverse as Associated Press, The New York Times, the Staten Island Advance, Black Entertainment Television, and Amsterdam News.

11.     At different times CPR or its member organizations have been involved in *Daniels v. City of New York* and *Floyd v. City of New York* and have a strong interest in the outcome of stop and frisk reform efforts. On March 3, 2013, CPR submitted a motion for leave to file an *amicus curiae* brief in support of Plaintiffs' remedial proposals in *Floyd*. On August 13, 2013, the Court granted this motion and accepted the brief as filed. (Dkt. # 377.) In addition, on May 16, 2012, the Court granted a request by members of CPR (Bronx Defenders,

4

Brotherhood/Sister Sol, the Justice Committee, Picture the Homeless, and Streetwise and Safe) to submit an *amicus curiae* brief in support of Plaintiffs' motion for class certification. (Dkt. # 208.) Most recently, members of CPR organizations and our partners attended the historic nine-week trial nearly every day. CPR and several of its member groups are committed to play a role in the joint remedy process the Court ordered as part of the injunctive relief in this case.

### Background: Floyd Trial and Decisions in the Context of the Police Reform Movement

12.    *Floyd* and *Daniels* have been linked to police reform efforts since their initial filing. Members of grassroots organizations have served as class representatives in both cases. Community organizations have filed amicus briefs before this Court when several important motions were filed by Plaintiffs' lawyers. CPR and/or its member organizations mobilized to attend the trial and are committed to play a role in the joint remedy process.

13.    Since the notorious death of Amadou Diallo at the hands of the Street Crimes Unit in the late-1990s, grassroots community organizations have sought reform of the NYPD's stop and frisk practices and an end to discriminatory policing. Even though the Justice Committee of the National Congress for Puerto Rican Rights (a grassroots organization that represented the interests of many New Yorkers illegally stopped, frisked and subjected to excessive force) was an original named-plaintiff in the *Daniels* lawsuit, many were skeptical that a court would be able to address this intractable problem.

14.    Yet, fourteen years later, community members impacted by unjust police practices sat in court each day, listening to weeks of trial testimony, hopeful that they, their family members and their communities would finally obtain justice. This chorus of community observers included mothers and family members of young men shot and killed at the hands of police officers. For community members routinely stopped and frisked, for no reason, witnessing the NYPD on trial for abusive conduct was an important moment in our City's history.

5

15.     The *Floyd* trial provided a pivotal moment in the decades-long movement for police accountability in New York City. In my various capacities as a long-time police reform advocate in New York City, I have spoken to a diverse array of hundreds of New Yorkers impacted by stop and frisk practices and other police misconduct. I have had the opportunity of meeting and hearing stories first hand from mothers, siblings, children, grandmothers, and partners of community members who have faced abuse from police officers. I have heard from many of them over the years a feeling that nothing will change the discrimination and abuse they face from police.

16.     Community members trusted that the evidence presented in court—mirroring the experiences of many friends, family members and themselves—would lead the Court to determine what has become axiomatic in Black and Latino neighborhoods: NYPD officers stop, frisk, search and use force against large numbers of Black and Latino New Yorkers for no reason other than race.

17.     The Court's August 12, 2013 decisions were embraced by CPR and its member organizations as a victory for all New Yorkers, especially for our constituents most affected by illegal stop and frisk practices. The fact that the Court not only acknowledged what we have known and experienced for years, but also put into place a collaborative remedial process that will include input from both law enforcement and community members gives community groups the sense that justice is available to them. The Court's decision has built confidence in the federal judiciary and the ability for the court system to make a difference in the lives of real people. For the legal system to protect marginalized communities is an ideal that many have heard about but few of the most affected community members have actually experienced.

18.     At the same time, CPR and its members are not blind to the difficulty of reform and have experienced the recalcitrance and stubbornness of the NYPD. The *Floyd* verdict, along with the recent passage of Intro 1079 and 1080, has created guarded optimism that real reform is possible in the next few years. Members of CPR's community based organizations hope that the injunctive relief ordered in *Floyd* will curtail the NYPD's unconstitutional stop and frisk practices, including racial profiling; create meaningful accountability for rights violations; and increase transparency through the joint remedy process.  It is the first step in the path to meaningful reform. Our member organizations understand that change on the scale required here doesn't happen overnight. The community members and organizations I represent are committed, willing and able to engage in the joint remedy process. The collaborative reform process the Court ordered will assist people impacted by illegal stops and frisks become part of the solution, and by doing so, help New York City become safer for everyone.

**Years of Delay will Harm Court Ordered Reform Process and the Public's Interest**

19.     The City's motion for a stay is against the public interest for two reasons. First, delaying the reform process for years will eliminate the opportunity for CPR to ensure community input into the joint remedy process by building on the current consensus that stop and frisk practices must be reformed. Second, the court system's interest in protecting marginalized members of the community will seem hollow if a stay is granted. I fear that *Floyd* will become a case of justice delayed is justice denied.

20.     Granting a stay will break the existing momentum across the city to change the NYPD's stop and frisk practices. Right now, community members are willing to work with the police department to build back public trust and understand that reform may take time. But

7

justice delayed for years while appeals are decided may turn a positive step towards reform into a victory in name only.

21.    CPR and its members believe more than a victory on paper is necessary. The decision to use community knowledge has built confidence among groups whose primary experience of the legal system and policing authorities is distrust. A stay would undermine this confidence and therefore make a truly collaborative reform process less likely to succeed. Granting a stay in many ways would reinforce the NYPD's position that it is an intolerable infringement for them even to engage in a meaningful dialogue with the communities they serve.

22.    In addition, a stay which delays the reform process and implementation of concrete change, potentially for years, could lead community members impacted by unconstitutional stop and frisk practices to lose confidence in the Court ordered remedies. I am concerned that a stay will cause young Black and Latino New Yorkers, their mothers and our organizers to lose trust and confidence that the NYPD can ever formally be held accountable for unconstitutional practices. The *Floyd* decision marks one of the few moments in years where I can recall hearing grassroots community members say that real change is possible. As a result of the decision, some believe that someday soon young people will not be thrown against the wall to meet a quota. Others believe diverting resources away from stop and frisk will lead to smarter policing and safer communities. And some await a day when a stop by a police officer doesn't lead to sexual harassment or inappropriate physical conduct. For the community members illegally stopped, frisked and searched every day (and their families and communities), a stay signals that unjust practices can continue with no recourse.

23.     For all of the reasons provided above and interest of justice, CPR strongly urges this Court to deny the City's motion for a stay of its August 13, 2013 opinions and orders.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: September 6 , 2013

Joo Hyun Kang

Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID FLOYD, et al.,

Plaintiffs,

\- v -

THE CITY OF NEW YORK, et al.,

Defendants.

No. 08 Civ. 1034 (SAS)

**DECLARATION OF
COUNCIL SPEAKER
CHRISTINE C. QUINN**

COUNCIL SPEAKER CHRISTINE C. QUINN declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1.     I am the Speaker of the Council of the City of New York (the "Council"). I represent Council District 3 in the borough of Manhattan and have been a member of the Council since 1999. I was elected Speaker in 2006.

2.     The Council District I represent has over 170,000 constituents, approximately one-third of whom are non-White.

3.     In my capacity as Council Speaker, I have worked closely with the New York City Police Department ("NYPD") to ensure the safety of the residents of New York City and have a deep appreciation for the challenges faced by the NYPD. In addition, I communicate regularly with residents of my Council District and the City at large and have received hundreds of informal complaints from the public about being stopped and frisked by members of the NYPD without reasonable suspicion.

4.     Beginning in March 2013, I co-sponsored legislation in the Council that would require the Commissioner of the Department of Investigation to investigate, review, and make recommendations relating to the policies and practices of the NYPD on an ongoing basis. This bill passed on June 27, 2013, by a vote of 40-11. Mayor Bloomberg vetoed the bill and the

1

Council overrode the Mayor's veto by a vote of 39-10 on August 22, 2013. The NYPD, however, has continued to resist the Council's efforts to monitor and reform the stop and frisk program.

5.      The City's decision to seek a stay from this Court's remedy opinion follows a similarly disheartening pattern. The NYPD has a longstanding track record of refusing to participate in a meaningful reform of the NYPD's stop and frisk policies. For example, the Council passed a local law as early as 2001 requiring the NYPD to report statistics on various practices, including stop and frisk.[1]  Yet the NYPD repeatedly refused even to provide the Council with the required data in a usable format until after a court ordered it released in response to a Freedom of Information Law request.

6.      In addition, the NYPD refused to participate in three public hearings organized by the the Black, Latino, and Asian Caucus of the City Council in October 2012. And the Court itself noted that the City refused to participate in a joint effort to craft the remedies in this case. The City's request for a stay in this action appears to be yet another attempt to avoid engaging in necessary reforms.

7.      I oppose the City's request for a stay because the joint remedial process is integral to repairing the damage in community relations caused by the current stop and frisk policies and to meaningfully move forward towards achieving reforms that balance the need for effective policing policies with protections for the constitutional rights of every New Yorker and, in particular, New York City's minority residents.

8.      I see no reason why the Court-ordered joint remedial process—as well as the appointment of an independent monitor—will cause the NYPD "irreparable harm," as the City claims. Rather, the joint remedial process will facilitate a much-needed dialogue between the

---

[1] *See* N.Y.C. Admin. Code § 14-150(a)(5).

NYPD and the community. And the appointment of a monitor will only set in motion an in-depth probe into how the NYPD can implement meaningful reform. These remedies would represent welcome progress regardless of the outcome of the City's appeal.

9.  I also disagree with the NYPD's claim that a stay would be in the public interest. Based on my perspective as Speaker of the City Council, the public has a strong interest in beginning the remedial process immediately and ending the practice of unconstitutional stops, with the dual goals of securing the liberties guaranteed by the Constitution, as well as fostering the kind of community trust in the NYPD that can ultimately contribute to its efforts to reduce crime.

10.  The NYPD's stop and frisk policy has gone on for far too long, resulting in harm not only to those who have been unconstitutionally stopped, but to the City as a whole as public concern over the practice has bred mistrust between the City's residents and the police charged with protecting them. Contrary to the City's argument for a stay of this Court's remedial order, it is a *delay* in implementing important and necessary reforms – delay that could last months or even years while an appeal is resolved – that would cause irreparable harm to the City and its residents.

11.  The Court-ordered remedies should therefore be allowed to take effect, regardless of what happens with the City's appeal in this case.

Dated: New York, New York
September **5**, 2013

CHRISTINE C. QUINN, SPEAKER
COUNCIL OF THE CITY OF NEW YORK

Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID FLOYD, et al., <br><br> Plaintiffs, <br><br> - v - <br><br> THE CITY OF NEW YORK, et al., <br><br> Defendants. | No. 08 Civ. 1034 (SAS) <br><br> **DECLARATION OF COUNCIL MEMBER ROBERT JACKSON** |

COUNCIL MEMBER ROBERT JACKSON declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1.    I am a member of the Council of the City of New York (the "Council") and Co-Chair of the Council's Black, Latino and Asian Caucus (the "BLAC"). I represent Council District 7 in the borough of Manhattan and have been a member of the Council for 11 years.

2.    The Council District I represent has approximately 156,000 constituents, 75% of whom are Black or Latino. Collectively, the 27 districts represented by the BLAC have over 4 million constituents, approximately 73% of whom are Black or Latino.

3.    In my capacity as a Council Member, I communicate regularly with my constituents. My staff and I have received hundreds of informal complaints from the public about being stopped and frisked by members of the New York Police Department ("NYPD") without reasonable suspicion.

4.    In my capacity as Co-Chair of the BLAC, I can attest to the fact that other members of the BLAC also receive complaints from constituents about suspicionless stops by

the NYPD on a regular basis.  Each of the BLAC's 27 members reports receiving, on average, two or three complaints every month about the NYPD's stop and frisk policies and practices.

5.      Members of the BLAC and I have worked to change the NYPD's stop and frisk policies and practices for years.  It is our belief that the NYPD's practices reinforce negative racial stereotypes and create distrust of the NYPD on the part of Black and Latino residents of New York City.  This distrust hampers efforts by the BLAC, including by my staff and me, to bring the community and NYPD together to deal with issues of crime and quality of life.  It is also my belief that the distrust of the NYPD which stems, in part, from its stop and frisk policies and practices, spills over into other institutions of government, making it more difficult for members of the BLAC and me to engage youth and other constituents, in an effort to solve persistent community problems.

6.      The Council and its members, including members of the BLAC, have taken significant actions to reform the NYPD's stop and frisk practices, including (a) passage of the Community Safety Act, which bans racial-profiling and requires the Commissioner of the Department of Investigations to investigate, review, and make recommendations relating to the policies and practices of the NYPD on an ongoing basis; (b) advocacy on behalf of individual constituents, and (c) direct communications with the NYPD to advocate a change in current practices.  With the Court's recent opinion and order[1]  regarding injunctive relief, we are encouraged that the NYPD must finally reform its stop and frisk policies to ensure that the constitutional rights of all New Yorkers are not being infringed upon.

---

[1] *Floyd v. City of New York*, No. 08-Civ-1034 (S.D.N.Y. August 12, 2013) (ECF No. 372) (the "Remedies Opinion").

7.    The BLAC, however, is disheartened and frustrated that the Bloomberg administration and the NYPD are seeking to stay the implementation of the remedies outlined in the Court's Remedies Opinion.

8.    The City's decision to seek a stay follows a familiar pattern.  The City has an longstanding track record of refusing to participate in meaningful reform of the NYPD's stop and frisk policies.  For example, the Council passed a local law as early as 2001 requiring the NYPD to report statistics on various practices, including stop and frisk.[2]  Yet the NYPD repeatedly refused even to provide the Council with the required data in a usable format until 2008, after a court ordered it released in response to a Freedom of Information Law request.

9.    In addition, the NYPD refused to participate in three public hearings organized by the BLAC in October 2012.  And the Court itself noted that the City refused to participate in a joint effort to craft the remedies in this case.  The BLAC believes that the City's request for a stay in this action is yet another attempt to avoid engaging in necessary reforms.

10.    In the Remedies Opinion, the Court calls for community leaders, civic groups and other stakeholders to engage in a joint remedial process with the City and the NYPD. (Remedies Op. at 30.)  This court-ordered remedial process—seeking "input from those who are most affected by the NYPD's use of stop and frisk"—is exactly the type of dialogue that the BLAC has sought to engage in with the City and the NYPD for years with little avail.  (*Id.* at 31.)  The BLAC believes that this court-ordered dialogue will finally force the NYPD to meaningfully engage with communities of color and to confront the reality that current stop and frisk policies reinforce negative racial stereotypes and engender a distrust of the police.

---

[2] *See* N.Y.C. Admin. Code § 14-150(a)(5).

11.     The BLAC opposes the City's request for a stay because the joint remedial process is integral to repairing the damage in community relations caused by the current stop and frisk policies and to meaningfully move forward towards achieving reforms that balance the need for effective policing policies, with protections for the constitutional rights of every New Yorker and, in particular, New York City's minority residents.

12.     I see no reason why the Court-ordered joint remedial process—as well as the appointment of an independent monitor—will cause the NYPD "irreparable harm," as the City claims.  Rather, the joint remedial process will facilitate a much-needed dialogue between the NYPD and the community.  And the appointment of a monitor will only set in motion an in-depth probe into how the NYPD can implement meaningful reform.  These remedies would represent welcome progress regardless of the outcome of the City's appeal.

13.     I also disagree with the NYPD's claim that a stay would be in the public interest.  The public has a strong interest in beginning the remedial process immediately and ending the practice of unconstitutional stops, with the dual goals of securing the liberties guaranteed by the Constitution, as well as fostering the kind of community trust in the NYPD that can ultimately contribute to its efforts to reduce crime.

14.     The NYPD's stop and frisk policy has gone on for far too long, resulting in harm not only to those who have been unconstitutionally stopped, but to the City as a whole as public concern over the practice has bred mistrust between the City's residents and the police charged with protecting them.  Contrary to the City's argument for a stay of this Court's remedial order, it is a *delay* in implementing important and necessary reforms – delay that could last months or even years while an appeal is resolved – that would cause irreparable harm to the City and its residents.

15.     The Court-ordered remedies should therefore be allowed to take effect, regardless of what happens with the City's appeal in this case.

Dated:  New York, New York
        September 5, 2013

_____
ROBERT JACKSON, MEMBER
COUNCIL OF THE CITY OF NEW YORK

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID FLOYD, et al.,

                    Plaintiffs,

        - v -

THE CITY OF NEW YORK, et al.,

                  Defendants.

No. 08 Civ. 1034 (SAS)

DECLARATION OF NEW
YORK CITY COUNCIL
MEMBER HELEN D. FOSTER

      NEW YORK CITY COUNCIL MEMBER HELEN S. FOSTER declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

      1.      I submit this affidavit in support of Plaintiffs' opposition to Defendants' Motion to Stay the Court's Injunctive Relief.  I am not a party to the above-captioned case.

      2.      I am an elected member of the Council of the City of New York (the "Council"). I represent Council District 16 in the Bronx and have been a member of the Council for 11 years.

      3.      I also serve on the Council's Public Safety Committee, which is responsible for legislatively overseeing the New York Police Department ("NYPD") and the NYPD's Civilian Complaint Review Board ("CCRB").

      4.      The Council District I represent, District 16, has over 175,000 constituents, more than of 95% of whom are non-White.  District 16 is also one of the poorest council districts in the City.

      5.      Before my election to the Council, I was Assistant Vice President for legal affairs for St. Barnabas Hospital.  I am also a former Assistant District Attorney for New York County.

6.     In my capacity as a Council member, I communicate regularly with my constituents.  My staff and I have received hundreds of informal complaints from the public about being stopped and frisked by members of the NYPD without reasonable suspicion.

7.     In my capacity as a member of the Council's Public Safety Committee, I can attest to the fact that the New York City Police Department's stop and frisk policies are the source of a significant amount of tension between the police and residents of minority communities.  It is my belief that the NYPD's practices reinforce negative racial stereotypes and create distrust of the NYPD on the part of Black and Latino residents of New York City.  This distrust hampers my efforts to bring the community and NYPD together to deal with issues of crime and quality of life.

8.     I was encouraged by the Court's recent opinion and order[1] regarding injunctive relief.  The Court-ordered remedies mean that the NYPD must finally reform its stop and frisk policies to ensure that the constitutional rights of all New York are not being infringed upon.  But I am disheartened and frustrated that the Bloomberg administration and the NYPD are seeking to stay the implementation of the remedies outlined in the Court's Remedies Opinion.

9.     In the Remedies Opinion, the Court calls for community leaders, civic groups and other stakeholders to engage in a joint remedial process with the City and the NYPD.  (Remedies Op. at 30.)  This court-ordered remedial process—seeking "input from those who are most affected by the NYPD's use of stop and frisk"—is exactly the type of dialogue that would generate meaningful reforms.  (*Id.* at 31).

10.     I oppose the City's request for a stay because the joint remedial process is integral to repairing the damage in community relations caused by the current stop and frisk policies and to meaningfully move forward towards achieving reforms that balance the need for effective

---

[1] *Floyd v. City of New York*, No. 08-Civ-1034 (S.D.N.Y. August 12, 2013).

2

policing policies with protections for the constitutional rights of every New Yorker and, in particular, New York City's minority residents.

11.     As a member of the City Council and the Council's Public Safety Committee—as well as a former Assistant District Attorney—I was eager to bring my experience and insight to discussions with the NYPD through the Court-ordered joint reform process.  It is unfortunate that the NYPD is seeking to eschew the process before even sitting down at the table.

12.     The stay is not in the public interest.  Rather, starting the reform process through a dialogue between stakeholders and the NYPD will immediately pave the way for meaningful changes to the NYPD's stop and frisk policies.  Such a dialogue will also ease tensions between the community and the NYPD because the members of the community will see that the NYPD is open to hearing their perspective on the current stop and frisk policies.

13.     The NYPD's stop and frisk policy has gone on for far too long, resulting in harm not only to those who have been unconstitutionally stopped, but to the City as a whole as public concern over the practice has bred mistrust between the City's residents and the police charged with protecting them.  Contrary to the City's argument for a stay of this Court's remedial order, it is a *delay* in implementing important and necessary reforms – delay that could last months or even years while an appeal is resolved – that would cause irreparable harm to the City and its residents.

Dated: New York, New York
    September  5  , 2013

HELEN D. FOSTER, MEMBER
COUNCIL OF THE CITY OF NEW YORK

3

Exhibit E



## THE PUBLIC ADVOCATE FOR THE CITY OF NEW YORK
## Bill de Blasio – PUBLIC ADVOCATE

September 6, 2013

**BY HAND**

Hon. Shira A. Scheindlin
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

*The Clerk of the Court is directed to docket this amicus letter brief. SO ORDERED.*

*Shira A. Scheindlin, USDJ*
*9/6/13*

*9/6/13*

Re:   *Floyd v. City of New York*, 08 Civ. 1034 (SAS)
      *Ligon v. City of New York, et al.*, 12 Civ. 2274 (SAS)

Dear Judge Scheindlin:

New York City Public Advocate Bill de Blasio (the "Public Advocate") respectfully requests leave to submit this letter brief as *amicus curiae* in opposition to the Defendant City of New York's request for a stay pending appeal of the Court's Remedies Opinion and Order, dated August 12, 2013 (the "Remedies Order", *Floyd*, ECF No. 372, *Ligon*, ECF No. 120), issued in conjunction with the Court's Liability Opinion in *Floyd* on the same date (the "Liability Order", ECF No. 373), and the amended preliminary injunction Opinion in *Ligon*, issued on February 14, 2013 (*Ligon*, ECF No. 105), collectively the "District Court Orders."[1] Contrary to the City's contentions, the constitutional rights of New Yorkers should weigh heaviest in the Court's decision whether to stay its Remedies Order. A stay of the Remedies Order will result in irreparable harm to the citizenry of New York by allowing the unconstitutional stop and frisk violations of untold numbers of people to continue, especially and disproportionately in communities of color.

---

[1] The Public Advocate respectfully requests the docketing of this letter on the Court's ECF system in both *Floyd* and *Ligon*. The plaintiffs in *Floyd* and *Ligon* consent to the Public Advocate filing as *amicus curiae*; Defendant City of New York has not yet responded to the Public Advocate's request for consent.



**THE PUBLIC ADVOCATE FOR THE CITY OF NEW YORK**
**Bill de Blasio – PUBLIC ADVOCATE**

**The Public Advocate's Interest In Denying The Stay Of The Remedies Order**

The Public Advocate is one of only three city-wide elected officials, first in line of succession to the Mayor and a member of the New York City Council. New York City Charter ("Charter") §§ 10(a), 22, 24(a). Chief among his responsibilities is monitoring city agencies and officials to ensure compliance with the City Charter. *Id.* § 24(i). The Public Advocate is also the City's ombudsman, required to monitor and investigate the effectiveness of City agency responses to citizen complaints and to recommend measures to improve such responses. *Id.* §§ 24(h) and (f). In short, the Public Advocate is "the citizens' representative or protector," *Boykin v. 1 Prospect Park ALF, LLC*, No. 12 Civ. 06243, 2013 U.S. Dist. LEXIS 111978, at *57 (E.D.N.Y. Aug. 8, 2013), and operates as "a 'watchdog' over City government and a counterweight to the powers of the Mayor." *Green v. Safir*, 174 Misc.2d 400, 403, 664 N.Y.S.2d 232, 234 (N.Y. Sup. Ct. 1997).

Consistent with this role, the Office of the Public Advocate has a long history of investigating "[m]isconduct by those invested with police power." *Id.* The New York Police Department's "stop and frisk" policy is a prime example of a police practice investigated by the Public Advocate. In May 2013, the Public Advocate released a report (the "Report") evaluating the 2012 stop and frisk database that in many ways previewed this Court's findings.[2] The Report concluded, among other things, that while African-American and Latino New Yorkers comprise only 54% of the general population, they constituted 84% of all stops, and 88.8% of the people stopped were not charged.

---

[2] "Stop and Frisk and the Urgent Need for Meaningful Reforms," Office of the Public Advocate for the City of New York, May 2012, *available at* http://advocate.nyc.gov/sites/advocate.nyc.gov/files/DeBlasioStopFriskReform.pdf.



# THE PUBLIC ADVOCATE FOR THE CITY OF NEW YORK
## Bill de Blasio – PUBLIC ADVOCATE

In addition to the Report, the Public Advocate's Constituent Services Department has firsthand experience receiving complaints from constituents regarding stop and frisk, fielding thousands of complaints on the subject. Further, in the summer of 2012, the Public Advocate delivered to City Hall over 5,000 signatures from New Yorkers in support of an Executive Order to dramatically reduce the number of stops made by the NYPD.

Despite presenting these findings to the City and the NYPD, no meaningful changes in the administration, oversight, and application of stop and frisk followed. The District Court Orders invalidating the NYPD's stop and frisk practice as an unconstitutional violation of New Yorkers' Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure and receive equal protection under the law required the City to hear the voices it has long ignored and undertake the remedial efforts it has long resisted.

Accordingly, as the city-wide elected public official charged with "pointing the way to right the wrongs of government,"[3] and one with a track record of shedding light on the unconstitutional wrongs of the City's stop and frisk practice, the Public Advocate has a unique perspective and interest in preserving the Remedies Order and denying the City's request for a stay pending appeal of the District Court Orders.

---

[3] *Green*, 174 Misc.2d at 403, 664 N.Y.S.2d at 234 (recognizing that the Charter Revision Commission, which created the Office of the Public Advocate, envisioned "an independent public official to monitor the operations of City agencies with the view to publicizing any inadequacies, inefficiencies, mismanagement and misfeasance found, with the end goal of pointing the way to right the wrongs of government.").

3



# THE PUBLIC ADVOCATE FOR THE CITY OF NEW YORK
## Bill de Blasio – PUBLIC ADVOCATE

**A Stay Of The Remedies Order Will Not Irreparably Harm The City But Will Cause Irreparable Constitutional Injury To The Citizens Of New York**

The City seeks a stay of the Remedies Order on the ground that, *inter alia*, the City will suffer irreparable harm. But the City has it backwards. It is the irreparable harm to the constitutional rights of thousands of New Yorkers should the Remedies Order *not* be implemented that weighs decisively *against* granting a stay. This Court found, and the Report and thousands of complaints received by the Public Advocate have confirmed, that the way in which the NYPD conducts stop and frisk violates the Fourth and Fourteenth Amendment rights of New Yorkers. The violation of an individual's civil liberties and constitutional rights is *per se* irreparable harm that cannot justify staying an injunction crafted to cease and remedy the violation.[4]

In fact, when faced with similar constitutional violations by a city's police force, courts have refused to stay the implementation of remedial measures. For example, in *United States v. City of New Orleans*, No. 12 Civ. 01924, 2013 WL 492362 (E.D. La. Feb. 8, 2013), the District Court rejected New Orleans' attempt to stay pending appeal the implementation of remedial measures contained in a consent decree. Those measures sought to change the policies and practices of the New Orleans police force, which had been engaged in a pattern and practice of excessive force, unlawful searches and seizures, and discriminatory policing. The District Court denied the stay because "the residents of New Orleans will suffer substantial harm to their interests in having a constitutional police force if the Court grants the City's [stay] motion." *Id.* at *4. The same applies

---

[4] *See* Remedies Order, --- F. Supp. 2d ---, 2013 WL 4046217, at *2-*4 (S.D.N.Y. Aug. 12,2013); *Armstrong v. Brown*, 857 F. Supp. 2d 919 (N.D. Cal. 2012) (denying officials' request to stay system-wide injunctive relief where officials' efforts to comply with Americans with Disabilities Act of disabled state prisoners and parolees had been inadequate, ineffective, and unconstitutional).

 **THE PUBLIC ADVOCATE FOR THE CITY OF NEW YORK**
**Bill de Blasio – PUBLIC ADVOCATE**

with equal force here, where hundreds of thousands of innocent New Yorkers of color have been stopped and frisked and thousands more will follow if the Remedies Order is stayed.

The City's suggestion that harm will come of the additional training ordered by the Court – let alone irreparable harm – is unfounded. Any additional training that results from implementation of the Remedies Order should be conducted in a manner so as not to harm a Police Department that must operate under principles of "courtesy, professionalism, and respect." Research conducted by the Office of the Public Advocate on the manner in which stop and frisk has been utilized supports this Court's holding that increased training must be integrated into the NYPD's on-going operations. Neither the City, the NYPD, nor anyone else will be injured through this training process to ensure constitutional and effective policing.

**The Public Interest Weighs Squarely Against Granting A Stay Of The Remedies Order**

The public interest of New Yorkers requires NYPD policies and practices that comport with constitutional norms. For several years now, the City has refused to engage in effective reform of its stop and frisk policy and practice. As the Report noted, the NYPD announced a series of reforms to stop and frisk in May 2012. These reforms resulted in little substantive change because despite the overall reduction in stops, the proportion involving African-American and Latino New Yorkers remained practically the same. Even now, in the face of a well-reasoned federal judicial opinion supported by record evidence, through its stay application, the City is seeking to avoid continuing to meet with plaintiffs and the court-appointed monitor to discuss the implementation of the Remedies Order. The City's continued stonewalling harms New York, and a stay would reward such obstinance. In case after case, courts have refused to halt the implementation of measures that

5

 **THE PUBLIC ADVOCATE FOR THE CITY OF NEW YORK**
**Bill de Blasio – PUBLIC ADVOCATE**

will remedy a city's constitutional violations where the city has failed to remedy the serious deficiencies on its own.[5]

    The City's unsubstantiated claim that crime will rise if the NYPD is required to depart from the unconstitutional way it conducts stop and frisk provides no basis for a stay. Recent events in New York City and peer-reviewed research suggest that there is no correlation between a heavy reliance on stop and frisk and a decline in crime. According to the City's own data, the use of stop and frisk has fallen more than 50% in New York City since last year, while overall crime has declined 2.7% over the same period, including a 30% decline in murders.[6] Stop and frisk shows "few effects" on burglary and robbery levels.[7]

    A court-appointed monitor should not reverse the City's success in decreasing crime. This Court's Remedies Order provides the monitor only with limited, specific mandates that if appropriately carried out should not impede the NYPD's anti-crime efforts. In Los Angeles, a federal monitor was in place as part of a consent decree and transition agreement from 2001 until May of 2013.[8] This monitor was charged with, among other tasks, overseeing the elimination of

---

[5] *See City of New Orleans*, 2013 WL 492362, at *4 (finding implementation of reforms in the public interest where the U.S. Department of Justice's investigation found "systemic failures [that] 'have created an environment that permits and promotes constitutional harm'" and the City took no remedial action); *Chandler v. James*, 998 F. Supp. 1255, 1264-65 (M.D. Ala. 1997) (refusing to stay permanent injunction barring public schools from encouraging religion where schools continued to evidence "their unwillingness to comply with the court's Permanent Injunction, or, for that matter, with Supreme Court and Eleventh Circuit precedent detailing proscribed activity.").

[6] Tamar El-Ghobashy & Michael Howard Saul, "New York Police Use of Stop-and-Frisk Drops: Plummet in Disputed Tactic Tracks Overall Decrease in Crime," WALL STREET JOURNAL, May 6, 2013.

[7] Richard Rosenfeld & Robert Fornango, *The Impact of Police Stops on Precinct Robbery and Burglary Rates in New York City, 2003-2010*, JUSTICE QUARTERLY, August 21, 2012.

[8] U.S. v. City of Los Angeles, Joint Final Status Report; Decl. of Alexander Bustamante, May 3, 2013, *available at*



## THE PUBLIC ADVOCATE FOR THE CITY OF NEW YORK
## Bill de Blasio – PUBLIC ADVOCATE

biased-based policing. Over the period during which the LAPD operated under the supervision of a

federal monitor, violent crime dropped more than 50%, and property crime dropped 40%.[9] Over the

same period, citizen satisfaction with the LAPD rose substantially to 83%.[10] In fact, the current use

of stop and frisk exacerbates the rift in community relations and may *prevent* crime from falling as

low as it could absent a curtailing of the practice.[11]

The Public Advocate has voiced the need for a ban against the use of race as the sole basis

for stopping and frisking an individual,[12] urged the use of CompStat to measure not just the number

of stops but also the effectiveness of the tactic,[13] and demanded accountability for unwarranted

---

http://atty.lacity.org/stellent/groups/electedofficials/@atty_contributor/documents/contributor_web_http_content/lacityp_025573.pdf.

[9] U.S. Department of Justice, Uniform Crime Reporting Statistics, *available at* http://www.ucrdatatool.gov/Search/Crime/Local/RunCrimeJurisbyJurisLarge.cfm.

[10] Christopher Stone, Todd Foglesong, Christine M. Cole, "Policing Los Angeles Under a Consent Decree: The Dynamics of Change at the LAPD," Harvard Kennedy School of Government, May 18, 2009.

[11] A review of social science research finds that "the substance and procedure of how stops are conducted in New York have costs on legitimacy, and that the legitimacy deficits that ensue have negative effects on public safety." Jeffrey Fagan, Tom Tyler, and Tracey Meares, "Street Stops and Police Legitimacy in New York," Conf. Paper, John Jay College of Crim. Justice Conference on Understanding the Crime Decline in New York City, Sept. 2011, *available at* http://www.jjay.cuny.edu/Fagan_Tyler_and_Meares_Street_Stops_and_Police_Legitimacy_in_New_York.pdf.

[12] "Video: De Blasio Slams Mayor's 'Fear-Mongering' on Racial Profiling Bill," June 24, 2013, *available at* http://pubadvocate.nyc.gov/news/2013-06-24/video-de-blasio-slams-mayors-fear-mongering-racial-profiling-bill.

[13] "De Blasio on Reduction of Stop and Frisks: Public Safety Depends on Right-sized Approach, Deeper Police-Community Collaboration," Aug. 3, 2012, *available at* http://pubadvocate.nyc.gov/news/2012-08-03/de-blasio-reduction-stop-and-frisks-public-safety-depends-right-sized-approach-deepe.

7

 **THE PUBLIC ADVOCATE FOR THE CITY OF NEW YORK
Bill de Blasio – PUBLIC ADVOCATE**

stops.[14] The specific remedial acts required by the Remedies Order will hopefully help accomplish these goals. The immediate reforms ordered in the Remedies Order – including revising the policies and training that have led to racial profiling, simplifying the stop and frisk documentation, and improving the supervision, monitoring, and discipline of officers performing stop and frisks – should be carried out in a way to simultaneously ensure the constitutionality of individual stops and ensure the practice's effectiveness in providing much needed police protection.

It is well-past time for the City to cease the meritless scare tactic of contending that conforming the use of stop and frisk to constitutional standards will increase crime or make the public unsafe. There is simply no proof of the divisive proposition that the District Court Orders will harm the public. The Administration is free to make this specious argument in the political process, but for the City to make this claim in a court application without any factual support is a cynical politicization of the judicial process. It insults the public's intelligence and demeans the Court's considered process. The Public Advocate calls on the City to act constructively on the merits of this issue by finally acknowledging in a mature manner that those who have a different point of view – most notably, this Court – are also motivated by the City's safety and the public interest, and to work with the Court, the monitor and the plaintiffs to protect constitutional safeguards and ensure public safety. The City's fear mongering about the impact of the Remedies Order, like its earlier aspersions about the integrity of the independent judiciary,[15] should have no impact on this Court's consideration of the stay request.

---

[14] "De Blasio Launches Campaign to Reform Stop and Frisk, Repair Police-Community Divide," Aug. 3, 2012, *available at* http://pubadvocate.nyc.gov/news/2012-05-09/de-blasio-launches-campaign-reform-stop-and-frisk-repair-police-community-divide.

[15] *See* Bill de Blasio, "The Bloomberg Administration's Attack of the Judiciary," HUFFINGTON POST, June 3, 2013.

 **THE PUBLIC ADVOCATE FOR THE CITY OF NEW YORK**
**Bill de Blasio – PUBLIC ADVOCATE**

For the foregoing reasons, on behalf of the Public Advocate for the City of New York, we respectfully request that the Court deny the City's request for a stay of the Remedies Order pending appeal.

Respectfully submitted,

OFFICE OF THE PUBLIC ADVOCATE
FOR THE CITY OF NEW YORK

By: _____
Steven R. Newmark
General Counsel

One Centre Street
New York, N.Y. 10007

BAKER & HOSTETLER LLP

By: _____
John Siegal
Fernando A. Bohorquez, Jr.
Jacqlyn R. Rovine

45 Rockefeller Plaza
New York, N.Y. 10111

Attorneys for Public Advocate
Bill de Blasio

cc: All parties of record and amicus,
served by First Class Mail.

9