**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

——————————————————— x

DAVID FLOYD, et al.,

                     Plaintiffs-Appellees,

                - against -

CITY OF NEW YORK,

                    Defendant-Appellant.

——————————————————— x

Docket No. 13-3088

**DECLARATION IN
SUPPORT**

I, **STEVEN A. ENGEL**, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information and belief:

1.       I am a partner in the law firm of Dechert LLP, counsel to movants the Patrolmen's Benevolent Association of the City of New York, Inc., the Detectives Endowment Association, Police Department, City of New York, Inc., the Lieutenants Benevolent Association of the City of New York, Inc., and the Captains' Endowment Association of New York, Inc. (collectively, the "Police Unions") in this matter.

2.       This declaration, the annexed memorandum of law, and the exhibits annexed hereto are submitted in support of the Police Unions' motion for leave to file a memorandum of law as *amici curiae* in support of Appellant the City of New

York's motion to stay the district court's Remedial Order pending a decision on appeal.

3.     Annexed hereto as Exhibit A is the Declaration of Joseph Alejandro, Treasurer of the Patrolmen's Benevolent Association of the City of New York, Inc.

4.     Annexed hereto as Exhibit B is a Letter of Patrick J. Lynch, PBA President, to All Delegates and Members of the PBA (July 9, 2013).

5.     Annexed hereto as Exhibit C is the Police Unions' proposed Memorandum of Law as *Amici Curiae* in Support of Defendant-Appellant's Motion to Stay.

Dated this 27th day of September, 2013

/s/ Steven A. Engel
Steven A. Engel

15044797

Exhibit A

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

———————————————————— x

DAVID FLOYD, et al.,                          :
                                              :
                Plaintiffs-Appellees,         :
                                              :  Docket No. 13-3088
                - against -                   :
                                              :
CITY OF NEW YORK,                             :
                                              :
                Defendant-Appellant.          :

———————————————————— x
                                              :
JAENEAN LIGON, et al.,                        :
                                              :
                Plaintiffs-Appellees,         :
                                              :  Docket No. 13-3123
                - against -                   :
                                              :
CITY OF NEW YORK,                             :
                                              :
                Defendant-Appellant.          :

———————————————————— x

**DECLARATION JOSEPH ALEJANDRO,**
**TREASURER OF THE PATROLMEN'S BENEVOLENT ASSOCIATION**

I, Joseph Alejandro, hereby declare, pursuant to 28 U.S.C. § 1746, that the

following is true and correct to the best of my knowledge, information and belief:

1.     I hold the rank of Police Officer and have served in the New York

Police Department for more than 29 years.

2.     I am assigned to the Bronx Task Force.

3.     Since 1999, I have served as the Treasurer of the Patrolmen's Benevolent Association ("PBA"), one of the proposed *Amici Curiae* in this matter.

4.     I am familiar with the membership, functions and missions of the Patrolmen's Benevolent Association of the City of New York, Inc. ("PBA"), the Detectives Endowment Association, Police Department, City of New York, Inc. ("DEA"), the Lieutenants Benevolent Association of the City of New York, Inc. ("LBA"), and the Captains' Endowment Association of New York, Inc. ("CEA") (collectively, the "Police Unions").

5.     I submit this Declaration in support of the Police Unions' Motion for Leave to File an *Amici Curiae* Memorandum in Support of the City of New York's Motion to Stay and in support of the Police Unions' Memorandum of Law as *Amici Curiae* in Support of the City's Motion for a Stay.

6.     The Police Unions consist of four unions that collectively represent 29,000 of the 35,000 members of the NYPD.

7.     The PBA is the designated collective bargaining agent for the more than 22,000 police officers employed by the NYPD.  The PBA negotiates on Police Officers' behalf with the City of New York in matters of policy, terms and conditions of employment, and all matters relating to police officers' general welfare.

8.    The DEA is the certified and recognized exclusive bargaining representative for a bargaining unit consisting of all the approximately 5,000 Detectives employed by the NYPD.

9.    The LBA is the certified and recognized exclusive bargaining representative for a bargaining unit consisting of all the approximately 1,700 Lieutenants employed by the NYPD.

10.    The CEA is the sole and exclusive collective bargaining representative for the unit consisting of all the approximately 730 employees of the NYPD in titles including Captain, Captain detailed as Deputy Inspector, Inspector and Deputy Chief (collectively, the "Captains").

11.    The core mission of the PBA, DEA, LBA and CEA is to advocate for and protect the interests of its respective members of the NYPD.

12.    The members of each of the Police Unions perform vitally important functions in connection with enforcing state and New York City laws and ensuring public safety.

13.    In particular, they perform and supervise the policing practices and procedures challenged by the plaintiffs in this action.

14.    The members of the Police Unions perform field police work, including patrolling, conducting surveillance, effecting arrests and searches, and engaging in stop, question and frisk procedure at issue in this action.

15.    Members also supervise other officers, including in connection with their performance of the challenged practices and procedures.

16.    While on duty, a police officer is aware of, and inspects, his or her post or sector for conditions requiring police attention, and renders all necessary police service in his or her assigned area and as directed.

17.    Against a backdrop of approximately 7,000 fewer uniformed officers in the NYPD, police officers have taken on increased responsibilities in recent years.

18.    Adding to their traditional responsibilities of combating crime and answering an increasing number of calls for police service, police officers have taken on anti-terrorism responsibilities and other periodic initiatives from the City.

19.    During my time as patrol officer, I have personally used the NYPD's UF-250 form.

20.    I am familiar with the form's design and use.

21.    The UF-250 form now utilized by the NYPD consists of a double-sided form containing a series of checkboxes and fields and it records certain data related to the stop of an individual.

22.    The UF-250 form is not and never has been the sole evidence in support of the constitutionality of a particular stop.

23.    To the extent that a particular stop is challenged in court, either through a § 1983 action or a motion to exclude evidence in a criminal case, the prosecutors will introduce the testimony of the officer, witnesses to the events, and any other written records involved.

24.    Based on my conversations with members, the district court's orders have already had a chilling effect.

25.    The district court's decision relating to stop, question, and frisk has been causing substantial confusion among the members.

26.    Based on my conversations with members, many officers are hesitant to initiate stops that are not based on personal observation of criminal activity, even if the circumstances suggest potential criminal activity in light of the uncertainty created by the district court's decision.

27.     Given the realities of day-to-day field work, police officers second-guessing themselves during the stop, question and frisk procedure threatens the public and their safety.

28.     In response to the City Council's recently passed racial-profiling bill, which permits suits against individual officers, the PBA issued a notice cautioning its members in taking action in circumstances other than where they actually observe criminal or life-threatening conduct.  Letter of Patrick J. Lynch, PBA President, to All Delegates and Members of the PBA (July 9, 2013) (Engel Decl. Ex. B).

29.     This notice was sent out because of concerns that PBA members would suffer adverse consequences even for taking police action within their discretion and with the good faith belief that those actions were lawful and in the public interest.

30.     The PBA has issued similar cautionary admonition to its members in light of the district court decision.

31.     Such concerns have only been deepened by the district court's rulings.


Dated this 27th day of September, 2013

Joseph Alejandro

Exhibit B



*Patrolmen's Benevolent Association*

Of The City Of New York, Incorporated

**PATRICK J. LYNCH, 90th Pct.**
*President*

**JOHN PUGLISSI, 94th Pct.**
*First Vice-President*

**MUBARAK ABDUL-JABBAR, TD#11**
*Second Vice -President*

**JOSEPH ALEJANDRO, BXTF**
*Treasurer*

**ROBERT W. ZINK, TD#2**
*Recording Secretary*

**FINANCIAL SECRETARIES**

**MERRITT R. RILEY, MTN Pct.**
*Manhattan South*

**COREY GRABLE, TD# 32**
*Transit*

**DANIEL TIRELLI, 114th Pct.**
*Queens North*

**DREW BAILEY, 71st Pct.**
*Brooklyn South*

**JOHN GIANGRASSO, 75th Pct.**
*Brooklyn North*

**ALBERT R. ACIERNO, 120th Pct.**
*Lower Manhattan & Richmond*

**JOSEPH RAO, 103rd Pct.**
*Queens South*

**BRIAN McGUCKIN, 40th Pct.**
*Bronx*

**RICHARD DIANA, HB-SSS**
*Housing*

**JOSEPH STRONG, 30thPct.**
*Manhattan North*

**TRUSTEES**

**THOMAS P. HELLEM, 71st Pct.**
*City-Wide*

**JOHN A. FLYNN, 13th Pct.**
*Manhattan South*

**ROBERT IABONI, QNTF**
*Queens North*

**CHRISTOPHER RYKERT, 75th Pct.**
*Brooklyn North*

**MICHAEL MORGILLO, TD#1**
*Transit*

**GEORGE WINKLER, 120th Pct.**
*Lower Manhattan & Richmond*

**PATRICK HENDRY, 103rd Pct.**
*Queens South*

**MIKE HERNANDEZ, 52nd Pct.**
*Bronx*

**DESMOND STAFFORD, 34th Pct.**
*Manhattan North*

**JOSEPH ANTHONY, PBBX**
*Bronx*

**ANTHONY MILO, PSA#5**
*Housing*

**BRIAN  D. FUSCO, 72nd Pct.**
*Brooklyn South*

July 9, 2013

## TO ALL DELEGATES AND MEMBERS:

As you may know, the New York City Council recently passed a bill that would allow police officers to be sued for stopping suspects based on descriptions that rely on "race, color, creed, age, alienage or citizenship status, gender, sexual orientation, disability or housing status." If this bill and its problematic provisions become law through an override of the mayor's expected veto, the PBA hereby advises:

All officers should take action if he or she sees a crime in progress, or if he or she sees that his or her life or the life of another person is in danger. Otherwise, concerning events not occurring in the officer's presence, all officers should be careful not to initiate any law-enforcement action that could be construed as violating the new legislation and subject the officer to legal action.

Fraternally,

Patrick J. Lynch
President

**PLEASE POST ON ALL BULLETIN BOARDS**
**PBA WEBSITE ADDRESS: www.nycpba.org**

125 Broad Street        New York, N.Y. 10004-2400        212-233-5531

Exhibit C

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

——————————————————— x

DAVID FLOYD, et al.,                                       :
                                                          :
           Plaintiffs-Appellees,          :
                                                          :  Docket No. 13-3088
     - against -                                :
                                                          :
CITY OF NEW YORK, et al.,                                  :
                                                          :
          Defendant-Appellant.              :

——————————————————— x


**MEMORANDUM OF LAW OF**
**THE PATROLMEN'S BENEVOLENT ASSOCIATION,**
**THE DETECTIVES ENDOWMENT ASSOCIATION,**
**THE LIEUTENANTS BENEVOLENT ASSOCIATION, AND**
**THE CAPTAINS' ENDOWMENT ASSOCIATION**
**AS *AMICI CURIAE* IN SUPPORT OF**
<u>**DEFENDANT-APPELLANT'S MOTION FOR STAY**</u>

DECHERT LLP

Steven A. Engel
Edward A. McDonald
James M. McGuire
Elisa T. Wiygul
1095 Avenue of the Americas
New York, New York  10036
T: (212) 698-3693
F: (212) 698-3599
steven.engel@dechert.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. ii

INTERESTS OF *AMICI CURIAE* ........................................................1

PRELIMINARY STATEMENT ............................................................2

ARGUMENT ......................................................................................5

    I.    THE CITY WILL LIKELY SUCCEED ON APPEAL ......................6

        A.    This Case Should Not Have Proceeded as a Class Action ........6

        B.    The District Court Erred in Relying on UF-250 Forms.............9

        C.    The District Court Similarly Erred in Finding Systematic Fourteenth Amendment Violations..........................................11

    II.    THE CITY AND THE UNIONS WILL SUFFER IRREPARABLE HARM ABSENT A STAY PENDING APPEAL ..................................................................................13

    III.    THE PUBLIC INTEREST FAVORS A STAY .................................18

CONCLUSION ................................................................................19

i

# TABLE OF AUTHORITIES

**CASES**

**Page(s)**

*Adams v. Williams*,
  407 U.S. 143 (1972)......................................................................15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................11

*Brown v. City of Oneonta*,
  221 F.3d 329 (2d Cir. 2000) ........................................................11

*Florida v. Harris*,
  133 S. Ct. 1050 (2013)................................................................2, 9

*Floyd v. City of New York*,
  283 F.R.D. 153 (S.D.N.Y. 2012) ...............................................7, 17

*Floyd v. City of New York*,
  --- F. Supp. 2d ----, 2013 WL 4046209 (S.D.N.Y. Aug. 12, 2013)............*passim*

*Floyd v. City of New York*,
  --- F. Supp. 2d ----, 2013 WL 4046217 (S.D.N.Y. Aug. 12, 2013)...................17

*Floyd v. City of New York*,
  Nos. 08 Civ. 1034, 12 Civ. 2274, 2013 WL 5225319
  (S.D.N.Y. Sept. 17, 2013)........................................................15, 16

*Nken v. Holder*,
  556 U.S. 418 (2009).....................................................................5-6

*People v. Benjamin*,
  51 N.Y.2d 267 (1980) ...................................................................16

*Rahman v. Chertoff*,
  530 F.3d 622 (7th Cir. 2008) .......................................................8, 9

*Terry v. Ohio*,
  392 U.S. 1 (1968).............................................................................*2*

*United States v. Arvizu,*
    534 U.S. 266 (2002)............................................................................10

*Wal-Mart Stores, Inc. v. Dukes,*
    131 S. Ct. 2541 (2011)....................................................................6, 7

*Ybarra v. Illinois,*
    444 U.S. 85 (1979)............................................................................16

**STATUTES & RULES**

N.Y. City Admin. Code § 12-307(6)b ...................................................17

Local Rule 29.1(b) ..................................................................................1

**OTHER AUTHORITIES**

*Ray Kelly: Stop-And-Frisk Ruling May Have "Chilling Effect" On Law
    Enforcement*, Gothamist, Sept. 20, 2013 ........................................14

Jamie Schram & Kirstan Conley, *Gun Crime Up After Stop-and-Frisk
    Ruling*, N.Y. Post, Sept. 19, 2013....................................................15

Pervaiz Shallwani & Sarah Armaghan, *Police Chafe at Scrutiny: As Stop-
    and-Frisk Numbers Plummet, Some Officers Say They Are Pulling Back*,
    Wall St. J., Sept. 4, 2013 .................................................................14

## <u>INTERESTS OF *AMICI CURIAE*</u>

*Amici Curiae* the Police Unions collectively represent the interests of more than 29,000 of the 35,000 active members of the New York City Police Department ("NYPD") (collectively, "police officers").[1]  The district court's liability findings directly concern the police officers' activities, and the court-ordered changes to existing policies would directly affect their work and safety. The police officers are compelled to do their critical jobs under a cloud of uncertainty while the district court's remedial process moves forward at the same time as this Court considers this appeal.  The district court's order contemplates burdensome changes in training, supervision, monitoring, and discipline, all of which could be negated or modified based upon this Court's decision.[2]

---

[1]     The Police Unions are the Patrolmen's Benevolent Association of the City of New York, Inc. ("PBA"), the Detectives Endowment Association, Inc., Police Department, City of New York ("DEA"), the Lieutenants Benevolent Association of the City of New York, Inc. ("LBA"), and the Captains' Endowment Association of New York, Inc. ("CEA").

No party or party's counsel has authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting this brief.  No person—other than the *amici curiae*, their members, or their counsel—contributed money intended to fund preparing or submitting this brief.  Local Rule 29.1(b).

[2]     The Police Unions' motion to intervene is currently pending in the district court.  Pending that decision, or a motion to intervene in this Court, the Police Unions seek to participate as *amici curiae*, so that this Court may consider their views with respect to the stay motion of the City of New York.

1

## PRELIMINARY STATEMENT

The district court would re-write the rules governing how the 35,000 members of the NYPD conduct themselves on a day-to-day basis. Through a misuse of the class action device, a misplaced reliance on a form (the UF-250), and a misreading of statistics, the district court has found system-wide constitutional violations where there were none and would subject the NYPD to a complex remedial process that the court expects to last for many months, if not years.

The decision below is fundamentally unsound. The Supreme Court has repeatedly emphasized the fact-specific nature of *Terry* stops. *See, e.g.*, *Florida v. Harris*, 133 S. Ct. 1050, 1055-56 (2013); *Terry v. Ohio*, 392 U.S. 1, 9, 19-21 (1968). The district court, however, allowed a handful of challenges to morph into a classwide attack on the NYPD's *Terry* stops over an eight-year period. The district court correctly acknowledged the "inherent difficulty" of reviewing millions of individual actions, and admitted that it would be "*impossible* to assess individually whether each of the 4.4 million stops at issue in this case was based on an officer's reasonable articulable suspicion that criminal activity was afoot." *Floyd v. City of New York*, --- F. Supp. 2d ----, 2013 WL 4046209, at *16 (S.D.N.Y. Aug. 12, 2013) (hereinafter "*Liability Op.*").

Rather than recognizing that these realities made its task impossible, the district court erroneously found that Plaintiffs could rely on the UF-250 forms to

2

prove hundreds of thousands of violations. These police records could not, and were never intended to, constitute the only evidence to justify one stop, much less 4.4 million. Even so, Plaintiffs' expert could not dispute the lawfulness of 94% of them, yet concluded that in 6%, the information was insufficient. Based solely on this thread, the district court reached the extraordinary conclusion that "*at least 200,000 stops were made without reasonable suspicion.*" *Id.* at *4.

The district court similarly elevated its flawed analysis of the UF-250 forms into a finding that the NYPD had engaged in *intentional* racial discrimination. During the period at issue, approximately 83% of reported criminal suspects were black or Hispanic. *Id.* at *20. At the same time, 83% of the persons stopped, because of police officers' suspicion, were black or Hispanic. *Id.* at *4. This correspondence between the population of criminal suspects and the population stopped on suspicion should dispel any inference of racial discrimination.

The district court, however, rejected the proposition that the demographics of criminal suspects could constitute a relevant benchmark. Because the lawful investigatory stop of a suspicious person will not usually generate sufficient evidence for an on-the-spot arrest, the district court concluded that a suspicious person not arrested must actually be "innocent" and thus no more likely to have triggered suspicion than anyone else in the neighborhood. *Id.* at *5, *20. From

this, the court concluded that those stopped for acting suspiciously should mirror the neighborhood's demographics, rather than the population of criminal suspects.

The district court's conclusion is demonstrably incorrect. If the district court were right, then the stopped population should not only mirror the racial demographics of the neighborhood, but also the gender and age demographics as well. The police apparently should be making *Terry* stops of women, the elderly, and even young children, in proportion to their numbers in the neighborhood, notwithstanding the fact that crime is committed overwhelmingly by young men. While erroneous, the district court's conclusion formed the basis for its very grave and injurious finding of intentional discrimination.

Because the district court's review of millions of *Terry* stops does not stand up, the City of New York could not have ignored pervasive violations that do not exist. And if the City is not liable under *Monell*, then there is no basis for federal judicial supervision over the NYPD's training, monitoring, and implementation of stop-and-frisk, in accordance with one district judge's view of the law.

While this Court is highly likely to reverse, for these and other reasons, what should be clear is that the City of New York, its eight million people, and the 35,000 members of the NYPD should not be obliged to participate in this complex, distracting, and protracted remedial process until this Court has had the opportunity to review the decision below. The district court's order and its

4

proposed remedy are not cost-free.  The decision already has generated substantial

uncertainty, chilling officers from engaging in lawful investigatory practices.  The

clarity that would come from appellate review is well worth a brief delay in a

remedial process that could last for years.

## ARGUMENT

The district court has asserted jurisdiction over the monitoring, supervision,

reporting, and training of the NYPD regarding the policy of "stop, question, and

frisk."  The court has appointed a Monitor, a Facilitator, and now an "Academic

Advisory Council."  The court contemplates that these judicial designees are to

shepherd a months-long, if not years-long, process that will involve numerous

interested parties and look far more like a legislative committee hearing than a

federal court proceeding.  These court-ordered reforms are supposed to lead to

fundamental but burdensome changes.  If such city-wide reforms are warranted,

then they should not be imposed based upon the views of a single district judge,

but only after this Court has the opportunity to conduct its review, both as to

liability and as to remedy, and determine whether in fact they are justified.[3]

---

[3]    In determining whether to order a stay pending appeal, this Court considers:
"(1) whether the stay applicant has made a strong showing that he is likely to
succeed on the merits; (2) whether the applicant will be irreparably injured absent a
stay; (3) whether issuance of the stay will substantially injure the other parties
interested in the proceeding; and (4) where the public interest lies."  *Nken v.*

# I.    THE CITY WILL LIKELY SUCCEED ON APPEAL

The City will likely succeed on appeal because the district court's sweeping ruling is erroneous in numerous respects.  The Police Unions summarize some of those errors here.

## A.    This Case Should Not Have Proceeded as a Class Action

The district court committed a fundamental error by allowing this case to proceed to trial as a class-wide challenge to the NYPD's alleged practice of stopping and frisking persons without reasonable suspicion.  If the named plaintiffs believed they were treated unlawfully, then they had a right to pursue damages pursuant to 42 U.S.C. § 1983.  The district court erred, however, by allowing them to mount a class challenge to 4.4 million stops, each of which turned on its own particular facts and circumstances.  The court's decision to allow Plaintiffs to present claims through class-wide proof led directly to fundamental distortions of the judicial process.

As the Supreme Court recently recognized, the class action device is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quotation omitted).  The existence of "common questions" will not

---

*Holder*, 556 U.S. 418, 434 (2009) (internal quotation omitted).

permit classwide litigation, where the plaintiffs cannot show that all of their claims

turn on a "common contention . . . capable of classwide resolution." *Id.* at 2551.

In *Wal-Mart*, a class of 1.5 million female employees sought to demonstrate,

through "statistical evidence" and "anecdotal reports of discrimination" from a few

members of the class, that Wal-Mart had a "pattern or practice" of gender

discrimination. *Id.* at 2549. Because each act of discrimination, however,

depended upon its individual facts, the Court refused to permit the plaintiffs to

proceed on a classwide basis.

So, too, here. Plaintiffs claimed that the NYPD had a "practice" of engaging

in *Terry* stops without reasonable suspicion and purported to represent a class

consisting of hundreds of thousands of persons stopped unlawfully. *See Floyd v.

City of New York*, 283 F.R.D. 153, 160 (S.D.N.Y. 2012) (hereinafter "*Class Cert.

Op.*"). Yet Plaintiffs did not challenge a single "practice" in this matter any more

than did the plaintiffs in *Wal-Mart*. Rather, Plaintiffs claimed that many of the

individual 4.4 million stops were themselves unlawful, and that when aggregated,

they demonstrated that the City had paid insufficient attention to ending the alleged

unconstitutional behavior.

Indeed, the district court recognized that in order to find the City liable for

an unlawful "practice" under *Monell*, it would have to "mak[e] findings and

conclusions regarding 4.4 million stops," all of which were to be judged on their

7

individual circumstances.  *Liability Op.*, 2013 WL 4046209, at *4.  Just like the lower court in *Wal-Mart*, the district court here erroneously concluded that plaintiffs could make such a showing through "statistical evidence" and "anecdotal reports."  Having permitted Plaintiffs to proceed to trial under such a flawed premise, the district court erroneously assumed the power to review millions of events not before the court.

In contrast, the Seventh Circuit has recognized that the class action device may not be used to mount a broad Fourth Amendment challenge to the policies of the Department of Homeland Security.  In *Rahman v. Chertoff*, 530 F.3d 622, 626 (7th Cir. 2008), the court reversed the grant of a class consisting of "all United States citizens who now are and/or in the future will be subjected to detentions upon reentry to the United States" as a result of the defendants' challenged policies.  As the court explained:

> The classes certified in this case are equivalent to a class of "all persons in the United States who have been, or ever will be, stopped without probable cause" certified in an effort to take control of how the police investigate crime and make arrests.  Improper arrests are best handled by individual suits for damages (and potentially through the exclusionary rule), not by a structural injunction designed to make every error by the police an occasion for a petition to hold the officer (and perhaps the police department as a whole) in contempt of court.

*Id.* at 626-27.  While courts may hear individual suits for those individually wronged, the federal judiciary should not "tak[e] control" of "legislative or

8

executive questions" through "a structural injunction" concerning the policies, training, and monitoring of law enforcement.  *Id.* at 626, 627.  In seeking to take control of the NYPD's practices of stop, question, and frisk, the district court below committed the identical error recognized by the Seventh Circuit in *Rahman*.

### B.    The District Court Erred in Relying on UF-250 Forms

The district court further erred by allowing Plaintiffs to challenge 4.4 million stops based on the UF-250 forms.  The Fourth Amendment permits police officers to conduct *Terry* stops on reasonable suspicion, and the constitutionality of a particular stop must be decided on the "totality of the circumstances" in a "flexible, all-things-considered approach."  *Florida*, 133 S. Ct. at 1055-56.  The district court accepted that the City could not be charged with a *Monell* violation absent evidence of widespread constitutional violations among the 4.4 million stops at issue.  Because it would be "impossible" for Plaintiffs actually to make such a showing, *Liability Op.*, 2013 WL 4046209, at *16, the district court allowed Plaintiffs to draw statistical conclusions based on the NYPD's UF-250 forms.  In so doing, however, the court mistook the nature of those forms and called into question the entirely lawful conduct of the men and women of the NYPD.

The NYPD requires officers to complete the UF-250 forms following a stop. *Id.* at *5, *13.  The UF-250 form now used by the NYPD is a double-sided form containing a series of checkboxes and fields, and it records certain date related to

9

the stop of an individual.  Declaration of Joseph Alejandro ("Alejandro Decl.")
¶ 21, attached to Declaration of Steven A. Engel, Esq. ("Engel Decl.") as Ex. A.
The UF-250 form, however, is not and never has been the sole evidence in support
of the constitutionality of a particular stop.  *Id.* ¶ 22.  To the extent that a particular
stop is challenged in court, either through a § 1983 action or a motion to exclude
evidence in a criminal case, the government will introduce the testimony of the
officer, witnesses to the events, and any other written records involved, all of
which permit the "totality of the circumstances" to be evaluated.  *Id.* ¶ 23; *see,*
*e.g.*, *United States v. Arvizu*, 534 U.S. 266, 274 (2002) ("The [lower] court's
evaluation and rejection of seven of the [ten] listed factors in isolation from each
other does not take into account the 'totality of the circumstances,' as our cases
have understood that phrase.").

The district court recognized that it would be "impossible" to rely upon such
evidence in reviewing the 4.4 million stops purportedly at issue in this case.
Hearing evidence relating to just 19 stops "took weeks of testimony."  *Liability*
*Op.*, 2013 WL 4046209, at *16.  But instead of concluding that Plaintiffs could not
make their case, the district court allowed Plaintiffs' expert to opine on the
lawfulness of those stops based exclusively on his review of the UF-250 forms.
The expert opined that 6% of the stops were "apparently unjustified" even though

10

in none of those cases had the expert considered the testimony of the officer in question, the person stopped, or any other evidence.

The district court erred in adopting the expert's opinion and finding, as a purported matter of fact, that "at least 200,000 stops were made without reasonable suspicion." *Id.* at *4 (emphasis omitted). Because the UF-250 forms could not, and were never intended to, constitute the sole or sufficient evidence of the lawfulness of a particular stop, the district court could not rely upon them to find a single Fourth Amendment violation, much less 200,000. The district court's erroneous finding unfairly undermines the public's confidence in the day-to-day performance of police officers' vitally important jobs.

## C.    The District Court Similarly Erred in Finding Systematic Fourteenth Amendment Violations

The district court's ruling that the City engaged in intentional racial discrimination is similarly unsupported. As the City has explained in its motion, the evidence that blacks and Hispanics were stopped more than others does not suffice to show discriminatory intent. *See, e.g.*, *Brown v. City of Oneonta*, 221 F.3d 329, 338 (2d Cir. 2000). The reliance on crime suspect data that indicates a correlation between crime rates and race is not intentional discrimination but rather is a policy that operates "in spite of[] the action's adverse effects upon an identifiable group." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). It is not

11

surprising that crime suspect data would closely mirror the demographics of those stopped and frisked.  A host of factors, sometimes including crime suspect data, contribute to individual officers' reasonable judgment as to suspicious activity.

Most strikingly, the district court found intentional discrimination based on demographics that showed the *absence* of disparate impact, much less "indirect racial profiling."  The percentage of persons stopped as suspicious who were black or Hispanic (83%) closely tracked the demographics of crime suspects, as reported by victims and recorded on arrest reports.  *Liability Op.*, 2013 WL 4046209, at *4, *20.  The district court, however, concluded that there should be no correlation between those numbers, because only 6% of persons subject to a *Terry* stop are arrested during that encounter.  Accordingly, in the district court's view, because 94% of those stopped as suspicious are "innocent," their demographics should match the neighborhood's, not the criminal suspect population.

It does not take an experienced police officer to understand that a person stopped, on reasonable suspicion, is not necessarily "innocent" simply because the stop does not give rise to probable cause to make an arrest.  The standard for an arrest is higher than for a stop, and a stop may still be lawful, appropriate, and justified, without yielding sufficient facts to support an arrest.  The district court's conclusion that the police should be making *Terry* stops in proportion to "local population demographics" rather than the "criminal suspect population in the same

12

area," *Liability Op.*, 2013 WL 4046209, at *5, is unjustified, at odds with common sense, and would lead to the absurd proposition that not only the race, but also the gender and the age, of those stopped should match the total local population's.

## II.    THE CITY AND THE UNIONS WILL SUFFER IRREPARABLE HARM ABSENT A STAY PENDING APPEAL

Absent a stay, the City, the NYPD, and the police officers will suffer irreparable harm from the confusion that has chilled proactive police conduct; from the stigmatization of police officers and the diminution in the public confidence necessary to their crime-fighting mission; and from the need for the parties, the Police Unions, and others to participate in a complex remedial process that may well prove unnecessary should this Court reverse.

First, absent a stay, the district court's order will continue to chill effective and lawful police practices.  As the district court acknowledged, during the eight years at issue, New York has seen an unprecedented drop in crime.  *Liability Op.*, 2103 WL 4046209, at *26 n.210.  There can be little doubt that this decline has been caused by effective and proactive policing methods, including methods like stop, question, and frisk.

Not surprisingly, the district court's orders already have had a chilling effect on the police. Numerous articles have reported that phenomenon.[4] The Police Unions can attest that their members have felt that same chill. Alejandro Decl. ¶ 24. The district court's decision to put stop, question, and frisk on trial (or, more accurately, to put the U-250 forms on trial) has caused substantial confusion among the NYPD. *Id.* ¶ 25. Police officers are hesitant to initiate stops that are not based on personal observation of criminal activity—even stops that would be constitutional under the district court's orders. *Id.* ¶ 26.

In response to the City Council's recently passed racial-profiling bill, which permits suits against individual officers, the PBA issued a notice cautioning its members in taking action in circumstances other than where they actually observe criminal or life-threatening conduct. Letter of Patrick J. Lynch, PBA President, to All Delegates and Members of the PBA (July 9, 2013) (Engel Decl. Ex. B). The PBA has issued similarly cautionary admonitions to its members in light of the district court's rulings. Alejandro Decl. ¶ 30.

---

[4]    *See, e.g.*, Pervaiz Shallwani & Sarah Armaghan, *Police Chafe at Scrutiny: As Stop-and-Frisk Numbers Plummet, Some Officers Say They Are Pulling Back*, Wall St. J., Sept. 4, 2013, at A17 ("In more than a dozen interviews across the city, current and former NYPD officers said police are more on edge as they go about their jobs. Some said they are conducting fewer stops out of fear of being accused of racial profiling." ); *Ray Kelly: Stop-And-Frisk Ruling May Have "Chilling Effect" On Law Enforcement*, Gothamist, Sept. 20, 2013, *available at* http://gothamist.com/2013/09 /20/kelly_says_stop-and-frisk_ruling_ma.php.

As the district court recognized, the use of stop, question, and frisk practices has declined substantially over the past year.  *See Floyd v. City of New York*, Nos. 08 Civ. 1034, 12 Civ. 2274, 2013 WL 5225319, at *4 & n.24 (S.D.N.Y. Sept. 17, 2013) (hereinafter "*Stay Order*") (stops were down 50% in the second quarter of 2013 compared to the prior year).  While the district court appeared to regard this development as something that justified the *denial* of a stay, it was undisputed below that the overwhelming number of *Terry* stops in fact constituted lawful police conduct.  Accordingly, the evidence suggests that this litigation has succeeded in chilling and limiting proactive, lawful police activity to the detriment of the people of New York.  Indeed, in the 28-day period ending on September 8, 2013, as compared to the same period in 2012, the number of gun seizures and gun-related arrests decreased, and the number of shootings and gunshot victims increased.  *See* Jamie Schram & Kirstan Conley, *Gun Crime Up After Stop-and-Frisk Rulin*g, N.Y. Post, Sept. 19, 2013.

Second, as the district court recognized, officers "on the beat mak[e] split-second decisions in situations which may pose a danger to themselves and others." *Liability Op.*, 2013 WL 4046209, at *47.  An officer must have "the opportunity to protect himself from attack by a hostile suspect," *Adams v. Williams*, 407 U.S. 143, 146 (1972), and, "for his own protection and safety," has the right to "conduct a patdown to find weapons that he reasonably believes or suspects are then in the

15

possession of the person he has accosted." *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979).  A police officer should not be required "to await the glint of steel before he can act to preserve his safety."  *People v. Benjamin*, 51 N.Y.2d 267, 270 (1980).  Indeed, it is critically important to the officers' safety that they have confidence in their judgment when it comes to encounters with individuals whom they reasonably believe are acting suspiciously and, potentially, dangerously.

The district court's decision, however, undermines police officers' confidence in their judgment and training by declaring that the guidance with which they have lived with for years is insufficient, and that they have too readily frisked individuals despite their reasonable fears for their safety.  Such a ruling has imposed substantial concern among the Police Unions' members over their ability to exercise their discretion and ensure their own safety.  Officers who are hesitant to exercise their professional judgment to frisk an individual they have stopped will be placing their own safety at risk.  The Police Unions' members should not be consigned to uncertainty about their authority to conduct both stops and protective frisks as they await the clarity that review by this Court will provide.

Third, the remedial process ordered by the district court will involve a protracted effort to change the NYPD's policies, training, supervision, monitoring and discipline.  In denying a stay, the district court emphasized that those changes will not occur until the completion of a process that may take months or more.

16

*Stay Opinion*, 2013 WL 5225319, at *2. Yet the process, as envisioned by the district court, is exceedingly complex, involving a court-appointed Monitor, Facilitator, and now an "Academic Advisory Council," as well as many other interested groups. The "Immediate Reforms" alone include burdensome and costly training of NYPD officers, a FINEST message setting forth new guidelines for conduct, and changes to the documentation of stops that will dramatically increase officers' workloads. *See Floyd v. City of New York*, --- F. Supp. 2d ----, 2013 WL 4046217, at *6-*10 (S.D.N.Y. Aug. 12, 2013) (hereinafter "*Remedies Op.*"). The district court has also ordered an extraordinary body-worn camera pilot program. *Id.* at *10-*11.[5] These costs and burdens will take officers away from the streets, and will prove irreparable, yet unnecessary, should this Court reverse. Given that this lawsuit has already taken several years, and the remedial process envisioned will take many months in any event, the best course is to preserve the status quo pending clarification by this Court.

---

[5]    Additionally, the Police Unions' collective bargaining rights are implicated by the remedies ordered below. Under New York City's labor laws, the City must engage in collective bargaining over all mandatory terms and conditions of employment as well as "the practical impact that decisions on [certain matters of policy] have on terms and conditions of employment, including, but not limited to, questions of workload, staffing and employee safety." N.Y. City Admin. Code § 12-307(6)b. The Police Unions' legal protections are jeopardized by the court's orders, and the status quo should be preserved so that these interests can be considered by the court.

## III.    THE PUBLIC INTEREST FAVORS A STAY

The public interest would be best served by a stay of the district court's ruling, maintaining the status quo until this Court has weighed in.  As discussed above, the district court's opinion has led to uncertainty and confusion among police officers about how they may exercise their professional judgment.  This state of affairs impedes the ability of the Police Unions' members to do their job and risks the safety of police officers, who themselves are entrusted with promoting public safety.

In denying the City's motion to stay, the district court relied on declarations filed by politicians on the eve of an election.  Those statements cannot as a matter of law be judged a reliable measure of the "public interest."  What they do demonstrate, however, is that New York's *political* process is engaged with the matters at issue here.  In a democracy, it is those political actors, not a single judge, who should be responsible for fashioning the NYPD's policies on training, supervision, monitoring and discipline.  That is where the public interest lies.[6]

---

[6] There is no serious argument that Plaintiffs will suffer harm from a stay. Delaying implementation of the remedial plan for a few months will hardly *cause* unconstitutional action, and any individual allegedly harmed would have the right to pursue his own § 1983 action.

18

# CONCLUSION

For the reasons set forth above, the City of New York's application for a stay pending appeal of the district court's orders should be granted.

Dated:  New York, New York
        September 27, 2013

Respectfully submitted,

/s/ Steven A. Engel
Steven A. Engel
Edward A. McDonald
James M. McGuire
Elisa T. Wiygul
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500 (telephone)
(212) 698-3599 (facsimile)
steven.engel@dechert.com

*Counsel for Movants
the Patrolmen's Benevolent
Association of the City of New York,
Inc., the Detectives Endowment
Association, Police Department, City
of New York, Inc., the Lieutenants
Benevolent Association of the City of
New York, Inc., and the Captains'
Endowment Association of New York,
Inc.*

15044843

19