# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

DAVID FLOYD, *et al.*,

               Plaintiffs-Appellees,

v.

CITY OF NEW YORK, *et al.*,

               Defendants-Appellants.

**Docket No. 13-3088**

## BRIEF *AMICI CURIAE* OF MICHAEL B. MUKASEY AND RUDOLPH W. GIULIANI IN SUPPORT OF DEFENDANTS-APPELLANTS' MOTION FOR A STAY PENDING APPEAL

Daniel S. Connolly, Esq.
Rachel B. Goldman, Esq.
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 508-6100
Facsimile:  (212) 508-6101
Email: daniel.connolly@bgllp.com
Email: rachel.goldman@bgllp.com

*Counsel for Amici Curiae Michael B. Mukasey and Rudolph W. Giuliani*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. ii

INTERESTS OF THE *AMICI* ............................................................1

ARGUMENT ...................................................................................3

    I.      The City Will Suffer Irreparable Injury Without A Stay ....................5

          A.    Despite The District Court's Suggestion That The
                  Orders Call For No Immediate Change In Lawful
                  Procedures, The Orders Will Have An Immediate And
                  Deleterious Effect .......................................................5

          B.    The Orders Constrain The City's Constitutional Use Of
                  Race In Effective Policing And Will Adversely Affect
                  Crime Prevention .......................................................6

          C.    The Orders Exceed The Proper Authority Of The
                  District Court To Remedy Purported Constitutional
                  Violations ................................................................11

    II.     The Public Interest Favors Granting A Stay .......................................18

CONCLUSION ...............................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Brown v. City of Oneonta, New York*,
  221 F.3d 329 (2d Cir. 1999) ....................................................................7

*Brown v. City of Oneonta, New York*,
  235 F.3d 769 (2d Cir. 2000) ...............................................................8, 10

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)...................................................................................11

*Curtis v. City of New Haven*,
  726 F.2d 65 (2d Cir. 1984) .....................................................................12

*Gonzales v. Oregon*,
  546 U.S. 243 (2006).................................................................................12

*Hilton v. Braunskill*,
  481 U.S. 770 (1987)...................................................................................3

*Horne v. Flores*,
  557 U.S. 433 (2009).............................................................................14, 15

*Laratro v. City of New York*,
  8 N.Y.3d 79 (2006) ..................................................................................14

*Million Youth March, Inc. v. Safir*,
  155 F.3d 124 (2d Cir. 1998) ...................................................................16

*Mohammed v. Reno*,
  309 F.3d 95 (2d Cir. 2002) ........................................................................3

*Paganucci v. City of New York*,
  785 F. Supp. 467 (S.D.N.Y. 1992) .........................................................12

*Plummer v. Quinn*,
  No. 07 Civ 6154 (WHP), 2008 WL 383507 (S.D.N.Y. Feb. 12, 2008) .............17

*Rahman v. Chertoff*,
  530 F.3d 622 (7th Cir. 2008) ..............................................................13, 14

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Rizzo v. Goode*,
    423 U.S. 362 (1976) ........................................................................12

*Rufo v. Inmates of Suffolk County Jail*,
    502 U.S. 367 (1992) ........................................................................12

*Terry v. Ohio*,
    392 U.S. 1 (1968) ................................................................. 9, 11-12

*Thapa v. Gonzales*,
    460 F.3d 323 (2d Cir. 2006) ..........................................................17

*U.S. v. City of New York*,
    717 F.3d 72 (2d Cir. 2013) ......................................................16, 17

## Rules

Rule 29 of the Federal Rules of Appellate Procedure ...............................1

Local Rule 29.1(b) .....................................................................................1

## Other Authorities

David Goodman, *City Council Votes to Increase Oversight of New York
    Police*, N.Y. TIMES, June 27, 2013.. ...............................................9

Pursuant to Rule 29 of the Federal Rules of Appellate Procedure, Michael B. Mukasey and Rudolph W. Giuliani (the "Amici") submit this memorandum, as *amici curiae*, in support of the motion for a stay pending appeal (the "Stay Motion") filed by Defendant-Appellant City of New York (the "Appellant" or "City"), and respectfully request that the Court grant the motion.[1]

## INTERESTS OF THE *AMICI*

The Amici have served in several of the highest public offices concerned with law enforcement and governance of the City of New York and the United States; they have served as United States Attorney General, Chief Judge of the United States District Court for the Southern District of New York, Mayor of the City of New York, and United States Attorney for the Southern District of New York, among other offices. In light of their substantial experience across several decades, including significant involvement with the New York City Police Department (the "NYPD"), the Amici are uniquely suited to provide insight into the impact of the district court's Remedies Opinion and Order, dated August 12, 2013 (the "Remedies Order"), and the district court's Liability Opinion issued on the same date (the "Liability Order") (collectively, the "Orders"), on the NYPD and the ability of the City to carry out its mission to provide for the safety and

---

[1] Pursuant to Local Rule 29.1(b), the Amici hereby confirm that no party, or its counsel, has contributed money that was intended to fund the preparation or submission of Amici's proposed brief. In addition, no non-party other than the Amici or their counsel has contributed such funds. Counsel for the parties did not author the proposed brief in whole or in part.

welfare of the residents of the City of New York.  As described below, the Amici are currently employed in the private sector and have no interest in the outcome of this case aside from the continued effective and constitutional operation of the NYPD and the safety of the residents of the City of New York.

Individually, the Amici are as follows:

Michael B. Mukasey served for more than 18 years as United States District Judge of the United States District Court for the Southern District of New York, six of those years as Chief Judge.  He also served as Attorney General of the United States, the nation's chief law enforcement officer.  As Attorney General from November 2007 to January 2009, Mukasey oversaw the U.S. Department of Justice and advised on critical issues regarding all areas of the law.  He is the recipient of several awards for his work, most notably the *Learned Hand Medal* of the Federal Bar Council.  Mukasey is currently a partner at the international law firm Debevoise & Plimpton LLP.

Rudolph W. Giuliani served two terms as Mayor of the City of New York, from 1994 to 2001.  Prior to serving as mayor, Giuliani was the Associate Attorney General of the United States and, for six years, United States Attorney for the Southern District of New York.  Giuliani is widely credited with improving the quality of life in the City, in large part due to the significant drop in crime under his administration.  Over Giuliani's eight years in office, New York's crime rate

fell by 57 percent and the Federal Bureau of Investigation rated New York City as

America's safest large city.  Many of the City's law enforcement strategies

implemented during Giuliani's administration, including the CompStat program

that won the 1996 Innovations in American Government Award from the Kennedy

School of Government at Harvard University, have become models for other cities

around the world.  Giuliani is currently a partner at the law firm of Bracewell &

Giuliani LLP.

## ARGUMENT

In determining whether to grant a stay pending appeal, a court must

consider:  (1) the likelihood of success on the merits; (2) irreparable injury to the

moving party if a stay is denied; (3) substantial harm to the party opposing a stay if

one is issued; and (4) the public interest.  *Mohammed v. Reno*, 309 F.3d 95, 100

(2d Cir. 2002) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).  In this brief,

the Amici address the second and fourth stay factors, and rely upon Appellants'

arguments in support of the remaining factors.  The Amici respectfully submit that

the City will suffer irreparable harm if a stay is not granted.  Despite the suggestion

in the district court's September 17, 2013 Opinion and Order (the "September 17

Decision") denying the City's motion for a stay that the Orders will have no

palpable effect during the pendency of the appeal, or until the district court has

ordered particular steps, the experience of the Amici in overseeing law

enforcement agencies teaches that when the mandate for a fundamental shift in law enforcement approach has been put in place, both day-to-day performance and long-term planning and training are immediately affected. The Orders declare that the already complicated and nuanced constitutional analyses that police must quickly perform in advance of street encounters is improper, leaving police with little direction until a comprehensive set of reforms, which themselves could later be deemed unnecessary if the district court is overturned, is developed and approved by the district court in order for police conduct to survive legal challenge.

Also, the Orders impermissibly infringe on the City's and NYPD's legitimate consideration of race in conducting police activities within constitutional bounds, which will thereby have a deleterious effect on the City's ability to fight crime. Further, the City will be irreparably harmed should the Remedies Order remain in effect because the extensive remedial program it prescribes violates federalism principles and intrudes upon the City's local law enforcement duties.

Finally, the public interest points decidedly in favor of issuing a stay pending appeal because a stay will best preserve the City's recent success in reducing crime and providing for the public safety, which is of paramount concern in this case.

## I.    The City Will Suffer Irreparable Injury Without A Stay

### A.    Despite The District Court's Suggestion That The Orders Call For No Immediate Change In Lawful Procedures, The Orders Will Have An Immediate And Deleterious Effect

The September 17 Decision suggests that the City can suffer no legally cognizable injury because all the Orders have done, even if broadly read, is to require that police officers comply with already applicable law. *See* September 17 Decision at 3.  That breathtaking claim disregards the obvious impact of the Orders, which constitute a determination that current NYPD policies and practices do not conform with the law, and thus that those who carry them out – police officers – are in constant peril of being found to have violated applicable law. Both the City and those police officers are thus on notice that they must change their methods in undefined ways or be called to account.

The experience of the Amici teaches that months and sometimes even years of planning and training are necessary before procedures are changed or new mandates put in place.  Thus, the CompStat program referred to above, integral to the dramatic reductions in crime achieved by the NYPD, or the FBI Guidelines, which have transformed the FBI from strictly a crime-fighting agency to an intelligence gathering agency as well, took careful preparation before they could be implemented.

The "stop-question-and-frisk" procedure, often referred to simply as "stop-

and-frisk," is not a stand-alone procedure but rather is only one element of a proactive approach to policing that stresses situational awareness and affirmative steps to prevent crime. Whether or not the district court acknowledges it, that entire approach has been cast in doubt by the Orders. Both the NYPD and individual police officers have been told, in essence, that their current conduct is in violation of fundamental constitutional guarantees. It is impossible to exaggerate the impact the Orders will have on planning and training within the NYPD, and on individual day-to-day policing decisions, if the Orders are not stayed.

### B.    The Orders Constrain The City's Constitutional Use Of Race In Effective Policing And Will Adversely Affect Crime Prevention

The City will suffer irreparable harm in the absence of a stay pending appeal because of the severe impact the Orders will have on the NYPD's ability to effectively and constitutionally police the City of New York. To permit the implementation of the Orders would sanction the district court's attempt to radically alter existing constitutional law, which in fact provides that police may consider a person's race in conjunction with other descriptive characteristics when investigating and preventing crime. This infringement on the City's constitutional exercise of its police power irreparably harms the City. Further, as the remedies ordered by the district court provide insufficient guidance to officers, the City and its residents will be irreparably harmed because of the adverse effect this will have on crime prevention. Thus, a stay pending this Court's decision on the merits is

appropriate.

As this Court has stated, while courts may be mindful of the impact of police activities on community relations, the court's "role is not to evaluate whether the police action in question was the appropriate response under the circumstances, but to determine whether what was done violated the [constitutional provision at issue]." *Brown v. City of Oneonta, New York*, 221 F.3d 329, 339 (2d Cir. 1999). Here, however, the district court has disregarded this Court's exhortation and imposed its own view on how the NYPD should be policing the City.

In finding that "the City adopted a policy of indirect racial profiling by targeting racially defined groups for stops based on local crime suspect data," Liability Order at 13, the district court ignored bedrock constitutional law providing that police may consider a person's race while conducting police work without offending the Constitution. For example, where police stop and question an individual based on "a description that include[s] race as one of several elements [] defendants d[o] not engage in a suspect racial classification that would draw strict scrutiny" under the Equal Protection Clause. *Brown*, 221 F.3d at 337-38. This is because "[t]he Equal Protection Clause . . . has long been interpreted to extend to governmental action that has a disparate impact on a minority group *only* when that action was undertaken with discriminatory intent." *Id.* at 338 (emphasis added).

Indeed, the very fears enunciated by Chief Judge Walker in response to the argument in *Brown* that *any time* police use a racial descriptor they are using a suspect racial classification subject to strict scrutiny – which echoes the import of the Liability Order – will prove prophetic in the absence of a stay pending appeal:

> The theories suggested . . . would require a police officer, before acting on a physical description that contains a racial element, to balance myriad competing considerations, one of which would be the risk of being subject to strict scrutiny in an equal protection lawsuit. Moreover, the officer frequently would have to engage in such balancing while under the pressure of a time-sensitive pursuit of a potentially dangerous criminal. Police work, as we know it, would be impaired and the safety of all citizens compromised.

*Brown v. City of Oneonta, New York*, 235 F.3d 769, 771 (2d Cir. 2000) (Walker, J., concurring in denial of rehearing in banc).

Further, as Judge Walker explained:

> I have little doubt that the rules of constitutional law proposed . . . would weaken police protection within all communities. . . . In my view, it is a grave mistake to seize upon an idea that would alter police work and law enforcement procedures fundamentally without considering its effect on those most vulnerable to crime.

*Id*. Critically, the maximum impact will be felt by the "most vulnerable and isolated . . . and, if police effectiveness is hobbled by special racial rules, residents of inner cities would be harmed most of all," *id.*, which harm is unquestionably irreparable.

Without a stay, the confusion resulting from the Orders will chill policing

efforts due to the fear of doing something wrong.[2]  Officers wary of facing a

lawsuit will be hesitant to stop even those individuals engaging in reasonably

suspicious behavior who happen to be of a racial minority group, or suspects

matching description data that includes race, out of a fear of committing a

wrongful stop.[3]  In short, Chief Judge Walker's fears will be realized should the

Orders not be stayed.

The likelihood of chill is apparent from the Remedies Order itself.  Among

the most imminent of the "Immediate Reforms" is a FINEST message to be sent to

all NYPD personnel (i) explaining the Liability Order, (ii) delineating the

constitutional standards pertaining to stop-and-frisk and racial profiling as

articulated by the district court in a decision that is on appeal and thus could be

determined to be erroneous and (iii) ordering immediate compliance with the

recited standards.  Remedies Order at 25.  The FINEST message will be the *first*

mandated explanation to NYPD personnel of the coming changes as a result of the

Liability Order, yet there is no timetable for rolling out this important

communication and cannot be announced until after meetings among various

---

[2] In the absence of a stay, officers will also be less inclined to engage in mere street encounters for fear of being accused of committing an unlawful stop.  Such encounters benefit the community in a number of ways, including helping an intoxicated person home or mediating a dispute.  *See Terry v. Ohio*, 392 U.S. 1, 13 n.9 (1968).

[3] This concern is likely to be amplified in light of the City Council's passage of the Community Safety Act, which broadens residents' ability to sue the NYPD for racial profiling. *See* David Goodman, *City Council Votes to Increase Oversight of New York Police*, N.Y. TIMES, June 27, 2013.

constituencies to decide upon the text of the message and district court approval of the language. *See* Plaintiffs' Stay Opp'n Ltr., dated Sept. 6, 2013, at 5 [Dist. Ct. ECF No. 385] (arguing that "the FINEST message cannot be written until the Immediate Relief is developed, as the Court ordered the FINEST message to include an explanation of that relief"). Even if a court-approved FINEST message were to be released quickly – a relative term that the district court acknowledges is likely to take "several months" – that message will set forth constitutional standards without critical operational guidelines necessary to instruct the NYPD on how to constitutionally handle the multiple possible circumstances that comprise a street encounter. The FINEST message will only create confusion and necessitate hesitation in potentially life-threatening situations without accompanying training, which is not to take place until after implementation of revised policies in consultation with the Monitor and approval by the district court. Thus, officers are unlikely to know when – under the potentially erroneous standard set by the Liability Order – their conduct violates the 4th and 14th Amendment.

Accordingly, because the Orders impermissibly infringe upon the City's effective and constitutional policing efforts, which will thereby cause "[p]olice work, as we know it, [to] be impaired and the safety of all citizens compromised," *Brown*, 235 F.3d at 771, this Court should issue a stay pending appeal.

**C.     The Orders Exceed The Proper Authority Of The District Court To Remedy Purported Constitutional Violations**

The City is also entitled to a stay pending appeal because the Orders dramatically overstep the proper bounds of the judiciary in fashioning injunctive relief against a municipality, thereby irreparably harming the City.  While the district court's lengthy and detailed Remedies Order is surely a considered effort, the remedies ordered severely encroach upon the City's ability to govern and are at odds with substantial case law.

Well-established principles of federalism inform consideration of the Remedies Order.  "[R]ecognition of the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the states' criminal laws in the absence of irreparable injury which is both great and immediate."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 112 (1983).  That suits brought under § 1983 ordinarily may result in injunctions imposed on state proceedings "d[oes] not displace the normal principles of equity, comity and federalism that should inform the judgment of federal courts when asked to oversee state law enforcement authorities.  In exercising their equitable powers federal courts must recognize the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law."  *Id.* (citations and internal quotation marks omitted); *see also Terry*, 392 U.S. at 12 (acknowledging the "limitations of the

-11-

judicial function in controlling the myriad daily situations in which policemen and citizens confront each other on the street"); *Curtis v. City of New Haven*, 726 F.2d 65, 67-68 (2d Cir. 1984) (recognizing "considerations of comity and federalism in cautioning federal courts to exercise restraint before interfering with the administration of law enforcement by the states" emphasized by the *Lyons* Court). A district court's injunctive order that "significantly revis[es] the internal procedures of [a city's] police department, [i]s indisputably a sharp limitation on the department's latitude in the dispatch of its own internal affairs" to which a local government "has traditionally been granted the widest latitude." *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976) (citations and internal quotation marks omitted). The matters of local concern for which local governments deserve wide latitude include the protection of the health and safety of their residents. *See Gonzales v. Oregon*, 546 U.S. 243, 270 (2006).

The remedies ordered by the district court in conjunction with the Liability Order are vast, substantial and multi-faceted, and afford the judiciary an impermissible degree of oversight of the inner-workings of a municipality's police function that offends federalism principles.[4]  Among its many directives, the

---

[4] It is worth noting that the remedies that have issued here are not the result of a consent decree entered into by the City due to a concession that it would be difficult to defend the policies in question. *See, e.g.*, *Paganucci v. City of New York*, 785 F. Supp. 467, 477 (S.D.N.Y. 1992). Rather, the City believes that the NYPD's use of stop-and-frisk is constitutional, that the Liability Order is incorrect and the Remedies Order is inappropriate. Thus, while institutional reform consent "decrees often remain in place for extended periods of time," *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 380 (1992), and may be wide-ranging, the same is not true for

Remedies Order:  (i) appoints a Monitor to oversee the announced remedies; (ii)

establishes the Immediate Reforms, which require the NYPD to issue the FINEST

message, revise its policies and training regarding stop and frisk, revise the UF-250

form to include a narrative section for officers to record the basis for a stop, direct

officers to record stop and frisk activity in activity logs and improve its system of

monitoring, supervising and disciplining officers; (iii) requires officers in select

precincts to wear body-worn cameras; and (iv) orders the parties to engage in a

joint remedial process involving community input.  Remedies Order at 9-32.  The

district court further appointed a Facilitator to shepherd the joint remedial process,

and has since appointed an Academic Advisory Council consisting of 13 law

professors from area law schools to help the Monitor and Facilitator.  Each of the

reforms resulting from the above must be approved by the district court, and all of

the costs incident to the above initiatives and tasks, including costs incurred by the

Monitor and Facilitator but excluding those of the Academic Advisory Council, are

to be borne by the City.

The Remedies Order is akin to a "relic of a time when the federal judiciary

thought that structural injunctions taking control of executive functions were

sensible.  That time is past."  *Rahman v. Chertoff*, 530 F.3d 622, 626 (7th Cir.

2008).  More recent cases "demonstrate the impropriety of certifying open-ended

a court-ordered injunction in the circumstances of this case.

-13-

classes to facilitate structural injunctions designed to regulate law-enforcement practices." *Id.* (citing cases). Rather, "modesty is the best posture for the branch that knows the least about protecting the nation's security and that lacks the full kit of tools possessed by the legislative and executive branches." *Id.* at 628. Further, while members of the executive and legislative branches may be replaced by the electorate as a consequence of the elected officials' decision-making, "judges are immune from that supervision and must permit those who bear the blame for errors (in either direction) to assume the responsibility for management." *Id.*[5]

These precepts are particularly true in the context of injunctions concerning a municipality's police practices. "[I]nstitutional reform injunctions often raise sensitive federalism concerns. Such litigation commonly involves areas of core state responsibility," *Horne v. Flores*, 557 U.S. 433, 448 (2009), such as the City's duty to provide for the public safety, *Laratro v. City of New York*, 8 N.Y.3d 79, 81 (2006) ("Protecting health and safety is one of municipal government's most important duties."). Thus, the district court's prescriptions that the NYPD revise the UF-250 to include a narrative, record stop and frisk activity in activity logs, and alter its system of monitoring, supervising and disciplining officers, among

---

[5] As the final decision-maker regarding the formation and implementation of new police policies and procedures, rather than arbiter, it is arguable that the district court has usurped the role of police commissioner and mayor.

other remedies, constitute an improper intrusion into the City's policing role.[6]

Not only is the breadth of the remedies inappropriate for its impact on the City's local law enforcement role, but also "[f]ederalism concerns are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities," *Horne*, 557 U.S. at 448, which the Remedies Order does by requiring the City to bear the significant costs of compliance with the Orders.[7]  A court's interference with local budget priorities is troubling because "[s]tates and local governments have limited funds.  When a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs." *Id.* (citation omitted).

In addition to the overbreadth of the Remedies Order in general, a number of the remedies in particular are at odds with case law addressing the appropriate reach of injunctions impacting municipal law enforcement and public safety. "[W]hen a federal district court crafts an injunction to vindicate a plaintiff's protected rights, it cannot simply order whatever a City is physically capable of doing, without regard to considerations of public health, safety, convenience, and

---

[6] By way of specific example, the mandate to introduce a body-worn camera pilot program fails to address the district court's constitutional concern in a narrowly tailored manner. The evidence shows that stop-and-frisk activities account for only a small portion of an NYPD officer's daily activity, but all activity would be captured by the cameras despite the unquestioned legality of those activities.

[7] By way of example, the City will be required, at significant cost not just in terms of money but more importantly in time and productivity, to organize and attend working group and public meetings to develop and approve the ordered remedies, and attend continuous court appearances as part of the approval process.

cost.  On the contrary, the Court must make a sound exercise of equitable discretion that considers all the relevant circumstances." *Million Youth March, Inc. v. Safir*, 155 F.3d 124, 126 (2d Cir. 1998) (modifying injunction that had allowed march to be held along 29-block portion of Malcolm X Boulevard for 12 hours to a 6-block event limited to four hours along same boulevard in light of constraints on police force during Labor Day weekend).  Thus, while the City may literally be capable of issuing a FINEST message, reformatting its stop-and-frisk documentation, revising its policies, re-training the police force and meeting with members of the community in conjunction with the Monitor and Facilitator, the breadth and scale of these tasks are not appropriate, and to require the City to comply will improperly intrude upon the City's policing function at a time when the underlying decision is on appeal.

In particular, as this Court found in *U.S. v. City of New York*, those portions of the Remedies Order requiring the City to pay outside parties, such as the Monitor or Facilitator, to prepare reports concerning reforms to the NYPD's policies and practices, at the City's expense, should be stayed because City employees can perform the same task and "it does not require burdening the City with the extra expenses of an outside consultant."  717 F.3d 72, 97-98 (2d Cir. 2013).  Furthermore, this Court has also found that an injunction requiring implementation of contemporaneous written records of all relevant encounters is

-16-

"far too intrusive," *id.*, which casts doubt on the propriety of the Remedies Order's prescriptions for a narrative section in the UF-250 form and requirement to record stop and frisk activity in activity logs.

The above provides ample evidence of the overbreadth of the Remedies Order sufficient to justify a stay of the remedies announced therein pending appeal, and in any event, violates fundamental principles of federalism that serve to uphold the City's interest in self-governance without undue interference by the judiciary.

For all the foregoing reasons, the City will suffer irreparable injury in the absence of a stay pending appeal of the Orders.  Given the severity of the irreparable injuries at stake, the balance of hardships favors the City and merits issuance of a stay.  *See Thapa v. Gonzales*, 460 F.3d 323, 334, 336 (2d Cir. 2006) (recognizing the "sliding scale" stay factors analysis in this Circuit which holds that the necessary level of success on the merits is inversely proportional to the irreparable injury the moving party will suffer without stay); *see also Plummer v. Quinn*, No. 07 Civ 6154 (WHP), 2008 WL 383507, at *1-2 (S.D.N.Y. Feb. 12, 2008) (granting Quinn and the City stay pending appeal of district court's partial denial of summary judgment motion in case asserting constitutional violations because (i) permitting case to proceed to trial would violate Quinn's qualified immunity, thereby irreparably harming her, and (ii) there was "a possibility" of success on the merits).

## II.    <u>The Public Interest Favors Granting A Stay</u>

The greatest public interest at issue in this case is public safety and continued prevention of crime in this nation's largest city.  The Appellant has successfully carried out its duty of protecting health and safety over the past two decades in large part because of the efficacy of stop-and-frisk among other police tools in detecting and deterring crime.  Those who have benefited the most in the triumph of this public interest have been residents living in areas with the highest rates of crime, and where rates have dropped precipitously.  The public interest lies decidedly in favor of a stay pending appeal so that the NYPD may continue to fulfill its mission of providing for the public safety and preventing violent crime without facing a vast array of overbroad injunctive remedies that interfere with the City's ability to carry out these responsibilities and which will have a chilling effect on law enforcement.  Further, the public has a particular interest in a stay pending appeal as the City, *i.e.*, taxpayers, must fund the ordered remedies, which will be wasted should this Court reverse the district court.

Moreover, principles of federalism discussed above strongly support staying the injunctive remedies the district court ordered, which will ensure the internal affairs of the NYPD and the City attendant to providing for the health and safety of New Yorkers are not unjustly interfered with prior to a decision on the merits of the appeal.  In short, the status-quo should be maintained until this Court has an

opportunity to rule on the far-reaching and substantial effects of the Orders.

On account of the foregoing, the public interest lies definitively on the side of granting a stay pending appeal.

## <u>CONCLUSION</u>

For all the set forth above, the Amici respectfully request that the Court grant the City's motion for a stay pending appeal and grant such further relief as the Court deems just and proper.

Dated:  September 30, 2013
      New York, New York

Respectfully submitted,

    /s/ Daniel S. Connolly
Daniel S. Connolly, Esq.
Rachel B. Goldman, Esq.
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 508-6100
Facsimile: (212) 508-6101
Email: daniel.connolly@bgllp.com
Email: rachel.goldman@bgllp.com

*Counsel for Amici Curiae Michael B. Mukasey and Rudolph W. Giuliani*

-19-

# CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 29 AND 32

1.     This memorandum complies with the type-volume limitation of Fed.

R. App. P. 29(d) and Fed. R. App. P. 32(a)(7)(B)(i) because it contains 5,156

words, excluding the parts of the brief exempted by Fed. R. App. P.

32(a)(7)(B)(iii).


2.     This memorandum complies with the typeface requirements of Fed.

R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6)

because it has been prepared in a proportionally spaced typeface using Microsoft

Word 2010 in 14-point Times New Roman.


Dated:     September 30, 2013
           New York, New York

                              /s/  Daniel S. Connolly