UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
--------------------------------------------------X

Docket No. 13-3088

DAVID FLOYD, *et al.*,

      *Plaintiffs-Appellees*,

-against-

THE CITY OF NEW YORK,

      *Defendant-Appellant*.

--------------------------------------------------X


## <u>MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT-APPELLANT'S MOTION FOR A STAY</u>


      CENTER FOR CONSTITUTIONAL RIGHTS
      666 Broadway, 7th Floor
      New York, New York 10012
      (212) 614-6439

      BELDOCK LEVINE & HOFFMAN LLP
      99 Park Avenue, Suite 1600
      New York, New York 10016
      (212) 490-0400

      COVINGTON & BURLING LLP
      The New York Times Building
      620 Eighth Avenue
      New York, New York 10018-1405
      (212) 841-1000

# INTRODUCTION

Plaintiffs-Appellees ("Plaintiffs") submit this memorandum of law in opposition to the motion of Defendant-Appellant City of New York's ("City") for a stay pending appeal of the District Court's Remedies Order, Koeleveld Decl. (Dkt # 72), Ex. A ("Remedies Op."), and Liability Order, Koeleveld Decl. Ex. B ("Liability Op."). *See* Dkt # 72 ("Stay Mot.").[1] The City seeks to stay an order that requires it to do nothing more than engage in discussions with Plaintiffs, a court-appointed monitor and facilitator, and stakeholders, including the police officers, about how to best remedy the widespread constitutional violations which the District Court found the City has committed for more than a decade. The parade of horribles the City predicts will flow from the Remedies Order is speculative, and the remedies, when imposed, will not constitute irreparable harm under the law of this Circuit. The District Court's decision to direct a process for developing remedies that permits the City's input into crafting injunctive relief, and its direction limiting reforms to stop and frisk, is the type of measured, narrowly-tailored remedial approach consistently taken by equity judges in institutional reform cases.

---

[1] This memorandum also responds in part to the Amici Curiae briefs of the Sergeants Benevolent, Patrolmen's Benevolent, Lieutenants' Benevolent, Captains' Endowment, and Detectives' Endowment Associations (collectively the "Police Unions"), Michael Mukasey and Rudolph Giuliani. *See* Dkt ## 105-3, 107-2, 115-3.

The City is unlikely to succeed on the merits of its appeal because the District Court's liability findings were based on clear, well-established Supreme Court and Circuit precedent. Virtually all of the City's merits arguments are disagreements with factual findings which, given the comprehensive and detailed review of the trial record in the Liability Order, were not clearly erroneous.

Finally, as demonstrated by the more than 30 declarations opposing the City's motion from named plaintiffs, local elected officials, current and former NYPD personnel, academic researchers on policing, and organizations that work with communities most impacted by the NYPD's unconstitutional stop-and-frisk practices, staying the remedial process ordered by the District Court would harm Plaintiffs and the public interest because it would allow suspicionless and race-based stops to continue unabated, undermine public confidence in the remedial process and thus undermine the chances of remedial success, and would delay a long-overdue dialogue between the NYPD, the communities it polices, and other stakeholders, which is a necessary first step to ending more than a decade of unconstitutional policing. Accordingly, the City's motion should be denied.

## **BACKGROUND**

On August 12, 2013, the District Court issued its opinion finding the City liable for violating Plaintiffs' Fourth and Fourteenth Amendment rights following a nine-week bench trial in which over 100 witnesses testified and approximately

2

400 exhibits were admitted into evidence, producing a trial record of over 8,000 pages. Charney Decl. ¶ 8. Both parties submitted Proposed Findings of Fact and Conclusions of Law and Post-Trial Briefs after the close of evidence. Charney Decl. ¶ 9. In its almost 200-page Liability Order, the District Court dedicated 11 pages to relevant Supreme Court and Second Circuit precedent and 85 pages to purely factual findings regarding unconstitutional and racially discriminatory policies and practices and deliberate indifference at the institutional level. These findings relied on testimony from dozens of NYPD employees from the rank of police officer to Chief of Department, including commanders of precincts throughout the City, and leaders of multiple NYPD units, as well as extensive documentary, audio and statistical evidence. In addition, the District Court addressed the anecdotal evidence of individual 19 Named Plaintiff and class member stops in over 60 pages.

The same day that it issued its Liability Order, the District Court issued a separate order addressing the appropriate relief to be afforded to address these persistent and pervasive constitutional violations. The Remedies Order set forth two stages of a process to develop a set of reforms to current NYPD policies and practices: (1) the parties and the Independent Monitor would work together to develop a set of proposed reforms, which will be submitted to the court and implemented only upon court approval; (2) a court appointed Facilitator is to work

3

with the parties, through a six-to-nine month process allowing community, police union, and other stakeholder input, to develop a set of supplemental reforms which also will be submitted to the court and implemented only upon court approval.

As the District Court explained, "the remedial phase of the case is ongoing and no final order has yet issued." Koeleveld Decl., Ex. C ("Stay Op.") at 6. The remedial process "is still in its earliest stages" and "[i]t is unlikely that any orders will issue for several months." Stay Op. at 6-7. The District Court underscored that "the vast majority" of reforms "will not be implemented until the Facilitator and the Monitor have the opportunity to work with the community, the NYPD, and the other stakeholders identified;" the "only activity at this stage is discussion", and "no other specific relief is imminent." *Id*. at 4 - 5.

On August 27, 2013, the City moved for a stay of the Remedies Order in the District Court. The City did not submit any declarations in support of its stay motion to the District Court. Charney Decl. ¶ 12. Following briefing on the motion, the District Court denied the City's motion on September 17, 2013.  Stay Op. at 14.

## ARGUMENT

### POINT I:
### THIS COURT LACKS JURISDICTION TO CONSIDER
### THE CITY'S MOTION

On September 24, 2013, Plaintiffs moved to dismiss this appeal for lack of jurisdiction and requested that their motion to dismiss be considered in tandem

with the City's motion for a stay. Dkt. # 76.[2] As more fully explained therein, this Court lacks jurisdiction to review interlocutory orders that merely direct the development of remedies, and this is in part because allowing such review would require conjecture and result in piecemeal appeals. Dkt. # 76 at 9 *et seq*. Because the Remedies Order directs only a process for developing remedies, this Court lacks jurisdiction to hear the City's interlocutory appeal and motion for a stay.

**POINT II:**
**THE CITY HAS NOT ESTABLISHED ENTITLEMENT TO A STAY**

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009); *see also Maldonado-Padilla v. Holder*, 651 F.3d 325, 327 (2d Cir. 2011). Courts examine four factors in determining whether to issue a stay pending appeal: "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (quoting *Hilton v. Braunskill*,

---

[2] The Police Unions lack standing to appeal the Liability and Remedies Orders. *Marino v. Ortiz,* 484 U.S. 301, 304 (1988). Their motions to intervene are likely to be denied by the District Court, as they have no cognizable interest in this appeal and, even if they did, their motions are grossly belated. *See e.g. Schonfeld v. City of New York*, 14 Fed. Appx. 128, 131 (2d Cir. 2001). Plaintiffs reserve the right to move to dismiss any appeal pursued by the Police Unions, and any arguments pertaining to the merits of their intervention motions are not before this Court.

481 U.S. 770, 776 (1987)); *accord Nken*, 556 U.S. at 433. "The first two factors . . . are the most critical." *Nken*, 556 U.S. at 434. The City "bears a heavy burden to 'establish a favorable balance of these factors.'" *Natural Res. Def. Council v. U.S. FDA*, 884 F. Supp. 2d 108, 122 (S.D.N.Y. 2012).[3]

**(1)    The City has Failed to Establish that It Faces Irreparable Harm**

The District Court recognized that "[i]t takes time to fashion appropriate remedies." Stay Op. at 6. Mindful that "[i]t would be unwise and impractical . . . to impose [ ] reforms" without input from the parties and stakeholders, the District Court declined to immediately impose any remedies. Remedies Op. at 13-32. Instead, the District Court directed the parties to engage in a facilitated process to develop remedies within certain parameters. *Id*. In the second paragraph of the Remedies Order, the District Court unequivocally made "very clear" that it was "*not* ordering an end to the practice of stop and frisk." Remedies Op. at 2 (emphasis supplied). The District Court then clearly articulated the constitutional standards applicable to stop encounters that must underpin the remedies, and it drew those standards from, *inter alia*, *Terry v. Ohio*, 392 U.S. 1 (1968), *Florida v. Bostick*, 501 U.S. 429 (1991), *United States v. Place*, 462 U.S. 696 (1983),

---

[3] In the event this Court grants the City's motion, the stay must be narrowly tailored to address established harms. *See Osmose, Inc., v. Viance, LLC*, 612 F.3d 1298, 1323 (11th Cir. 2010); *Tamko Roofing Prods., Inc., v. Ideal Roofing Co., Ltd.*, 282 F.3d 23, 40 (1st Cir. 2002) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 972 (D.C. Cir. 1990).

*Alabama v. White*, 496 U.S. 325 (1990), *Ybarra v. Illinois*, 444 U.S. 85 (1979),

*Arizona v. Johnson*, 555 U.S. 323 (2009), and *United States v. Lopez*, 321 Fed.

App'x 65 (2d Cir. 2009). Remedies Op. at 15-16.

Despite its clear enunciation of long-established constitutional standards, the

City claims there is now "confusion" about the state of the law. Stay Mot. at 24-26.

Preliminarily, the District Court's orders have not resulted in confusion. Members

of the NYPD understand that stops remain an available policing tool, and it is a

tool they continue to use. Charney Decl., Ex. U ¶4-5, Ex. MM ¶ 5. If anything has

led officers to abstain from law enforcement activity, it is not the Liability and

Remedies Orders, but misleading statements from NYPD officials such as notices

from police unions *encouraging officers to abstain from making stops*, which were

made *before* the District Court issued its Liability and Remedies Orders. *Id.,* Ex.

JJ.

Moreover, it is not possible for this Court to stay the Liability Order; that

order will remain extant pending appeal even if a stay issues. With respect to the

Remedies Order, any confusion will be resolved once the remedies are developed

and so-ordered. As the District Court opined, "[t]he reason the relief is not yet

'clear,' that no end point is yet 'discernible' and that 'standards' have not yet been

determined is because the remedial phase of the case is ongoing and no final order

has yet issued." Stay Op. at 6 (quoting the City). The surest way to provide clarity

7

is to move forward with the remedial process and issue the FINEST message to NYPD personnel described in the Remedies Order, *see* Remedies Op. at 25, a message which a stay would delay.

Because the remedies have not yet been ordered, the remaining harms the City cites are, by the City's admission, merely "potential" harms. *See e.g.* Stay Mot. at 24. For example, the City predicts that training designed to remedy constitutional violations might have negative repercussions, *see* Stay Mot. at 25, but no training will occur until the District Court so-orders training. Unless James O'Keefe and the City are prescient, they cannot know whether a training (not yet developed) will disrupt police operations, remove operations from patrol or result in lost crime prevention "opportunities." *See id.* at 24, 25. These potentialities cannot support entry of a stay. *Nken*, 556 U.S. at 434 (holding that irreparable harm requires more than "simply showing some possibility of irreparable harm.") (quoting *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998)); *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) (opining that to establish irreparable injury, "the harm must be imminent or certain, not merely speculative."). And the City routinely trains officers, even requiring the attendance of 9,000 officers at off-site- and legally incorrect-stop and frisk training between 2012 and April 2013, Liability Op. at 104 n. 372, and crime notably did not increase during that period. *See* NYPD, *Citywide Compstat Report Covering the Week 9/16/2013 through*

8

*9/22/2013*, available at http://www.nyc.gov/html/nypd/downloads/pdf/ crime_statistics/cscity.pdf.

The City submits that it faces irreparable injury because personnel will be needed and expenses will be incurred in developing remedial proposals. Stay Mot. at 24-26. It argues, for instance, that the body-worn camera pilot program, which originated from the City's remedial expert who *sua sponte* testified at trial that body-worn cameras were "a good idea" (Remedies Op. at 25), will require the participation of "patrol supervisors and other personnel." Stay Mot. at 25. Putting aside that this is yet again mere speculation, "injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" to satisfy the irreparable harm factor. *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *Conkright v. Frommert*, 556 U.S. 1401, 1401 (2009) (quoting *Sampson*); *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) (same). Moreover, the District Court's directive that the parties participate together in the development of remedies will provide the City an opportunity to raise and resolve any concerns and is "a path well-worn by equity judges overseeing complex, institutional litigation." *Henrietta D. v. Giuliani*, 246 F.3d 176, 182 (2d Cir. 2001).

Thus, administrative outlays are not irreparable harms. *See Schwartz v. Dolan*, 159 F.R.D. 380, 384 (N.D.N.Y. 1995) ("Because defendant alleges only administrative and economic harm, this court finds that they are unable to allege

injury amounting to irreparable harm."), *Schwartz v. Dolan,* 86 F.3d 315, 318 (2d Cir. 1996) (noting that Second Circuit had also denied defendant's application for a stay pending appeal in the case); *NRDC v. U.S. FDA*, 884 F. Supp. 2d 108, 124 (S.D.N.Y. 2012) ("[T]he argument that potentially wasted and diverted staff resources constitutes irreparable harm has been held meritless. . . . This is a sensible rule. . . . [A]ccepting the Government's argument would almost always result in a finding of irreparable harm whenever an agency was required to comply with a court order.") (citation and quotation omitted). And so too, the expenditures devoted to a remedial process do not constitute irreparable harm. *See United States v. City of New Orleans*, 2013 U.S. Dist. LEXIS 77166, *46 (E.D. La. Feb. 8, 2013) (in police department's request for stay: "'inadequate resources can never be an adequate justification for depriving any person of his constitutional rights.'") (quoting *Udey v. Kastner*, 805 F.2d 1218, 1220 (5th Cir. 1986)); *See* Charney Decl., Ex CC ¶¶ 9-12. The City's purported concerns about costs should also be considered in light of its repeated refusal over more than a decade to address the unconstitutionality of its stop and frisk practice and avoid litigation costs. *See* Liability Op. at 61-63, 115; Remedies Op. at 7-8 and n.20.

The City argues that it "should not be forced" to wait for an order that actually compels remedial action before moving for a stay, but points to no irreparable harm that would result from waiting. Stay Mot. at 23. The "burden"

that would supposedly befall the City should it have to brief an emergency stay petition is not irreparable because the City would still have the right to move for relief. And if claimed errors of law in a district court's decision constituted irreparable harm then every appellant would automatically be entitled to a stay.

Grasping for harms where none exist, the City argues that somehow the orders threaten federalism. *See* Stay Mot. at 26-27. The City does not cite any authority standing for the proposition that equitable relief remedying constitutional violations causes irreparable harm to federalism. Nor could it, as federal courts have a duty to remedy constitutional violations, even where the relief ordered affects local government institutions. *See Brown v. Plata*, 131 S. Ct. 1910, 1928-29 (2011) ("Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."); *Allee v. Medrano*, 416 U.S. 802, 815 (1974); *Ass'n of Surrogates v. New York*, 966 F.2d 75, 79 (2d Cir. 1992), *modified on reh'g*, 969 F.2d 1416, 1418 (2d Cir. 1992).

The City's reference to cases requiring courts to be mindful of federalism concerns, Stay Mot. at 26, is inapposite because the District Court recognized that its equitable authority is limited by principles of federalism, and it issued the Remedies Order within those limits and in light of its concomitant obligation to enforce the Constitution. Remedies Op. at 6-8. Indeed, in setting out the authority of the Independent Monitor to develop and implement remedies, the District Court

11

was careful to preclude interference with the City's proper policing authority:

> The Monitor will be specifically and narrowly focused on the City's compliance with reforming the NYPD's use of stop and frisk. . . .

> The Monitor will not . . . replace or assume the role or duties of any City or NYPD staff or officials, including the Commissioner. The Monitor's duties, responsibilities, and authority will be no broader than necessary to end the constitutional violations in the NYPD's stop and frisk practices described in the Liability Opinion.

Remedies Op. at 11-12.

The remaining cases the City invokes on federalism grounds are similarly unavailing. This Court said nothing of federalism concerns in its brief order granting the stay motion in *United States v. Bloomberg*, 2013 U.S. App. LEXIS 2792 (2d Cir. Feb. 7, 2013).[4] And *Gonzales v. Oregon*, 546 U.S. 243 (2006) and *Turner v. Safely*, 482 U.S. 78 (1987), neither of which involved a request to a stay of a remedial process, do not support a finding of irreparable harm, and if anything support appropriate judicial intervention. *See id.* at 99-100 (striking down statute as constitutionally invalid).

The City's final argument on this factor is particularly troubling. The City suggests that the Police Commissioner should be free from court intrusion into his interpretation of the Constitution. Stay Mot. at 27. Yet it is not for the Police

---

[4] Amici Mukasey and Giuliani's citation to this Court's merits decision in *Bloomberg* is similarly misleading. *See* Dkt # 115-3 at 16. This Court did not stay, but in fact upheld, an order that the City pay costs of a monitor appointed "to oversee the FDNY's long-awaited progress toward ending discrimination." *United States v. City of New York*, 717 F.3d 72, 97 (2d Cir. 2013).

12

Commissioner to expound the Constitution; that is the province of the courts. After a nine-week trial, the District Court found, based on un-rebutted testimony, that the Police Commissioner endorsed a stop-and-frisk policy with an express racial classification. *See* Liability Op. at 87-88. The Police Commissioner is without discretion to violate the Constitution.

**(2)      The City has Failed to Establish Likelihood of Success on the Merits**

An injunction is subject to reversal where the District Court abused its discretion, including "application of an incorrect legal standard" or reliance on "clearly erroneous findings of fact." *Nicholson v. Scoppetta*, 344 F.3d 154, 165 (2d Cir. 2003). Factual findings are clearly erroneous if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Resner v. Arc Mills, Inc.*, 152 F.3d 920 (2d Cir. 1998). A choice between two permissible views "cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985). The clearly erroneous standard applies with equal force to findings "that deal with 'ultimate' and those that deal with 'subsidiary' facts." *Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982). As set forth below, the District Court applied well-established Supreme Court and Circuit precedent, and its factual findings are all supported by the extensive trial record.

13

(a)  **Fourth Amendment Claim**

The City's primary argument for overturning the District Court's finding of a widespread practice of Fourth Amendment violations is the supposed failure to apply the "totality of the circumstances" test for determining whether stops and frisks comply with the Fourth Amendment. Stay Mot. at 13-19. This argument mischaracterizes well-established standards for proving policy and practice claims in civil rights cases, the District Court's findings, and the trial evidence.

The City's contention that statistics derived from the UF-250 data are not probative of whether the NYPD has engaged in a widespread practice of suspicionless stops, Stay Mot. at 13-15, ignores extensive precedent holding that statistics, usually in combination with anecdotal evidence, can provide circumstantial evidence from which to infer a widespread practice of illegal conduct in civil rights cases, even where the challenged practice itself consists of a series of individual and discretionary decisions taken by subordinate officials. *See, e.g., Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339, 342 n.24 (1977); *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 301-07 (1977); *Ingram v. Madison Square Garden Ctr., Inc.*, 709 F.2d 807, 810-11 (2d Cir. 1983); *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 872 (2d Cir. 1992).

The City moreover ignores the extensive evidence presented at trial beyond statistics that supports the District Court's finding of a widespread practice. *See,*

*e.g.*, Liability Op. at 180-181. This evidence included fourteen out of nineteen individual stop-and-frisk encounters that the District Court found, under the totality of the circumstances, violated the Fourth Amendment, and which occurred in all five boroughs over a five-year period, 2006-2011. *Id*. at 119-174. A finding of the existence of a custom or widespread practice can only be reversed upon a showing of clear error, *see Ingram*, 709 F.2d at 810-11; *Singletary v. District of Columbia*, 351 F.3d 519, 529 n.10 (D.C. Cir. 2003), and both the Supreme Court and this Court have upheld such findings that were based on both reliable statistical evidence and similar amounts of anecdotal evidence of individual incidents of illegal conduct. *See, e.g.*, *Hazelwood*, 433 U.S. at 301-07 (affirming lower court finding of pattern and practice of racial discriminatory teacher hiring based on statistical evidence and 16 individual incidents of discrimination against class members); *Ingram*, *supra* (affirming district court finding of pattern and practice of employment discrimination based on statistics and 6 individual incidents of discrimination against class members); *Nicholson*, 344 F.3d at 163, 165-66 (affirming district court's finding of New York City Administration for Children's services policy or custom of unconstitutional removals of children from custody of domestic violence victim mothers based on statistics and unconstitutional child removals from ten plaintiff class members).[5]

---

[5] The City, citing to *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011), argues that the

15

The City takes issue with the District Court's factual conclusion that flaws in the UF-250 stop-and-frisk database "all skew towards underestimating the number of unconstitutional stops that occur." Stay Mot. at 16, citing Liability Op. at 7. Yet, the trial evidence strongly supports this conclusion. All five of the unconstitutional stops of the named Plaintiffs and testifying class members for which a UF-250 form was completed were apparently justified based on stop factors checked off on the forms, but the stopping officers' subsequent trial testimony revealed that all five actually lacked reasonable suspicion. *See* Liability Op.at 124-38, 145-54; Charney Decl. Exs. KK, LL. Conversely, not a single stop that appeared unjustified based on the stop factors checked off on the UF-250 form was subsequently found constitutional based on the stopping officers' trial testimony. Add to this the evidence of individual officers actually engaging in the scripting of stop factors shown by Plaintiffs' statistical evidence, *see* Liability Op. at 46-47, and the conclusion that 200,000 underestimates the number is well-founded.

Moreover, as this Court has noted, the purpose of the "widespread practice" inquiry is to "determine whether there is a fair inference that the 'practice. . .[is] so manifest as to imply the constructive acquiescence of senior policy making

---

District Court's reliance on the UF-250 data somehow renders class certification improper. Stay Mot. at 15. The class certification decision is not properly the subject of this appeal, Dkt # 76-3 at 4 n.1, and, in any event, the City ignores that Plaintiffs challenged and proved a centralized policy, which makes this case very different from *Wal-Mart. See Floyd v. City of New York*, 283 F.R.D. 153, 162-66, 173-74 (S.D.N.Y. 2012); Liability Op. at 64-67, 78-81, 93-97, 100-111.

officials." *Nicholson*, 344 F.3d at 166 n.5 (citation omitted, alternation in original) (finding that "hundreds of incidents of unconstitutional [child protective removals] would certainly represent overwhelming evidence of the constructive acquiescence of senior officials" of the New York City Administration for Children's Services); *see also*, New York City Administration for Children's Services, *Abuse/Neglect Reports by Community District, 2008-2011* (showing that ACS conducts approximately 90,000 child abuse and neglect investigations a year), available at http://www.nyc.gov/html/acs/downloads/pdf/acs_stats_abuse_ cd_ 2011.pdf. Thus 200,000 suspicionless stops over an eight-and-a-half-year period, roughly *23,000 a year*, certainly provides evidence of NYPD senior officials' constructive acquiescence to a pattern of Fourth Amendment violations by officers.[6]

The City tries to manufacture legal error by mischaracterizing the District Court's ruling with respect to the constitutionality of the stop factors "Furtive Movements," "High Crime Area," and "Suspicious Bulge." Stay Mot. at 14. The District Court found only that such factors are "vague and subjective" and that additional narrative explanation of why an officer checked-off these factors on a

---

[6] *Mortimer v. Baca*, 594 F.3d 714 (9th Cir. 2010), Stay Mot. at 18, is distinguishable because there plaintiffs supported their claim that the Los Angeles County Sheriff's Department (LASD) had a policy or practice of over-detaining jail inmates for twenty-four or more hours with statistics showing that 43 out 50,706, or *8 hundredths of one percent*, of inmate releases involved such over-detentions. *Mortimer*, 594 F.3d at 718. And, unlike the NYPD, the LASD implemented policy changes that significantly reduced the unconstitutional detentions. *Id.* at 722.

UF-250 stop form is necessary to "reliably demonstrate individualized reasonable suspicion." Liability Op. at 8, 41. The District Court also explicitly noted that furtive movements and high crime area can contribute to reasonable suspicion. *Id*. at 44 n.153, 45 n. 160 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).

Moreover, the vagueness and subjectivity of these stop factors and skepticism about their reliability as indicia of individualized reasonable suspicion were corroborated by much of the statistical and anecdotal evidence presented at trial, including (i) data that stops based on furtive movements or high crime area had significantly lower hit rates than stops not based on those factors, (ii) data that officers check off high crime area the same percentage of the time for stops conducted in areas with high, low, and average crime rates, (iii) NYPD officers' broad and wildly divergent understandings of what constitutes a "furtive movement," (iv) officers' and supervisors' belief that a high crime area can encompass an entire precinct or borough, and (v) the numerous stops of the named Plaintiffs and testifying class members in which the supposed "suspicious bulges" observed by the stopping officers were run-of-the-mill cell phones. Liability Op. at 11, 34, 45-46 n.161, 100-101, 131, 137, 145-49; Charney Decl. Ex. LL.

Finally, none of the City's cited cases in support of its "hit rate" argument, Stay Mot. at 19, undermine the District's Court reasonable inference that the abysmally low hit rates for NYPD stops and frisks means that the number of

suspicionless stops is higher than 200,000. Liability Op. at 180. In fact, none mention hit rates at all. Moreover, the language in *United States v. Padilla*, describing reasonable suspicion as arising from conduct "as consistent with innocence as with guilt," 548 F.3d 179, 187 (2d Cir. 2009) (citation omitted), suggests that the hit rate for stops truly based on reasonable suspicion would be around 50%, not the 12% (or lower) rate of NYPD stops and frisks. At least one district court in this Circuit has held that "indicia of weapon possession that are correlated with actual weapon possession only one in 30 times"- which is twice as high as the weapons hit rate for NYPD stops and frisks, Liability Op. at 32- "are clearly constitutionally insufficient to justify an investigative detention" under *Terry. United States v. McCrae*, 07-CR-772, 2008 U.S. Dist. LEXIS 2314, *11-12 (E.D.N.Y. Jan. 11, 2008) (Gleeson, J.).

### (b) Equal Protection Claim

In holding that the City is liable for violating Plaintiffs' Equal Protection rights, the District Court applied well-established Supreme Court and Circuit precedent. The District Court employed the well-known framework for asserting Equal Protection claims established by this Court in *Brown v. City of Oneonta,* 221 F.3d 329, 337 (2d Cir. 2000), analyzing Plaintiffs' Equal Protection claim under the "express racial classification" and "intentionally discriminatory application of a facially neutral law or policy" prongs of that framework. Liability Op. at 27-28,

181-88. The District Court made the requisite findings of both discriminatory impact and discriminatory purpose. *See Washington v. Davis*, 426 U.S. 229, 239-40 (1976); *Jana Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2006); Liability Op. at 182-85. And its discriminatory intent determination adhered to the Supreme Court's and this Court's requirement that stops and frisks conducted by New York City police officers be "motivat[ed]" at least "in part" by race, even if race is not the "sole" or even "primary" or "dominant" factor in such stops. Liability Op. at 28-29, 183-85 (citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977), and *Hayden v. Patterson*, 594 F.3d 150, 163 (2d Cir. 2010)).

The City argues that if, as the District Court held, Plaintiffs' Equal Protection claim does not depend on NYPD stops being suspicionless, then the claim required evidence of a similarly-situated comparator group not offered at trial. Stay Mot. at 10-11. Yet this Court has limited the requirement of such evidence to equal protection claims based on a *selective prosecution* theory because of executive deference peculiar to that type of claim. *Pyke v. Cuomo* ("*Pyke I*"), 258 F.3d 107, 109 (2d Cir. 2001). Tellingly, *United States v. Armstrong*, 517 U.S. 456 (1996), the only case the City cites, is a selective prosecution case. In police racial profiling cases, comparator evidence is not required, and plaintiffs may instead demonstrate discriminatory intent through

statistics and other circumstantial evidence of selective enforcement, as Plaintiffs did here, even where no Fourth Amendment violation is alleged or proven. *See*, *e.g.*, *Chavez v. Illinois State Police*, 251 F.3d 612, 640 (7th Cir. 2001); *Bradley v. United States*, 299 F.3d 197, 206 (3rd Cir. 2002); *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003); *Doe v. Village of Mamaroneck*, 462 F.Supp.2d 520, 544-46 (S.D.N.Y. 2006).[7]

The City's causation argument, Stay Mot. at 11, ignores that a policy "motivate[ed]" only "in part" by race can violate the Equal Protection clause, *Village of Arlington Heights* and *Patterson*, *supra*; that racially pretextual stops otherwise lawful under the Fourth Amendment can violate Equal Protection, *see Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Scopo*, 19 F.3d 777, 786 (1994) (Newman, J. concurring) and that there need only be an affirmative link between the policy and the constitutional violation. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). *Hartman v. Moore*, 547 U.S. 250 (2006), Stay Mot. at 11, is inapposite because it deals narrowly with First Amendment retaliatory prosecution claims.

---

[7] The City mischaracterizes the District Court's summary judgment decision, Stay Mot. at 10-11, which did not require a Fourth Amendment violation to establish Plaintiffs' Fourteenth Amendment *Monell* claim, but, rather, held that a particular plaintiff's stop did not violate the Equal Protection clause because it was based on reasonable suspicion and there was no evidence of racial motivation, other than a lack of reasonable suspicion, presented on summary judgment. *Floyd v. City of New York*, 813 F.Supp.2d 417, 424-25, 444 (S.D.N.Y. 2011).

The City's remaining attacks on the District Court's Fourteenth Amendment liability ruling are nothing more than objections to the factual findings underpinning that ruling, none of which are clearly erroneous. First, the City disagrees with the District Court's rejection of the crime suspect race benchmark favored by the City's experts for statistically measuring the discriminatory effect of NYPD stops and frisks and adoption of the local crime and population benchmark offered by Plaintiffs' expert. Stay Mot. at 8-10; Liability Op. at 49-58. That the District Court gave more weight to Plaintiffs' expert's benchmark cannot be overturned unless clearly erroneous, *see Gilbert v. Frank*, 949 F.2d 637, 643 (2d Cir. 1991), which it is not because social scientists have never deemed the City's benchmark superior, and the District Court had social scientifically sound reasons to reject it. Liability Op. at 50 n.175, 51-54, 58 n.193.[8]

The City also objects to the District Court's holding that the City has an unwritten policy of targeting black and Hispanic young men for stops based on the appearance of members of those racial groups in the crime suspect data, a policy which the District Court termed "indirect racial profiling", and that such policy

---

[8] The City's argument that the police can stop and frisk innocent people without violating the Fourth Amendment or Equal Protection Clause, Stay Mot. at 10, is a non-sequitur. The District Court did not hold that the high percentage of innocent persons stopped rendered stops racially discriminatory, but that this percentage made the crime suspect race data a poor benchmark. Liability Op. at 51-54. Moreover, the District Court's concern about the 40% missing data, *see* Stay Mot. at 9-10, is both rational and supported by testimony from the City's expert that he was unaware of *any* scholarly support for using such an incomplete data set. Liability Op. at 58 n.193.

constitutes both an express racial classification and the intentionally discriminatory application of a facially neutral policy. Stay Mot. at 7-8, 10-11; Liability Op.at 58, 81-88, 183-188. But, again, such a finding of discriminatory intent cannot be disturbed absent clear error, *see Pullman-Standard*, 456 U.S. at 287; *Ingram v. Madison Square Garden Ctr., Inc.*, 709 F.2d 807, 810-11 (1983), and extensive evidence presented at trial supports this finding, including, *inter alia*:

- Un-rebutted evidence of statements made by the NYPD Commissioner that the NYPD targets Blacks and Hispanics for stop-and-frisk activity, "to instill fear in them, every time they leave their home, they could be stopped by the police." Liability Op. at 87-88, 184;

- Testimony from the NYPD Chief of Department that the NYPD targets its stop-and-risk activity at "black and Hispanic youths [age] 14 to 20" and "young men of color in their late teens, early 20's," because members of those demographic groups are "the people that are committing the crimes" and "doing th[e] shootings," *id*. at 83-84 n.283;

- An audio recording of a precinct commander in the Bronx instructing an officer that he should stop only the "right people" and that the "the right people" are "male blacks 14 to 20, 21," *id*. at 84-85;

- Anecdotal evidence that officers comported with these directives by aiming stop and frisk activity at blacks and Hispanics based on general crime pattern data. *Id.* at 85-87.

In addition, the circumstantial evidence supporting an inference of discriminatory intent that the City ignores is extensive. *See, e.g.*, *inter alia*, Liability Op. at 61-64, 89-99, 105-17, 189-91; *see also Arlington Heights*, 429 U.S.

at 267-68; *DiStiso v. Cook*, 691 F.3d 226, 241 (2d Cir. 2012).[9] Further, that suspect race statistics are derived from victim and witness crime complaints, Stay Mot. at 8, 11, is a red herring because it is not the data itself but the City's *use* of that data to target stops at certain races which the Court found racially discriminatory.

As the District Court emphasized, there is a meaningful difference between relying on a specific suspect description to investigate a specific crime, *see Iqbal v. Ashcroft*, 556 U.S. 662, 682 (2009); *Brown*, 221 F.3d at 337, and targeting a law enforcement tactic at one race based on that race's representation in general crime statistics. Liability Op. at 186-87. This Court in *Brown* recognized this very distinction, 221 F.3d at 337, and while the phrase "indirect racial profiling" may be novel, it refers to the far from novel proposition that the use of race in policing based on general crime patterns amounts to unlawful racial stereotyping. *See, e.g.*, *In re Cincinnati Policing*, 209 F.R.D. 395, 401 (S.D. Ohio 2002) ("It is difficult to comprehend how the use of race in routine policing- for example, in the description of a suspect when the police are not in hot pursuit- could satisfy" strict scrutiny); United States Department of Justice, *Guidance Regarding the Use of*

---

[9] It is of no moment that some of this evidence is recounted in the "Deliberate Indifference" section of the District Court's Findings of Fact because, as the District Court admonished, the Liability Opinion should be read "as a whole, with an understanding of the interplay between each section," Liability Op. at 4, which the City ignores by artificially separating the District Court's findings and trial evidence. *See* Stay Mot at 7-23. Moreover, this Court "may affirm [an injunction] on any ground supported by the record." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted).

*Race by Federal Law Enforcement Agencies*, at 4 (2003) ("Even if there were overall statistical evidence of differential rates of commission of certain offenses among particular races, the affirmative use of such generalized notions by federal law enforcement officers in routine, spontaneous law enforcement activities is tantamount to stereotyping . . . This is the core of 'racial profiling' and it must not occur."); New Jersey State Attorney General, "Interim Report of the State Police Review Team Regarding Allegations of Racial Profiling," at 66 (April 20, 1999) ("Many of the facts that are relied upon to support the relevance of race and ethnicity in crime trend analysis, however, only demonstrate the flawed logic of racial profiling, which largely reflects *a priori* stereotypes that minority citizens are more likely than whites to be engaged in certain forms of criminal activity"), available at http://www.state.nj.us/ lps/intm_419.pdf.

The City's argument that Plaintiffs provided insufficient anecdotal evidence of discriminatory animus to support the Fourteenth Amendment claim, Stay Mot. at 12, ignores black letter law that proof of racial animus is unnecessary and the extensive evidence at trial the City's policy was "motivate[ed]" "in part" by race. *Supra* at 20; *see also Ferrill v. Parker Group, Inc*., 168 F.3d 468, 473 n.7 (11th Cir. 1999) ("[I]ll will, enmity or hostility are not prerequisites of intentional discrimination"); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 230 (1995); *Grutter v. Bollinger*, 539 U.S. 306 (2003). Moreover, there is no minimum number

25

of anecdotes necessary to prove a pattern and practice of intentional racial discrimination. Indeed, this Court has held that even *one* anecdote in combination with statistical evidence of disparities is sufficient to establish a widespread practice of intentional discrimination by the NYPD. *See Sorlucco*, 971 F.2d at 872 (2d Cir. 1992). The question of discriminatory purpose "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266, and the extensive trial record supported the District Court's finding of discriminatory purpose here.[10]

Finally, while Plaintiffs did have to prove that at least one Plaintiff or class member suffered a race-based stop and frisk to obtain *Monell* liability on their Equal Protection claim,[11] the District Court's finding that class member Cornelio McDonald's stop was motivated at least in part by his race was not clearly erroneous. *See* Stay Mot. at 12. This finding is based on testimony from Mr. McDonald and the officer who stopped him, which included evidence of a

---

[10] *Brown v. City of Oneonta*, Stay Mot. at 12, is distinguishable because the plaintiffs there offered no evidence of a policy of targeting particular racial groups for *Terry* stops in general, no statistical evidence showing a racially disparate impact of Oneonta's overall stop practices, and no circumstantial evidence of discriminatory intent on the part of municipal policy makers. *Brown*, 221. F.3d at 337-38.

[11] Contrary to the City's assertion, *see* Stay Mot. at 12 n. 5, the equal protection claim of an unnamed class member may serve as a basis for *Monell* liability even if the named plaintiffs' claims failed. *See Sosna v. Iowa*, 419 U.S. 393, 402 (1975); *Whitlock v. Johnson*, 153 F.3d 380, 384 & n.1 (7th Cir. 1998).

26

similarly situated group of non-black pedestrians treated differently and that the stop was motivated in part by a dated borough-wide burglary pattern involving suspects described only as "black males." Liability Op. at 85-86, 129, 132-33. The record also supports an inference that the officer was aware of the similarly situated non-black group. *See* Charney Decl, Ex. HH at 3749:1-5, Ex LL.

**(c)** **Deliberate Indifference**

The District Court's factual finding that the NYPD pressured officers to increase stop-and-frisk activity regardless of whether reasonable suspicion existed is likewise amply supported by survey evidence which the City mischaracterizes, Liability Op. at 70, and by extensive testimonial, documentary and audio-recorded evidence the City completely ignores. *Id.* at 64-81. In addition, over the course of more than 30 pages, the District Court details the significant and deliberate failures and deficiencies in training, supervision, monitoring, auditing, and discipline in the areas of stops, frisks, reasonable suspicion, and racial profiling that have persisted despite the City's knowledge since 1999 of significant constitutional problems with its stop-and-frisk practices, and in the face of continued public outrage and demands for change. Liability Op. at 60-63, 89-117. The City omits that it failed to adopt the two RAND recommendations focused on identifying and addressing racial bias, and that the "audits" it trumpets are a superficial review of the same UF-250 forms which the City now argues are insufficient to determine reasonable

27

suspicion. Liability Op. at 93-94, 116-17 n.429.

Thus, the District Court's factual finding that the City "has turned a blind eye" for years to clear evidence of unconstitutional and racially discriminatory stops and frisks, Liability Op. at 178-180, 189-92, which may only be reversed if clearly erroneous, *see Nicholson*, 344 F.3d at 166-67, was well-supported by the trial record and therefore must be upheld.

**(3)    Plaintiffs will Suffer Substantial Harm if a Stay Issues**

While the harm to the City must be irreparable to support a stay, the harm to Plaintiffs need only be substantial to defeat a stay. *Nken*, 556 U.S. at 433. Plaintiffs sought a collaborative remedial process in the event of a finding of liability, and they did so based on evidence that such processes increase the effectiveness and staying power of ultimate remedies. Charney Decl. ¶¶5-6, Ex A. The Liability and Remedies Orders created a groundswell, and many stakeholders are actively interested in the remedial process, ignited and engaged. *See e.g.*, Charney Decl., Exs. C-F, H, O, W. A stay of the remedial process will weaken stakeholder engagement, *see infra*, and undermine the precise remedy Plaintiffs sought.

Moreover, violations of constitutional rights are always irreparable. *See State of Connecticut Dep't of Envtl. Prot. v. Occupational Safety and Health Admin.*, 356 F.3d 226, 231 (2d Cir. 2004). The City suggests that Plaintiffs have an adequate remedy at law, but Plaintiffs are entitled to be free from constitutional

28

violations by the City and the NYPD. This Court should not credit the City's unrealistic suggestion that thousands of likely poor New Yorkers can separately redress what took five years of protracted litigation and nine weeks of trial for the class of plaintiffs in this action to redress. The City's implicit acknowledgment that a stay will result in constitutional violations underscores the necessity of commencing the remedial process without further delay. Indeed, class representatives have recently been subjected to apparently unlawful stops and frisks and the resulting humiliation, even since the District Court issued its liability finding. Charney Decl. Ex. B ¶¶ 4-6, Ex. Y ¶ 6. Against the City's interim administrative inconveniences, the widespread, constitutional injuries to Plaintiffs tip the balance heavily against a stay.

**(4)    The Public Interest Favors Denying the City's Motion**

The public interest weighs decidedly in favor of permitting the parties and stakeholders to continue the remedial processes, and decidedly against permitting the continued widespread violation of New Yorker's constitutional rights in the face of an extensive record and a specious appeal. Preliminarily, the City's arguments regarding supposed confusion and administrative outlays are unavailing as already established *supra*. And the City ignores the considerable confusion it caused by refusing to follow black letter law governing stops and frisks. Liability Op. at 100-105; *see* Charney Decl., Ex. U ¶¶ 5-9, Ex. MM ¶¶ 4, 6-8. It is,

moreover, the City, not the District Court, that has generated ill-will in the community through its years of unlawful stops primarily targeting Black and Latino residents of New York. *See e.g.*, Charney Decl., Ex. H ¶6, Ex. O ¶¶ 4-8, Ex. S ¶¶5-10, Ex. Z ¶ 6; Liability Op. at 111-117; Dkt # 50-1, at 8-9. Additionally, law enforcement officials and academic policing experts agree that reforming a police department's practices to comply with the Constitution does not undermine policing effectiveness. *See* Charney Decl., Ex. G at 6-7 (citing research), Ex. CC ¶¶ 5-9, 11, Ex. EE ¶¶ 7-8.

As the District Court recognized, Stay Op. at 12, a stay will send the wrong message and deflate public confidence in the judiciary, the Monitor, and the remedial process. *See e.g.*, Charney Decl. Ex. F ¶¶ 16-22, Ex. K ¶¶ 8-9; Ex. P ¶¶ 8-9, Ex. S ¶11-13, Ex. W ¶ 10, Ex. FF ¶ 7. Even the City's remedial expert agrees with elected officials, civil rights, labor, faith leaders and community organizations that community trust is important to police officers' effectiveness and monitoring officers' activity. *See id.*, Ex. II at 7762:20-7763:5, 7817:4-21; *see also id.*, Ex. C ¶ 9, Ex. D ¶¶ 13-14, Ex. G at 7, Ex. H ¶ 6, Ex. M ¶8, Ex. O ¶7, Ex. R ¶6; Ex. AA ¶¶6-8.

The City's citation to *Rahman v. Chertoff*, 530 F.3d 622 (7th Cir. 2008) (Stay Mot. at 28-29), does not tip the balance in its favor. *Rahman* involved the federal executive branch's regulation of the United States' international borders, a

"plenary" federal executive power entitled to great judicial deference, *Rahman*, 530 F.3d at 624 (citations omitted), not the routine law enforcement practices of a municipal police department. More importantly, unlike here, the *Rahman* plaintiffs failed to identify any particular "policies, practices and customs" that contributed to the constitutional violations. *Rahman*, 630 F.3d at 625-26. Thus, *Rahman* in no way undermines the Supreme Court's pronouncement that "[w]here, as here, there is a persistent pattern of police misconduct, injunctive relief is appropriate." *Medrano*, 416 U.S. at 815. Indeed, just last week, a federal court ordered broad injunctive relief to address the Maricopa County, Arizona Sheriff's Office's widespread practice of unconstitutional and race-based traffic stops. *See Melendres v. Arpaio*, CV-07-2513, Dkt # 606 (D. Ariz. Oct. 2, 2013); *Melendres v. Arpaio*, 2013 U.S. Dist. LEXIS 73869 (D. Ariz. May 24, 2013).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs-Appellees respectfully request that this Court deny the City's motion to stay in its entirety.

Dated: New York, New York
     October 7, 2013

                      Respectfully submitted,


                      _____/s/_____

                      Darius Charney, Esq.
                      Sunita Patel, Esq.

Chauniqua Young, Esq.
Baher Azmy, Esq.
CENTER FOR CONSTITUTIONAL RIGHTS

Jonathan C. Moore, Esq.
Jenn Rolnick Borchetta, Esq.
BELDOCK LEVINE & HOFFMAN LLP

Eric Hellerman, Esq.
Kasey L. Martini, Esq.
COVINGTON & BURLING LLP