**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

--------------------------------------------------------- X

DAVID FLOYD, et. al.,                                       )
                                                           )
                    Plaintiffs-Appellees,                  )
                                                           )
        vs.                                                )        Docket No. 13-3088
                                                           )
THE CITY OF NEW YORK, et. al.,                             )
                                                           )
                    Defendants-Appellants.                 )

--------------------------------------------------------- X

**MEMORANDUM OF LAW OF THE OFFICE OF THE PUBLIC**
**ADVOCATE FOR THE CITY OF NEW YORK AS *AMICUS CURIAE* IN**
**OPPOSITION TO DEFENDANTS-APPELLANTS' MOTION FOR A STAY**

OFFICE OF THE PUBLIC ADVOCATE
FOR THE CITY OF NEW YORK
Steven R. Newmark
General Counsel
One Centre Street
New York, N.Y.  10007
(212) 669-7200
snewmark@pubadvocate.nyc.gov

BAKER & HOSTETLER LLP
John Siegal
Fernando A. Bohorquez, Jr.
45 Rockefeller Plaza
New York, N.Y.  10111
(212) 589-4200
jsiegal@bakerlaw.com
fbohorquez@bakerlaw.com

*Attorneys for Public Advocate Bill de Blasio*

## TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE..........................................................................1

PRELIMINARY STATEMENT ........................................................................3

ARGUMENT ..................................................................................................6

    I.    Any Impact of The District Court-Ordered Remedies Process on
Police Policies And Practices Is Not Imminent .........................................7

    II.    The Remedies Order Will Not Irreparably Harm Defendants-
Appellants  Pending Appeal And The Monitorship Process Serves
The Public Interest...................................................................................15

CONCLUSION ..................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Benjamin v. Fraser*,
343 F.3d 35 (2d Cir. 2003) ....................................................... 10-11

*Bogard v. Wright*,
159 F.3d 1060 (7th Cir. 1998) ......................................................16

*Boykin v. 1 Prospect Park ALF, LLC*,
No. 12 Civ. 06243, 2013 U.S. Dist. LEXIS 111978 (E.D.N.Y. Aug. 8,
2013) ...................................................................................2

*Floyd v. City of New York*,
--- F. Supp. 2d ----, No. 08 Civ. 1034 (SAS), 2013 WL 4046209
(S.D.N.Y. Aug. 12, 2013)...............................................................1

*Floyd v. City of New York*,
--- F. Supp. 2d -----, No. 08 Civ. 1034 (SAS), 2013 WL 4046217
(S.D.N.Y. Aug. 12, 2013)..........................................................*passim*

*Floyd v. City of New York*,
08 CIV. 1034 (SAS), 2013 WL 5225319 (S.D.N.Y. Sept. 17, 2013) .........10, 19

*Matter of Green v. Safir*,
174 Misc.2d 400, 664 N.Y.S.2d 232 (N.Y. Sup. Ct. 1997)...........................2, 3

*Handberry v. Thompson*,
446 F.3d 335 (2d Cir. 2006) ..................................................... 10-11

*Hilton v. Braunskill*,
481 U.S. 770 (1987)....................................................................6

*Horne v. Flores*,
557 U.S. 433 (2009)...................................................................12

*Laratro v. City of New York*,
8 N.Y 3d 79 (2009)...................................................................12

*Nken v. Holder*,
556 U.S. 418 (2009)....................................................................6

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Plummer v. Quinn,*
   No. 07 Civ. 6154, 2008 WL 383507 (S.D.N.Y. Feb. 12, 2008) .........................12

*Rahman v. Chertoff*,
   530 F.3d 622 (7th Circ. 2008) ..............................................................12

*S.E.C. v. Worldcom, Inc.*,
   02 CIV. 4963 (JSR), 2003 WL 22004827 (S.D.N.Y. Aug. 26, 2003) ......... 11-12

*Thompson v. Enomoto*,
   815 F.2d 1323 (9th Cir. 1987) ..............................................................16

*United States v. City of New York*,
   717 F.3d 72 (2d Cir. 2013) ...................................................................14

*United States v. City of New Orleans*,
   12 Civ. 1924, 2013 WL 492362 (E.D. La. Feb. 8, 2013)...................... 14, 17-18

*United States v. Mason Tenders Dist. Council of Greater New York*,
   94 CIV. 6487 (RWS), 1997 WL 345036 (S.D.N.Y. June 20, 1997)..................11

*United States v. Microsoft*,
   147 F.3d 935 (D.C. Cir. 1998)..............................................................13

*United States v. Stein*,
   452 F. Supp. 2d 281 (S.D.N.Y. 2006) ...................................................19

*United States v. Vulcan Soc'y, Inc.*,
   No. 07-CV-2067 (NGG)(RLM), 2010 WL 2160057 (E.D.N.Y. May 26,
   2010) ...........................................................................................8

**STATUTES**

N.Y.C. Charter § 10(a)................................................................................1

N.Y.C. Charter § 22 ...................................................................................1

N.Y.C. Charter § 24 ...................................................................................1

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

RULES

Fed. R. App. P. 27 and 29 ........................................................................1

Local Rule 29.1(b) ..................................................................................1

OTHER AUTHORITIES

Lauren Evans, GOTHAMIST (Sept. 20, 2013),
   http://gothamist.com/2013/09/20/kelly_says_stop-and-
   frisk_ruling_ma.php...........................................................................18

OFFICE OF THE INDEP. MONITOR, LAPD, FINAL REPORT (June 11, 2009),
   *available at*
   http://www.keypoint.us.com/Content/PublicReports/LAPD_FINAL-
   REPORT_06-11-2009.pdf..............................................................8, 13

OFFICE OF THE PUBLIC ADVOCATE FOR THE CITY OF NEW YORK, STOP AND
   FRISK AND THE URGENT NEED FOR MEANINGFUL REFORMS (May 2012),
   *available at*
   http://advocate.nyc.gov/sites/advocate.nyc.gov/files/DeBlasioStopFriskR
   eform.pdf............................................................................................2

Robert C. Davis et al., *Federal Intervention in Local Policing: Pittsburgh's
   Experience with a Consent Decree*...............................................8, 13

9C Wright & Miller, *Federal Practice & Procedure* § 2602.1 (3d ed. 2008) ..........8

Pursuant to Federal Rules of Appellate Procedure 27 and 29, the Public Advocate for the City of New York, Bill de Blasio, respectfully submits this memorandum, as *amicus curiae*, in opposition to the motion of Defendant-Appellant City of New York (the "City") for a stay pending appeal of the District Court's decision, *Floyd v. City of New York*, --- F. Supp. 2d -----, No. 08 Civ. 1034 (SAS), 2013 WL 4046217 (S.D.N.Y. Aug. 12, 2013) (the "Remedies Op."), and its supporting decision, *Floyd v. City of New York*, --- F. Supp. 2d ----, No. 08 Civ. 1034 (SAS), 2013 WL 4046209 (S.D.N.Y. Aug. 12, 2013) (the "Liability Op.") (together, the "District Court Orders").[1]

## INTEREST OF AMICUS CURIAE

The Public Advocate is one of only three city-wide elected officials, first in line of succession to the Mayor and an *ex officio* member of the New York City Council.  New York City Charter ("Charter") §§ 10(a), 22, 24(a).  Chief among his responsibilities is monitoring city agencies and officials to ensure compliance with the City Charter.  *Id.* § 24(i).  The Public Advocate is also the City's ombudsman, required to monitor and investigate the effectiveness of City agency responses to citizen complaints and to recommend measures to improve such responses.  *Id.*

---

[1] No party or party's counsel has authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting this brief.  No person—other than the *amicus curiae*, its members, or its counsel—contributed money intended to fund preparing or submitting this brief.  Local Rule 29.1(b).

§§ 24(h) and (f).  In short, the Public Advocate is "the citizens' representative or protector," *Boykin v. 1 Prospect Park ALF, LLC*, No. 12 Civ. 06243, 2013 U.S. Dist. LEXIS 111978, at *56 (E.D.N.Y. Aug. 8, 2013) (citations omitted), and operates as "a 'watchdog' over City government and a counterweight to the powers of the Mayor."  *Matter of Green v. Safir*, 174 Misc.2d 400, 403, 664 N.Y.S.2d 232, 234 (N.Y. Sup. Ct. 1997).

Consistent with this role, the Office of the Public Advocate has a long history of examining misuse of authority "by those invested with police power." *Id.*  The New York Police Department's "stop and frisk" policy is a prime example of a police practice reviewed by the Public Advocate.  In May 2013, the Public Advocate released a report (the "Report") evaluating the 2012 stop and frisk database that in many ways previewed the District Court's findings.[2]  The Report concluded, among other things, that while African-American and Latino New Yorkers comprise only 54% of the general population, they constituted 84% of all stops in 2012, and 88.8% of the people stopped were not charged.

In addition to the Report, the Public Advocate's Constituent Services Department has firsthand experience receiving complaints from constituents regarding stop and frisk, fielding thousands of complaints on the subject.  Further,

---

[2] OFFICE OF THE PUBLIC ADVOCATE FOR THE CITY OF NEW YORK, STOP AND FRISK AND THE URGENT NEED FOR MEANINGFUL REFORMS (May 2012), *available at* http://advocate.nyc.gov/sites/advocate.nyc.gov/files/DeBlasioStopFriskReform.pdf

in the summer of 2012, the Public Advocate delivered to City Hall over 5,000 signatures from New Yorkers in support of an Executive Order to dramatically reduce the number of stops made by the New York City Police Department (the "NYPD").

Accordingly, as the city-wide elected public official charged with "pointing the way to right the wrongs of government,"[3] and one with a track record of shedding light on the unconstitutional wrongs of the City's stop and frisk practice, the Public Advocate has a unique perspective and interest in preserving the Remedies Order and denying the City's request for a stay pending appeal.

## PRELIMINARY STATEMENT

Public Advocate Bill de Blasio and many others have long held that the way the City of New York has been using the important police tool of stop and frisk must change.  The Office of the Public Advocate has, for many years, documented the deleterious impact of the City's stop and frisk practices on the rights of citizens of color.  The District Court has now found that the City's practices violate the Constitution of the United States.  Now comes the hard work of translating constitutional mandates into policy and practice, to change the way the NYPD has

---

[3] *Matter of Green*, 174 Misc.2d at 403, 664 N.Y.S.2d at 234 (recognizing that the Charter Revision Commission, which created the Office of the Public Advocate, envisioned "an independent public official to monitor the operations of City agencies with the view to publicizing any inadequacies, inefficiencies, mismanagement and misfeasance found, with the end goal of pointing the way to right the wrongs of government.").

been utilizing stop and frisk consistent with the NYPD's ability to continue its magnificent performance over the past 23 years of dramatically reducing crime.

As New York turns the page on stop and frisk from backward-looking blame to forward-looking solutions, the District Court has ordered a remedial process designed to aid in this transition. It is a careful and deliberate policy planning process, utilizing a temporary court-appointed Monitor, with the full participation of all parties—especially the NYPD—with each reform subject to further court review and approval before implementation. This consultative planning process is essential and beneficial for New York's future, regardless of what happens in this case on appeal. Synchronizing the abstractions of constitutional law with the day-in, day-out realities of patrolling and policing the City of New York is a complex and constantly continuing public policy challenge. The Declaration of the Chief of Patrol James Hall, submitted in support of the stay motion, does an expert job of outlining some of the critical challenges, and is a valuable contribution to this dialogue. Notably, Chief Hall does not state that the Monitorship process will impede his ability to deploy and command the patrol force of the NYPD.

There is no basis for staying the District Court's remedial order pending appeal. The temporary Monitorship process serves the public interest by removing the issue of stop and frisk in the first instance from an adversarial, argumentative environment to an all-hands-on-deck, fact-based, policy planning forum. Any

4

change in policy that results will be developed in full consultation with the City and the NYPD and requires further order of the District Court. As shown below, that process does not constitute the imminent, irreparable injury required before this Court can stay the District Court's decision pending appeal.

But beyond the insufficient legal basis for a stay addressed throughout this brief, the stay application presents this Court with an opportunity to play a positive, constructive role in the resolution of an issue that has bedeviled the City for years and has unnecessarily strained police/community relations. By ensuring that the remedial process proceeds, this Court will be sending a powerful signal from the highest federal court in this jurisdiction that New Yorkers need to come together in a collaborative process to ensure that affirmative, effective policing and constitutional rights can not only co-exist but can combine to create a better, safer, fairer future for our community.

Facts, not fear, must guide us. The stay application and the *amicus* briefs submitted in support of it are suffused with baseless claims that the District Court's opinion itself has already somehow undermined the ability of the NYPD to patrol the streets, that the District Court has somehow undermined the City's COMPSTAT program, or otherwise imperiled 23 years of progress in policing. This speculative assertion has no factual support. It is contrary to recent public statements by the Police Commissioner. And it is a disservice to the public and to

5

the men and women of the NYPD.  But, most basically, it provides no lawful basis for this Court to issue a stay.

The stay application must be denied because no change in policy or practice as a result of the District Court Order is imminent. (*See* Point I *below*).  Nor is there anything in the District Court Order that will irreparably injure defendants-appellants pending appeal. (*See* Point II *below*).  To the contrary, the Monitorship process that will go forward pending appeal will itself benefit the public interest regardless of any disposition of the appeal.  For these reasons, the stay application must be denied.

## ARGUMENT

In determining whether to grant a stay pending appeal, a court must consider: (1) the likelihood of success on the merits; (2) irreparable injury to the moving party absent a stay; (3) substantial harm to other interested parties if a stay is issued; and (4) the public interest.  *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).  In this *amicus* brief, the Public Advocate addresses the second and fourth factors, irreparable injury and the public interest.

For the reasons detailed below, the Public Advocate respectfully submits that there will be no irreparable injury to defendants-appellants pending appeal. The purported harms asserted by defendants-appellants are unsupported factually,

are speculative and are not imminent.  In addition, as shown below, permitting the remedial process to begin now is in the public interest.

**I.    Any Impact of The District Court-Ordered Remedies Process on Police Policies And Practices Is Not Imminent**

The purpose of the remedies ordered by the District Court "is to ensure that the practice [of stop and frisk] is carried out in a manner that protects the rights and liberties of all New Yorkers, while still providing much needed police protection." *Remedies Op.*, 2013 WL 4046217, at *1.  To that end, the Court, at the recommendation of the United States Department of Justice (the "DOJ"), and consistent with "decades of police reform efforts across the country," appointed a Monitor, one time prosecutor and former New York City Corporation Counsel Peter Zimroth, to "serve the interests of all stakeholders, including the City, by facilitating the early and unbiased detection of non-compliance or barriers to compliance."  *Id.* at *4.

The purpose of the Monitor is to help the parties and New Yorkers turn the page on stop and frisk from blame and fear, to facts and forward-looking planning, to begin the hard and detailed work of translating constitutional mandates regarding excesses in stop and frisk into practical and workable policies and procedures consistent with affirmative, effective policing and continued public safety.  This appointment of a Monitor is appropriate because the solution here requires "administration or complex policing, particularly when a party has proved

resistant or intransigent or special skills are needed." *United States v. Vulcan Soc'y, Inc.*, No. 07-CV-2067 (NGG)(RLM), 2010 WL 2160057, at *4 (E.D.N.Y. May 26, 2010) (quoting 9C Wright & Miller, *Federal Practice & Procedure* § 2602.1 (3d ed. 2008)).  As the DOJ noted and the District Court agreed, the Monitor in this case "may provide substantial assistance to the Court and the parties and can reduce unnecessary delays and litigation over disputes regarding compliance." *Remedies Op.*, 2013 WL 4046217, at *4.

The remedial process here must be a collaborative one rooted in the realities of policing and not an academic exercise.  Much of the success of court-ordered police reform "depends on how the monitor and police officials work together during the years of the decree to achieve compliance."  Robert C. Davis et al., *Federal Intervention in Local Policing: Pittsburgh's Experience with a Consent Decree* 1 (U.S. Dep't of Justice, Office of Community Oriented Policing Services), 2005 (the "Pittsburgh Report").  In Pittsburgh, the DOJ found that the "monitor played an early, vital role . . . by helping [police] officials develop a plan of action." *Id.* at 36.  And, in Los Angeles, the monitor was a central figure in helping the LAPD achieve "substantial compliance" with mandated reforms. OFFICE OF THE INDEPENDENT MONITOR, LAPD, FINAL REPORT (June 11, 2009), *available at* http://www.keypoint.us.com/Content/PublicReports/LAPD_FINAL-REPORT_06-11-2009.pdf (the "LA Report").  Monitors have helped implement

police reforms in major cities across the nation, including Pittsburgh, Los Angeles and Seattle.  DOJ's Statement of Interest, dated June 12, 2013, at 13-15 [Dist. Ct. ECF No. 365].

This Monitorship is designed to move the discussion of reforming stop and frisk in the first instance from the well of the courtroom and public argument to an all-hands-on-deck collaborative policy planning process.  In this case, the Monitor's "initial responsibility will be to develop, *based on consultation with the parties*, a set of reforms of the NYPD's policies, training, supervision, monitoring, and discipline regarding stop and frisk." *Remedies Op.*, 2013 WL 4046217, at *5 (emphasis added).  Notably, these "Immediate Reforms"—in contrast to many other monitorships—will only be implemented upon approval by the Court. *Id.*  In addition to the court approved "Immediate Reforms," the Monitor will work with a facilitator and the parties in a "Joint Remedial Process" stage to develop any further reforms, which also will be implemented only upon court approval. *Id.* This is a deliberative, planning process, one in which a much needed dialogue is only just beginning.

As the District Court summarized in its denial of the stay, "[t]he only activity at this stage is discussion between the Monitor, the Facilitator, and the parties to develop the remedies described in the Remedies Order.  No other specific relief is imminent, much less ordered....[and] [i]t is unlikely that any

orders will issue for several months." *Floyd v. City of New York*, 08 CIV. 1034 (SAS), 2013 WL 5225319, at *2 (S.D.N.Y. Sept. 17, 2013) (the "Stay Op.").

The Monitorship in this case is "specifically and narrowly focused on the City's compliance with reforming the NYPD's use of stop and frisk . . .." *Remedies Op.*, 2013 WL 4046217, at *4. The District Court was careful to outline the Monitor's role and responsibilities, which are only temporary, so as not to constrict or interfere with the NYPD's execution of its broad and essential duties. The District Court did not appoint a quasi-judicial special master possessing the authority to direct the NYPD to comply with unilateral edicts. Rather, the District Court appointed a Monitor who was strongly encouraged "to develop a collaborative rather than adversarial relationship with the City" and provide "assistance" to the NYPD in implementing reforms that first require court approval. *Id.* at *5, *9.

This Court previously recognized the stark distinction between monitors who "aide[] the court in assessing compliance efforts" and special masters who have "'the ability to convene and to regulate hearings, to rule on the admissibility of evidence, to subpoena and swear witnesses, and to hold non-cooperating witnesses in contempt.'" *Handberry v. Thompson*, 446 F.3d 335, 352 (2d Cir. 2006) (quoting *Benjamin v. Fraser*, 343 F.3d 35, 45 (2d Cir. 2003)). The Monitor in this case "has not been given a mandate to exercise quasi-judicial powers, such

10

as finding facts that would be binding on the court absent clear error." *Id.* (citing *Benjamin*, 343 F.3d at 45). Thus, any impact on police policy and practices is not imminent, cannot be sprung on the City and the NYPD without notice and the opportunity to address it, and should be the result of consultation and planning with the NYPD intimately involved in the process.

Accordingly, the dramatic portrayal in the City's brief (the "City Br.") (*see* Dkt. # 72) of the City being "forced to await the eve of implementation, only to rush back to this Court with an emergency motion in hand," City Br. at 23, is exaggerated given the actual District Court Orders in which the City—and the NYPD—will be full participants in an on-going planning process facilitated by the Monitor and subject to judicial oversight and control. There can be no surprise. There should not ever be any need for emergency litigation. And nothing about this process is imminent. The Monitorship in this case is subject to greater judicial oversight and control than other monitors who often have the power and discretion to act without court approval. *See, e.g.*, *United States v. Mason Tenders Dist. Council of Greater New York*, 94 CIV. 6487 (RWS), 1997 WL 345036, at *3 (S.D.N.Y. June 20, 1997) (Union monitor has power to "take any and all actions that are consistent with his responsibilities under, and effectuate the purposes of, this Consent Decree."); *S.E.C. v. Worldcom, Inc.*, 02 CIV. 4963 (JSR), 2003 WL 22004827, at *8 n.5 (S.D.N.Y. Aug. 26, 2003) (citing SEC report lauding

11

company's support of "Corporate Monitor's efforts and the strict discipline thereby imposed" from "such wide-ranging internal oversight imposed from without").

Likewise, contrary to the assertions in the brief of *amici curiae* Michael B. Mukasey and Rudolph W. Giuliani (the "Former Gov't Officials Br.") (*see* Dkt. # 115-3), there is nothing in the District Court Orders that mandates or even permits dissemination of a new FINEST message on the constitutional requirements for stop and frisk without consideration of the NYPD's operational guidelines. Former Gov't Officials Br. at 10.  In fact, just the opposite is true:  because the FINEST message will not be disseminated until recommended by the Monitor in consultation with the parties, including the NYPD, and approved by the Court, the specter of a runaway court causing a message to the patrol force that is inconsistent with operational guidelines is a red herring.  It is the Monitor's duty, subject to further order of the District Court, to make sure that does not happen.[4]

---

[4] The Former Government Officials' Brief is suffused with overstatement that is perhaps best exemplified by its stretching of the case law cited therein.  When the cited and quoted passages are read in the context of the cases themselves, it is clear that many of the authorities cited have *nothing* to do with the issue before this Court—namely, the stay of a court-ordered remedy for unconstitutional policing practices.  For instance, *Rahman v. Chertoff*, 530 F.3d 622 (7th Circ. 2008), Former Gov't Officials Br. at 13-14, is a case about the scope of class certification for the no-fly list civil rights litigation; *Laratro v. City of New York*, 8 N.Y 3d 79 (2009), *id.* at 14, is a tort case against the City of New York for delay in the arrival of an ambulance for a stroke victim; *Horne v. Flores*, 557 U.S. 433 (2009), *id.* at 14-15, deals with overturning an injunction where the district court directed the entire funding of a defunct English language learning program; and in *Plummer v. Quinn,* No. 07 Civ. 6154, 2008 WL 383507 (S.D.N.Y. Feb. 12, 2008), *id.* at 17, the

The practice of establishing a monitorship process to oversee compliance with a remedial order is a "well-established tradition." *See United States v. Microsoft*, 147 F.3d 935, 954 (D.C. Cir. 1998). Monitors used under similar circumstances across the nation have provided invaluable assistance in the police reform process. And contrary to the arguments by the City and the Former Government Officials, the District Court's Remedies Order appointing a Monitor is neither an excessive nor exceptional response to unconstitutional policing practices. In fact, the Remedies Order largely tracks and is consistent with the specific reforms set forth in similarly situated police reform consent decrees in Pittsburgh and Los Angeles. For instance, both—like the District Court Remedies Order—have court appointed monitors. Pittsburgh Report at 7; LA Report at 2. Both—like the District Court Remedies Order—direct revisions to the policies and training materials relevant to the constitutional violations. Pittsburgh Report at 26; LA Report at 93-103. Both—like the District Court Remedies Order—direct revisions to day-to-day police record-keeping related to the constitutional violations like the UF-250 and Activity logs in this case. Pittsburgh Report at 13; LA Report at 34-36, 80.

---

stay was granted because the appellee's injury was compensable through money damages whereas the appellant would have lost qualified immunity. These cases have nothing to do with the issue before the Court.

Finally, the Former Government Officials' complaints as to the monetary cost of such invaluable assistance is misplaced because monitorship costs do not constitute irreparable harm. *See United States v. City of New Orleans*, 12 Civ. 1924, 2013 WL 492362, at *4 (E.D. La. Feb. 8, 2013) (where city sought stay of decree directing police reform measures that included selection of a monitor, finding the associated costs "can never be an adequate justification for depriving any person of his constitutional rights"). The Former Government Officials' citation to *United States v. City of New York*, 717 F.3d 72 (2d Cir. 2013) regarding monitorship costs is also misleading. In that case, the Court affirmed the District Court's appointment of a monitor. The passage quoted in the Former Government Official's brief concerned only the *additional* cost of an outside recruitment consultant. Former Gov't Officials Br. at 16. The court affirmed the monitorship but held that the additional consultant was an unnecessary expense at that time to be deferred until later in the remedial process, if necessary.

For these reasons, the stay application must be denied because there has been no showing that any harm is imminent.

## II.    The Remedies Order Will Not Irreparably Harm Defendants-Appellants  Pending Appeal And The Monitorship Process Serves The Public Interest

The City's submission in connection with its stay application, especially the Declaration of the NYPD's Chief of Patrol Services James P. Hall (the "Hall Decl.") (*see* Dkt. # 72, Ex. E), is a very helpful contribution to the implementation discussion that now has to proceed as the government and communities of New York turn the page on the issue of stop and frisk from past actions to forward-looking solutions.  In his Declaration, Chief Hall expertly raises a number of important policing strategy, management and training issues that have to be analyzed and addressed.  This is exactly the process initiated by the District Court Orders that the temporary Monitor created by the court is charged with facilitating.

This Monitorship, like many other such remedial processes utilized by courts in a variety of contexts, should not be an adversarial process and, as the City's submission accurately and helpfully indicates, the remedies "are to be devised by the Monitor *in conjunction with* the parties," City Br. at 4 (emphasis added), which most certainly includes the New York Police Department.  The Monitorship is designed to move this discussion in the first instance out of the courtroom and out of any adversarial environment so that the required analysis and planning can be conducted in what should be a solutions-oriented, fact-driven process.

15

This process should move forward pending appeal, as it poses no irreparable injury to the City and is clearly in the public interest.  Indeed, the City's submission highlights numerous ways in which a stay pending appeal is unsupported by any showing of irreparable injury and proceeding with the Monitorship would be beneficial to the public interest.

During the next phase of this case, the Monitor is charged with consulting with the parties and making a recommendation to the Court.  That will be a beneficial process, regardless of the outcome on appeal, and nothing about a monitor's process or recommendation constitutes irreparable injury.  *See Thompson v. Enomoto*, 815 F.2d 1323, 1327 (9th Cir. 1987) (defendant "made no showing of serious or irreparable harm from the interim appointment of a [prison monitor]" to warrant finding an interlocutory order appealable); *Bogard v. Wright*, 159 F.3d 1060, 1063 (7th Cir. 1998) (district court's order extending monitor's period of monitoring state's compliance with reforms was not likely to cause irreparable harm that would warrant immediate appeal via mandamus).

In the declarations by two high-ranking NYPD officers submitted in support of the stay application, neither of those police executives asserts that the Monitorship process itself constitutes any harm, much less irreparable harm.  The Chief of Patrol pointedly does not state in his Declaration that the Monitorship process itself will adversely affect, let alone irreparably impair, his ability to

16

deploy the patrol forces of the NYPD.  He raises important patrol issues for the Monitorship process to address in consultation with the Police Department.  That planning process itself will be beneficial and should proceed.  His Declaration makes a strong case, in the end, for proceeding with the Monitorship planning process now, making full use of his expertise and the experience of the NYPD's patrol leadership.

The participation of police personnel in the Monitorship process is not irreparable injury, and Chief Hall does not claim that such limited time commitments will interfere with his management of the patrol force.  The timing of any training programs resulting from the District Court Orders is to be considered by the parties, in consultation with the Monitor, and ultimately determined by the Court or by the NYPD should it choose to initiate reforms in advance of any further court order.

The Public Advocate concurs with the Former Government Officials that "months and sometimes even years of planning and training are necessary before procedures are changed or new mandates are put in place."  Former Gov't Officials Br. at 5.  This is precisely why no irreparable injury will result.  This is also why delay of the Monitor's planning process through a stay, however, would lead to further injury and is contrary to the public interest.  *See City of New Orleans*, 2013 WL 492362, at *4 ("[The City's] residents . . . will suffer substantial harm to their

interests in having a constitutional police force if the Court grants the City's [stay] motion.").

There is no evidence that the District Court Orders have adversely impacted policing, and the various assertions to that effect submitted to the Court are an appeal to fear and not to fact.[5]  The Police Commissioner has stated publicly, "[i]t's too early to tell."  Lauren Evans, GOTHAMIST (Sept. 20, 2013), http://gothamist.com/2013/09/20/kelly_says_stop-and-frisk_ruling_ma.php.  The stay application does not contain any localized analysis of stop and frisk activity compared with crime incidence reports as would be necessary to even begin to determine if those assertions have any credence whatsoever.  Reforming stop and frisk through the Monitorship process, like any criminal justice reform, must be carried out in conjunction with on-going review and analysis of current police management data in order to craft the right policy and management responses to the issues raised in this case.  Data, not beliefs, and facts, not unfounded fears, must control.

_____

[5] Exhibit B to the Declaration of Steven A. Engel included in the papers submitted by the Patrolmen's Benevolent Association, et al. ("PBA") is not germane to the issue before this Court and should be disregarded.  That exhibit is a letter dated July 9, 2013 from Patrick Lynch, PBA President, to delegates and members of the PBA regarding legislation passed by the City Council that is not before this Court.  *See* Dkt. # 107-2, Ex. B.

The suggestion that proactive policing is jeopardized by the District Court Orders has no evidentiary basis and is an escalation of the scare tactics that the District Court wisely rejected. *See Stay Op.*, 2013 WL 5225319, at *5 ("It is well-past time for the City to cease the meritless scare tactic of contending that conforming the use of stop and frisk to constitutional standards will increase crime or make the public unsafe. There is simply no proof of the divisive proposition that the District Court Orders will harm the public.") (citing *amicus curiae* Public Advocate Bill de Blasio Ltr. at 1, 4, 5, 8). Moreover, the Mayor's claims in this regard rest upon highly selective use of facts and statistical sleight of hand that would have two-plus-two equaling five. At any rate, it is speculation that should not bear in this Court's consideration of a stay. *United States v. Stein*, 452 F. Supp. 2d 281, 284 (S.D.N.Y. 2006) ("[A]n applicant for a stay pending appeal must demonstrate threatened irreparable injury that is imminent or certain, not a matter of speculation.").

Contrary to the City's contentions, nothing in the District Court Orders will in any manner limit or interfere with the Commissioner's discretion to "continue to rely on suspect descriptions and complaint reports to determine *where* to deploy officers." City Br. at 27 (emphasis added). The Public Advocate certainly concurs with Chief Hall's statement regarding the importance of the NYPD's COMPSTAT program in the deployment of NYPD resources, the prioritization of resources and

strategies, including staffing levels, and the use of special teams. Hall Decl. ¶ 6. But nothing about the District Court Orders should interfere with that essential strategic management focus.

Finally, the Public Advocate differs with the City in its view that the Monitorship process will squander public resources. City Br. at 28. Regardless of the outcome on appeal, the Monitor and the Facilitator will provide tangible benefits to the people, the government and the police of this City. The Public Advocate is appreciative of the commitment that Mr. Zimroth and the Vera Institute are making to this process. And he looks forward to the constructive role that the parties—especially the City and the NYPD—should play in looking forward and planning ahead to a day when police policy and practices, the Constitution of the United States, and this City's tremendous crime reductions are synchronized and serving, protecting and respecting, all of the communities and citizens of the City of New York.

## CONCLUSION

For the reasons set forth above, the application for a stay pending appeal of the District Court Orders by Defendants-Appellants should be denied.

Dated:  October 15, 2013
        New York, New York

Respectfully Submitted,

OFFICE OF THE PUBLIC ADVOCATE
FOR THE CITY OF NEW YORK

_____/s/ Steven R. Newmark_____
Steven R. Newmark
General Counsel
One Centre Street
New York, N.Y.  10007
(212) 669-7200
snewmark@pubadvocate.nyc.gov

BAKER & HOSTETLER LLP

_____/s/ John Siegal_____
John Siegal
Fernando A. Bohorquez, Jr.
45 Rockefeller Plaza
New York, N.Y.  10111
(212) 589-4200
jsiegal@bakerlaw.com
fbohorquez@bakerlaw.com

*Attorneys for Public Advocate Bill de Blasio*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 29 AND 32

1.    This memorandum complies with the type-volume limitation of Fed.

R. App. P. 29(d) and Fed. R. App. P. 32(a)(7)(B)(i) because it contains 4,901

words, excluding the parts of the brief exempted by Fed. R. App. P.

32(a)(7)(B)(iii).

2.    This memorandum complies with the typeface requirements of Fed.

R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6)

because it has been prepared in a proportionally spaced typeface using Microsoft

Word 2010 in 14-point Times New Roman.

Dated:   October 15, 2013
         New York, New York

　　　　　　　　　　　　　　　／s/ John Siegal　　　　
John Siegal
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, N.Y. 10111
(212) 589-4200
jsiegal@bakerlaw.com