**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

———————————————————— x

DAVID FLOYD, et al.,              :

                               :

        Plaintiffs-Appellees,   :

                               :  Docket No. 13-3088

        - against -          :

                               :

CITY OF NEW YORK, et al.,     :

                               :

        Defendant-Appellant.  :

———————————————————— x

**BRIEF OF THE PATROLMEN'S BENEVOLENT ASSOCIATION,**
**THE DETECTIVES ENDOWMENT ASSOCIATION,**
**THE LIEUTENANTS BENEVOLENT ASSOCIATION, AND**
**THE CAPTAINS' ENDOWMENT ASSOCIATION**
**IN OPPOSITION TO THE MOTIONS FOR REHEARING EN BANC AND**
**THE MOTION TO ADDRESS ORDER OF DISQUALIFICATION**

DECHERT LLP

Steven A. Engel
Edward A. McDonald
James M. McGuire
Elisa T. Wiygul
1095 Avenue of the Americas
New York, New York  10036
T: (212) 698-3693
F: (212) 698-3599
steven.engel@dechert.com

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................1

BACKGROUND ..................................................................................3

    1.      The District Judge Invites The *Floyd* Plaintiffs To File Suit..............4

    2.      The District Judge Conducts Press Interviews During The Trial .......5

    3.      Proceedings In This Court ..................................................7

ARGUMENT ......................................................................................8

  POINT I:

  THERE IS NO BASIS FOR REHEARING *EN BANC* ....................................8

  POINT II:

  THE PANEL HAD THE DISCRETION TO ACT *SUA SPONTE* ...................9

    A.      The District Judge Had No Right To Be Heard Before Reassignment ..................................................................11

    B.      Movants' Timeliness Objection Is Inapposite .................13

  POINT III:

  THE ORDER WAS WITHIN THE COURT'S DISCRETION UNDER THE CIRCUMSTANCES ..................................................................14

    A.      The District Judge's Press Statements ............................14

    B.      The District Judge's Statements In *Daniels* ...................18

CONCLUSION ...................................................................................19

# TABLE OF AUTHORITIES

CASES                                                                              Page(s)

*Andrade v. Chojnacki,*
   338 F.3d 448 (5th Cir. 2003) ...................................................................16

*Cullen v. United States,*
   194 F.3d 401 (2d Cir. 1999) ...................................................................10

*Floyd v. City of New York,*
   --- F. Supp. 2d ----, No. 08 Civ. 1034,
   2013 WL 4046209 (S.D.N.Y. Aug. 12, 2013)......................................5

*In re Boston's Children First,*
   244 F.3d 164 (1st Cir. 2001)..........................................................14, 15

*In re Drexel Burnham Lambert Inc.,*
   861 F.2d 1307 (2d Cir. 1988) .................................................................14

*In re IBM Corp.,*
   45 F.3d 641 (2d Cir. 1995) .........................................................9, 13, 14

*In re Marshall,*
   721 F.3d 1032 (9th Cir. 2013) ...............................................................16

*Kensington Int'l Ltd. v. Republic of Congo,*
   461 F.3d 238 (2d Cir. 2006) .................................................................12

*Liteky v. United States,*
   510 U.S. 540 (1994)....................................................................................9

*United States v. Amico,*
   486 F.3d 764 (2d Cir. 2007) .................................................................12

*United States v. Campo,*
   140 F.3d 415 (2d Cir. 1998) .................................................................10

*United States v. Cooley,*
   1 F.3d 985 (10th Cir. 1993) ..........................................................14, 15

*United States v. Haldeman,*
   559 F.2d 31 (D.C. Cir. 1976)...............................................................16

**Page(s)**

*United States v. Londono*,
  100 F.3d 236 (2d Cir. 1996) ..............................................................10

*United States v. Microsoft*,
  253 F.3d 34 (D.C. Cir. 2001)................................................*passim*

*United States v. Suleiman*,
  208 F.3d 32 (2d Cir. 2000) ................................................................10

*White v. Nat'l Football League*,
  585 F.3d 1129 (8th Cir. 2009) ..........................................................15

**STATUTES & RULES**

28 U.S.C. § 455 ................................................................................16

28 U.S.C. § 2106 ................................................................................9

7th Cir. R. 36 ...................................................................................10

Fed. R. App. P. 21 ............................................................................12

Fed. R. App. P. 35 ..........................................................................2, 9

**OTHER AUTHORITIES**

Joseph Goldstein, *Court Blocks Stop-and-Frisk Changes for New York Police*, N.Y. Times, Oct. 31, 2013.................................................8

Mark Hamblett, *Plaintiffs Say Stop-and-Frisk Panel Should Be Replaced*, N.Y. L.J., Nov. 13, 2013 ..........................................13

Mark Hamblett, *Stop-and-Frisk Judge Relishes Her Independence*, N.Y. L.J., May 20, 2013 ...............................................................6, 7

Larry Neumeister, *NY 'Frisk' Judge Calls Criticism 'Below-The-Belt'*, Associated Press, May 19, 2013 .........................................6

Jeffrey Toobin, *Rights and Wrongs:  A judge takes on stop-and-frisk*, New Yorker, May 27, 2013.................................................6

Wright & Miller, *Fed. Practice & Procedure* § 3967.1 (4th ed. 2013) ..................12

Pursuant to Federal Rule of Appellate Procedure ("FRAP") 27 and the invitation of the Court, the Patrolmen's Benevolent Association of the City of New York, Inc., the Detectives Endowment Association, Police Department, City of New York, Inc., the Lieutenants Benevolent Association of the City of New York, Inc., and the Captains' Endowment Association of New York, Inc. (collectively, the "Police Intervenors") respectfully submit this brief in opposition to the Request for Leave to File Motion to Address Order of Disqualification of Hon. Shira Scheindlin ("the District Judge") (the "Motion to Address Disqualification"), Dkt. Nos. 261 (*Floyd*), 188 (*Ligon*); the *Ligon* Plaintiffs' Motion to Reconsider by *En Banc* Court, Dkt. No. 185; and the *Floyd* Plaintiffs' Motion for Reconsideration by the *En Banc* Court, Dkt. No. 267.[1]

## INTRODUCTION

On October 31, 2013, the Court granted the City's motion for a stay pending appeal and, upon reviewing the record, concluded that these cases should be reassigned to a new judge, because the District Judge's actions had compromised "the appearance of impartiality surrounding the litigation."  Dkt. Nos. 247 (*Floyd*); 174 (*Ligon*) ("Order").  In so doing, the Court acted well within its broad

---

[1] The Police Intervenors have previously filed *amicus* papers in support of the City's motion for a stay pending appeal.  On November 7, 2013, they moved to intervene as appellants.  *See* Dkt. Nos. 252 (*Floyd*), 178 (*Ligon*).

1

supervisory power.  There is no basis for rehearing.

Plaintiffs and the Motion to Address Disqualification (collectively, "Movants") request that the Court rehear this matter *en banc*, yet they make no effort to explain how the Order meets the high threshold for such review.  Because the Order creates no circuit conflict, rehearing *en banc* is not "necessary to secure or maintain uniformity of the court's decisions."  Fed. R. App. P. 35(a).  And because it merely reassigns future proceedings to a new district judge, it can hardly present a "question of exceptional importance."  *Id.*  While the Court's decision was correct on the law, Movants' arguments of simple error do not meet the standards for *en banc* review.

Nor do Movants demonstrate any cognizable violation of any protectable rights.  Plaintiffs do not have any right to a hearing before a particular judge, and the District Judge has neither a proprietary interest in the case nor a right to be heard prior to reassignment.  The fact that the Court ordered reassignment based on its finding that the District Judge's actions had "r[u]n afoul" of the canons of judicial conduct does not implicate any of her rights.  *See, e.g.*, *United States v. Microsoft*, 253 F.3d 34, 107-16 (D.C. Cir. 2001) (disqualifying judge, without his participation, based upon findings of "egregious and flagrant" judicial misconduct).  If the same matters were to give rise to a complaint for judicial misconduct, then the District Judge plainly would have the right to mount a

2

defense.  A district judge's right in that wholly different context, however, does not diminish the Court's broad supervisory powers over the district court.

Moreover, the Order was within the Court's discretion.  The District Judge invited the plaintiffs to commence this action, informed them of her willingness to accept it as related to a prior one, and advised them that she would grant them the necessary discovery once they filed.  What is more, in the middle of an exceptionally important trial where the court purported to adjudicate claims against the NYPD involving hundreds of thousands of alleged constitutional violations, the District Judge elected to give at least three interviews in her chambers to reporters. During those interviews, the Judge boasted about her own courage and fidelity to the rule of law, and deprecated colleagues who, in her view, were afraid to rule against the government.  While no party moved to disqualify the judge, the Court properly concluded that these reported statements—which the District Judge has never disputed—irretrievably compromised the appearance of impartiality, "ran afoul" of the Code of Conduct for United States Judges, and required reassignment of the cases.  The motions should be denied.

## BACKGROUND

In the decisions below, the district court permitted 19 discrete challenges to particular NYPD stops to morph into a class action placing more than 4.4 million stops on trial.  Though a misuse of the class action device and a misreading of

3

statistics, the district court found system-wide violations where there were none, and issued a sweeping order that would subject the NYPD's policies, training, discipline, and record-keeping to court supervision for the foreseeable future. The impact of the Court's rulings on the 35,000 men and women of the NYPD, as well as policing in the City of New York, can hardly be overstated. In a case that has the potential to taint the integrity of these 35,000 individuals and ruin the reputation of officers unfairly deemed to have violated the Constitution, it is within the Court's supervisory powers to mandate that any appearance of impropriety be immediately removed from these proceedings.

### 1.    The District Judge Invites The *Floyd* Plaintiffs To File Suit

The *Floyd* matter was assigned to the District Judge after she invited the plaintiffs, shortly before the sunset of the consent decree in *Daniels v. City of New York*, to commence a new action. Order at 2 n.1. In a hearing in *Daniels*, the District Judge informed the plaintiffs that "if you got proof of inappropriate racial profiling in a good constitutional case, why don't you bring a lawsuit? You can certainly mark it as related. How could it not be related to this whole long seven or eight years we have lived together on this case?" *Daniels* 12/21/07 Oral Argument Transcript ("*Daniels* Tr."), Motion to Address Disqualification, Ex. 4, at 10-11. She also stated, "what I am trying to say—I am sure I am going to get in trouble for saying it, for $65 you can bring that lawsuit." *Id.* at 14; *see also id.* at 42 ("And

4

as I said before, I would accept it as a related case, which the plaintiff has the power to designate.").

Plaintiffs' counsel expressed concern that they could only bring the new lawsuit by relying upon confidential NYPD data, which they would soon be obliged to return at the sunset of the *Daniels* decree.  *Id.* at 15.  The District Judge assuaged their concerns, adopting an advocate's role:  "There is enough in the public record to craft the suit.  And then in the suit simply say, we want produced all that was produced in the 1999 lawsuit.  I don't know how you could lose getting it."  *Id.* at 18.

Plaintiffs thereafter commenced the *Floyd* action on January 31, 2008, and marked the matter as related to *Daniels*.  The *Ligon* Plaintiffs commenced their action on March 28, 2012.  They marked it as related to another case, *Davis*, which the District Judge had accepted as related to *Floyd*.  *See* City Motion to Vacate (Dkt. Nos. 265 (*Floyd*), 190 (*Ligon*)) at 8 n.4.

### 2.     The District Judge Conducts Press Interviews During The Trial

The *Floyd* trial began on March 18, 2013 and concluded on May 20, 2013. The District Judge presided over the trial and sat as the finder of fact.  *See Floyd v. City of New York*, --- F. Supp. 2d ----, No. 08 Civ. 1034, 2013 WL 4046209, at *2 (S.D.N.Y. Aug. 12, 2013).  Notwithstanding her role as both judge and jury in a high-profile case, the District Judge chose to give at least three interviews to

reporters in her chambers even as she was conducting the trial.

The District Judge reportedly stated that she would not comment upon the trial itself, but she avowed that she was "not afraid to rule against the government," that she "believe[d] in the Bill of Rights," and asserted that "too many" of her colleagues had become "government judges" who defer to the government because they "are fearful or they want a promotion." The District Judge spoke about her "gutsy" past rulings against the government, and the "vindication" and satisfaction she felt when, after this Court had reversed her in a terrorism case, the jury acquitted the defendant on remand. For example:

- "I don't think I'm the favorite of the U.S. Attorney's office for the Southern District. Because I'm independent. I believe in the Constitution. I believe in the Bill of Rights. These issues come up, and I take them quite seriously. I'm not afraid to rule against the government." Jeffrey Toobin, *Rights and Wrongs: A judge takes on stop-and-frisk*, New Yorker, May 27, 2013, at 5.

- "Too many judges, especially because so many of our judges come out of [the U.S. Attorney's] office, become government judges . . . ." *Id.*

- The judge described her exclusion of evidence in *United States v. Awadallah*, a terrorism case, as "gutsy." After this Court reversed, the jury ultimately acquitted the defendant, a decision she stated was a "vindication" of her past ruling and "an enormously satisfying experience." *Id.* at 11.

- Other judges "are fearful or they want a promotion or whatever it is, they don't exercise the independence they should have. . . . [F]ederal judges, who are appointed for life, don't appreciate how much independence they have—many of them are a little cautious, more cautious than they should be." Mark Hamblett, *Stop-and-Frisk Judge Relishes Her Independence*, N.Y. L.J., May 20, 2013, at 2.

6

- "I do think judges have a duty to protect individual rights because that's what the Bill of Rights is all about…. It's the responsibility of the judiciary to protect those rights granted by our Founders. Now, does that make me an activist? No." *Id.*

- "I know I'm not [the government's] favorite judge." Larry Neumeister, *NY 'Frisk' Judge Calls Criticism 'Below-The-Belt'*, Associated Press, May 19, 2013, at 2.

- "I don't think [the government is] entitled to deference . . . . [S]ome of the judges are a little more timid to maybe disagree with the U.S. attorney's office. . . . They have to prove their case like anybody else. I don't give them special respect. Maybe some judges do because they came from the office, they know the people there, whatever. I try not to do that." *Id.*

- After a newspaper reported that the Mayor's staff had prepared a report showing that the District Judge's prior decisions demonstrated a tendency to rule against law enforcement, she told the reporter that it was a "below-the-belt attack," and "[i]f that's true, that's quite disgraceful. . . . It was very discouraging and upsetting. I can't say it has no toll." *Id.* at 3.

- "That's the day you live for, to do something that you believe is right and that is upheld as right and has a national impact, that's great. . . ." *Id.* at 4.

### 3.    <u>Proceedings In This Court</u>

After the District Court issued its decisions below, the City of New York commenced this appeal and moved for a stay pending appeal. The Police Intervenors and others filed *amicus* briefs in support of that motion. This Court (Cabranes, Walker, Parker, JJ.) heard nearly three hours of oral argument, and on October 31, 2013, granted the City's motion. *See* Order.

In addition, the Court ordered that the case be reassigned to a different district judge "in the interest, and appearance, of fair and impartial administration

7

of justice." *Id.* at 3.  The Court concluded that the District Judge had "r[u]n afoul" of the Code of Conduct for United States Judges, and "the appearance of impartiality . . . was compromised by the District Judge's improper application" of the "related case rule" and "by a series of media interviews and public statements purporting to respond publicly to criticism of the District Court." *Id.* at 2-3.

After this Court issued its mandate, the District Judge issued a press release expressing her disagreement with the Court's order.  *See, e.g.*, Joseph Goldstein, *Court Blocks Stop-and-Frisk Changes for New York Police*, N.Y. Times, Oct. 31, 2013.  Several days later, through counsel, the District Judge filed a motion requesting leave to seek reconsideration or rehearing *en banc*.  Dkt. Nos. 261 (*Floyd*); 188 (*Ligon*).  On November 9, 2013, the District Judge filed a letter "urg[ing] the panel to withdraw, without prejudice" the Order's reassignment so as to end an "unseemly dispute among judges."  Dkt. Nos. 266 (*Floyd*), 191 (*Ligon*).

On November 8 and 11, 2013, respectively, the *Ligon* and *Floyd* Plaintiffs moved for rehearing *en banc*.  Dkt. Nos. 185 (*Ligon*), 267 (*Floyd*).

## ARGUMENT

### POINT I

### THERE IS NO BASIS FOR REHEARING *EN BANC*

All Movants request that the Court reconsider *en banc* the Panel's finding that the District Judge ran afoul of the Judicial Code of Conduct.  Not a single

8

motion addresses the legal standard for *en banc* reconsideration.  This Court will only grant rehearing *en banc* if "necessary to secure or maintain uniformity of the court's decisions" or if the "proceeding involves a question of exceptional importance."  Fed. R. App. P. 35(b)(A), (B).  Movants challenge a single sentence of the Order, which quotes the Code of Conduct for U.S. Judges and identifies the conduct at issue.  Order at 2-3.  The Order is not a published decision of the Court, and there is no genuine argument that it creates any kind of intra-circuit conflict.  The factbound questions as to whether a judge violated the Code of Conduct and whether a new district judge will receive these cases on remand are not questions of "exceptional importance" warranting further review by the full Court.

## POINT II

## THE PANEL HAD THE DISCRETION TO ACT *SUA SPONTE*

This Court has the discretion to exercise its supervisory powers for the purpose of reassigning a matter to a new district judge.  *See In re IBM Corp.*, 45 F.3d 641, 645 (2d Cir. 1995); 28 U.S.C. § 2106.  The "appellate court's authority to order reassignment of a case to a different judge does not rest on the recusal statutes alone but also on the statutory power to 'require such further proceedings to be had as may be just under the circumstances.'"  *IBM*, 45 F.3d at 645; *see also Liteky v. United States*, 510 U.S. 540, 554 (1994).  While reassignment was the only reasonable course given the Court's well-founded concern with the District

Judge's conduct below, the fact of reassignment itself does not require notice to the district judge. *See, e.g.*, *Microsoft*, 253 F.3d at 107-16.

As this Court has recognized, "[t]o reassign a case on remand" the Court "need only find that the facts might reasonably cause an objective observer to question [the judge's] impartiality, or . . . that reassignment is advisable to preserve the appearance of justice." *United States v. Londono*, 100 F.3d 236, 242 (2d Cir. 1996) (internal citations omitted), *abrogation on other grounds recognized by United States v. Suleiman*, 208 F.3d 32, 37 n.1 (2d Cir. 2000).

The District Judge plainly has no proprietary interest in retaining a case. This Court regularly remands cases to a different district judge without granting notice. *See, e.g.*, *Cullen v. United States*, 194 F.3d 401, 407 (2d Cir. 1999) (vacating judgment of district court and remanding to a different district judge); *United States v. Campo*, 140 F.3d 415, 420 (2d Cir. 1998) (same). While this Court does not reassign as a matter of course, the Seventh Circuit does, making clear that there is nothing unusual about doing so. *See* 7th Cir. R. 36 (all cases remanded for new trial will be reassigned unless the remand order specifies to the contrary or the parties request the original district judge).

10

### A.     The District Judge Had No Right To Be Heard Before Reassignment

The Movants contend that because the Court reassigned the matter based upon misconduct findings, the District Judge had a right to notice and the opportunity to be heard.  That is not the law.  The Court's order reassigning the District Judge does not constitute a sanction against her, and it does not trigger any right to her personal intervention in the appellate process.

In *Microsoft*, 253 F.3d at 107-16, for instance, the D.C. Circuit granted a motion to disqualify the trial judge based upon numerous press interviews given during a high-profile bench trial.  The court's opinion discussed the district judge's conduct at length, and found that his ethical violations were "deliberate, repeated, egregious, and flagrant."  *Id.* at 107.  The court, however, did not invite the district judge's participation in the matter, and expressly declined to remand for an evidentiary hearing, given that the press articles essentially spoke for themselves, and their accuracy was not challenged by any party.  *See id.* at 108-09.

In this case, the Movants contend that FRAP 21 should have given the District Judge a right to be heard.  By its terms, however, FRAP 21 sets the procedures only for writs of mandamus and other extraordinary writs, and this is not a mandamus proceeding.  Even if FRAP 21 set the governing standard, that rule would preclude any right to participation by the trial judge.  FRAP 21 provides

11

the Court with **discretion** to provide notice; it does not **require** it.  *See* Fed. R. App. P. 21(b)(4) ("The court of appeals may invite or order the trial-court judge to address the petition or may invite an amicus curiae to do so.").  While the trial judge may "request permission" to respond, *id.*, the rule affirmatively prohibits the judge from submitting a response "unless invited or ordered to do so."  *Id*.[2]

Indeed, the case law in mandamus proceedings confirms that the trial judge ordinarily should not participate, and a judge who files papers without invitation risks disqualification, precisely because such a filing conflicts with the judge's role as disinterested arbiter.  Thus, in *United States v. Amico*, 486 F.3d 764, 776 (2d Cir. 2007), this Court cited the district judge's decision to respond to a mandamus petition, without having been invited to do so, as a factor in support of disqualification.  *Id.*; *see also* Wright & Miller, *Fed. Practice & Procedure* § 3967.1 (4th ed. 2013) ("[I]f the trial-court judge makes an uninvited response to a petition without obtaining the court of appeals' permission, that in itself may

---

[2] In *Kensington Int'l Ltd. v. Republic of Congo*, 461 F.3d 238, 242 (2d Cir. 2006), the Court cited FRAP 21(b), in dicta, for the proposition that in a mandamus proceeding, "we generally must give the district judge notice and an opportunity to respond."  *Id.*  While the Court's observation may understate its discretion under FRAP 21(b), this is not a mandamus proceeding.

12

sometimes be a factor that contributes to a conclusion that the trial-court judge's impartiality could reasonably be questioned.").[3]

In this case, the District Judge's affirmative steps, since the Court's Order, serve only to validate the Order. The judge's press release criticizing this Court's Order, the uninvited brief seeking rehearing *en banc*, and the November 9 Letter characterizing the Order as an "unseemly dispute among judges" confirm that reassignment was within the Court's discretion.[4]

### B.    Movants' Timeliness Objection Is Inapposite

The *Floyd* Plaintiffs argue that this Court could not grant reassignment *sua sponte* where, as here, the City did not timely request it. *See Floyd* Motion at 9-10. In so doing, they rely upon cases barring litigants from misusing a recusal motion by "holding back a recusal application as a fall-back position in the event of adverse rulings on pending matters." *IBM*, 45 F.3d at 643. Where, as here, the Court acts *sua sponte*, the specter of gamesmanship cannot arise. This Court was

---

[3] The Motion to Address Disqualification cites two mandamus cases where the Court exercised its discretion to appoint counsel to represent the trial judge, *see* Motion at 7-8, but in both cases, the parties were aligned against the district judge. Absent the appointment of counsel, no party would have opposed the petition.

[4] The District Judge, through counsel, continues to speak with the press, criticizing the Court's Order as a "personal attack," and indicating that she will file an uninvited opposition to the City's motion to vacate. *See* Mark Hamblett, *Plaintiffs Say Stop-and-Frisk Panel Should Be Replaced*, N.Y. L.J., Nov. 13, 2013. The District Judge has become, essentially, a vested party to this proceeding, validating the Court's earlier Order.

13

well aware that the City had not sought reassignment.  Nonetheless, the Court

correctly concluded that "the interest, and appearance, of fair and impartial

administration of justice," warranted reassignment on remand.  Order at 3.

### POINT III

### THE ORDER WAS WITHIN THE COURT'S DISCRETION UNDER THE CIRCUMSTANCES

As this Court has explained, "[a] judge is required to recuse in any

proceeding in which his impartiality might reasonably be questioned, and the test

to be applied is an objective one which assumes that a reasonable person *knows*

*and understands all the relevant facts*."  *IBM Corp.*, 45 F.3d at 643 (citation

omitted) (quoting 28 U.S.C. § 455(a)).  In buttressing the recusal statute in the

1970s, "Congress aimed to promote public confidence in the judiciary."  *In re*

*Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988).

### A.    The District Judge's Press Statements

The Courts of Appeals, including this Court, have recognized that trial

judges tread a perilous line when they elect to give press interviews in connection

with high-profile cases.  *See Microsoft*, 253 F.3d at 112; *In re Boston's Children*

*First*, 244 F.3d 164 (1st Cir. 2001); *IBM*, 45 F.3d 641; *United States v. Cooley*, 1

F.3d 985 (10th Cir. 1993).  In making out-of-court statements to the press, the trial

judge creates the appearance of a personal interest in the case, and invites

14

reasonable observers to question whether the judge is a participant in the
controversy, rather than the neutral arbiter of it.

In *Boston's Children First*, for instance, the First Circuit ordered the trial
judge disqualified after she had sent a letter to the editor and granted a press
interview to respond to alleged misrepresentations by plaintiffs' counsel in a high-
profile class action. 244 F.3d at 165. Even though the judge sought only to correct
the record, her comments compromised her appearance of impartiality:

> [I]n newsworthy cases where tensions may be high, judges should be
> particularly cautious about commenting on pending litigation.
> Interested members of public might well consider [such] actions as
> expressing an undue degree of interest in the case . . . . In fact, the
> very rarity of such public statements, and the ease with which they
> may be avoided, make it more likely that a reasonable person will
> interpret such statements as evidence of bias.

*Id.* at 169-170. The Tenth Circuit reached the same conclusion in *Cooley*,
reasoning that the judge's press interviews created the perception that the district
judge had "an uncommon interest and degree of personal involvement in the
subject matter." *Cooley*, 1 F.3d at 995. Given that it is "unusual" for judges to
make statements to the press, the judge's statements "unavoidably created the
appearance that the judge had become an active participant . . . rather than
remaining as a detached adjudicator." *Cooley*, 1 F.3d at 995; *see also White v.
Nat'l Football League*, 585 F.3d 1129, 1140 (8th Cir. 2009) ("Judges should not
create the impression that they covet publicity. '[I]n order to be and remain

15

impartial, and to be "perceived" as impartial, the judge must be above the fray, not

become an advocate in it.'").

Finally, in *Microsoft*, the D.C. Circuit faulted the trial judge for giving a

series of press interviews describing the matters at issue in the case:

> Rather than manifesting neutrality and impartiality, the reports of the
> interviews with the District Judge convey the impression of a judge
> posturing for posterity, trying to please the reporters with colorful
> analogies and observations bound to wind up in the stories they write.
> Members of the public may reasonably question whether the District
> Judge's desire for press coverage influenced his judgments, indeed
> whether a publicity-seeking judge might consciously or
> subconsciously seek the publicity-maximizing outcome.

*Microsoft*, 253 F.3d at 115.[5]

In this case, a reasonable observer could only conclude that whatever her

subjective beliefs, the District Judge's comments to three different reporters

created the impression that she took pride in ruling against the government, she

viewed herself as "an active participant" in the matter, and she had "become an

---

[5] Ignoring this body of law, the *Floyd* Plaintiffs cite three cases, *see Floyd* Motion
at 14, that are readily distinguishable. *See In re Marshall*, 721 F.3d 1032, 1044
(9th Cir. 2013) (finding the judge's press conference in open court "highly unusual
and of some concern," but not warranting disqualification because it mostly
concerned "courtroom procedures and policies"); *Andrade v. Chojnacki*, 338 F.3d
448, 459-60 (5th Cir. 2003) (finding that the judge's comments would warrant
disqualification if true, but declining to disqualify judge in the absence of "context
and without verification of [their] accuracy"); *United States v. Haldeman*, 559 F.2d
31, 130-38 & n.275 (D.C. Cir. 1976) (en banc) (per curiam) (applying the pre-1974
version of 28 U.S.C. § 455, which set a higher standard for disqualification).

16

advocate" who "consciously or subconsciously [sought] the publicity-maximizing outcome."  As summarized above, *see supra* at 5-7, in several interviews, the District Judge freely discussed her attitude toward the government; the personal satisfaction and "vindication" she took over the results in particular cases; her distaste for the City's apparent dissemination of statistics concerning her past Fourth Amendment rulings; and her conviction that she was more independent and believed more strongly in the Bill of Rights than colleagues of hers who also have sworn to uphold the Constitution.

That the District Judge made these statements at the very same time that she was serving as both judge and jury in "one of the most significant civil rights cases in a generation," *Floyd* Motion at 1, compromises, as the Court put it, "the appearance of impartiality surrounding this litigation."  Order at 2.  A reasonable observer could only conclude that a judge who prides herself on being "gutsy" and not being a "government judge," for having a strong "belie[f] in the Bill of Rights," and for seeking to "live for" the day when she could have "a national impact" could reasonably be viewed as someone partial to declaring that the NYPD had committed at least 200,000 constitutional violations, and thus should be placed under the indefinite supervision of the District Judge.

In fact, a reasonable observer could conclude based on these comments that the appearance of impropriety may have infected the substance of her rulings as

17

well, including the certification of a class comprised of millions of individuals who were stopped over an eight-year period, by different officers, under disparate circumstances, as well as her novel evidentiary rulings that allowed such a challenge to proceed based upon police paperwork, the UF-250 forms, that have never been used as the sole evidence to justify a single stop, much less 4.4 million.

## B.    The District Judge's Statements In *Daniels*

The Court also found that the District Judge had acted improperly by inviting Plaintiffs to file suit and misapplying the related case rule.  The District Judge not only advised Plaintiffs' counsel that if they were to file suit, she would accept the matter as related to *Daniels*, but she advised counsel how they could circumvent their obligation in *Daniels* to return the confidential NYPD data upon which they wished to rely.  *See Daniels* Tr. at 18 ("There is enough in the public record to craft the suit.  And then in the suit simply say, we want produced all that was produced in the 1999 lawsuit.  I don't know how you could lose getting it.").  For these reasons, and the reasons stated in the City's August 12, 2013 Motion to Vacate, the Court correctly found that the District Judge's actions compromised the appearance of impartiality.  *See* Dkt. Nos. 265 (*Floyd*), 190 (*Ligon*) at 4 n.1, 7-11 & nn.4-6.  The District Judge's marking and accepting a number of cases alleging ***individual*** unlawful stop and frisks, *id.* at 8 n.4, only lends further support

18

to the reasonable perception that she had a personal interest in this controversy and that she had facilitated Plaintiffs' efforts to "judge shop" in these matters.

## CONCLUSION

For the above reasons, the Police Intervenors respectfully request that the Court deny the pending motions to vacate or reconsider en banc the Court's October 31, 2013 Order.

Dated:       November 13, 2013
               New York, New York

Respectfully submitted,

/s/ Steven A. Engel
Steven A. Engel
Edward A. McDonald
James M. McGuire
Elisa T. Wiygul
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036
T: (212) 698-3693
F: (212) 698-3599
steven.engel@dechert.com

*Attorneys for the Patrolmen's Benevolent Association of the City of New York, Inc., the Detectives Endowment Association, Inc., the Lieutenants Benevolent Association of the City of New York, Inc., and the Captains' Endowment Association of New York, Inc.*